

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 26, 2020**

*Hardin DeWayne Hale*

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-33868-15** |
| **EAGLE ENERGY INC.**[1] | § | |
| | § | **Chapter 15** |
| Debtor in a foreign proceeding. | § | |
| | § | **Jointly Administered** |

**ORDER (I) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' UNITED STATES ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) RECOGNIZING AND GIVING FULL FORCE AND EFFECT TO THE ORDER OF THE CANADIAN COURT APPROVING THE SALE OF SUCH ASSETS, AND (III) GRANTING RELATED RELIEF**

FTI Consulting Canada Inc. ("**FTI**") solely in its capacity as court-appointed receiver (the

"**Receiver**") of (1) Eagle Energy Inc. ("**Eagle Energy**"), (2) Eagle Energy Trust ("**Eagle Trust**"),

(3) Eagle Energy Holdings Inc. ("**Eagle Holdings**"), and (4) Eagle Hydrocarbons Inc. ("**Vendor**")

---

[1]    The Debtors are: (1) Eagle Energy Inc., (2) Eagle Energy Trust, (3) Eagle Energy Holdings Inc., and (4) Eagle Hydrocarbons Inc.

(collectively, "**Eagle**" or "**Debtors**") filed an *Expedited Motion for Order (I) Approving Sale of Certain of the Debtors' United States Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Recognizing and Giving Full Force and Effect to the Order of the Canadian Court Approving the Sale of Such Assets, and (III) Granting Related Relief* (the "**U.S. Sale Motion**").[2]

On November 19, 2019, White Oak Global Advisors, LLC, as the administrative agent (in such capacity, the "**Agent**") under that certain *Loan and Security Agreement* dated as of March 13, 2017, for itself and for and on behalf of a group of lenders on whose behalf White Oak Global Advisors, LLC signed (collectively, and in such capacity, the "**Lenders**"), filed an Application (Receivership Order) in the Canadian Proceedings (as defined below) seeking the appointment of FTI as receiver under section 243 of the Bankruptcy and Insolvency Act (the "**BIA**"), RSC 1985 c B-3 and section 13(2) of the Judicature Act, RSA 2000 c J-2 in the Court of Queen's Bench of Alberta, Judicial Centre of Calgary (the "**Canadian Court**") in the proceeding styled *In the Matter of the Receivership of Eagle Energy Inc.* et. al, Alberta Court of Queen's Bench File No. 1901-16293 (the "**Canadian Proceedings**").

On November 19, 2019, the Canadian Court, Honorable Justice R.A. Neufeld, granted a Receivership Order in Alberta Court of Queen's Bench File No. Court File No. 1901-16293 (the "**Receivership Order**") appointing FTI as the Receiver and manager of the Debtors.

On November 20, 2019 (the "**Petition Date**"), the Receiver filed Official Form No. 401 Chapter 15 petitions for each of the Debtors pursuant to 11 U.S.C. §§ 1504, 1509(a) and 1515(a), commencing the above-referenced chapter 15 cases (the "**Chapter 15 Cases**") [Dkt. No. 35, p. 2, ¶D.].

---

[2]   Capitalized terms used herein but not otherwise defined have the meanings given to such terms in the PSA (as defined below), and if not defined therein, the U.S. Sale Motion.

On December 5, 2019, this Court entered the *Order (I) Granting Expedited Petition For Recognition As Foreign Main Proceeding Pursuant To Sections 1515 And 1517 Of The United States Bankruptcy Code And Related Relief And (II) Authorizing Receiver's Limited Use Of Cash Collateral* ("**Recognition Order**") [Dkt. No. 35].

On February 11, 2020, the Receiver filed with the Canadian Court the *Application Approval of Sale Process and Order Sealing* ("**Canadian Application**") requesting authorization to implement the Sale Process (as defined in the Canadian Application).

On February 20, 2020, the Canadian Court entered an *Order Approval of Engagement and Sale Process* ("**Canadian Sale Process Order**") authorizing and directing the Receiver to implement the Sale Process in respect of the Debtors.

On February 24, 2020, this Court entered *Order Granting Receiver's Expedited Motion for Approval of Sale Process* (the "**Sale Process Order**") approving, among other things, the Sale Process as described in the Canadian Sale Process Order and in the Canadian Application for assets of the Debtors located in the territorial jurisdiction of the United States [Dkt. No. 57].

On May 28, 2020, Aguila Energy, LLC, a Delaware limited liability company and an affiliate of the Agent (the "**Purchaser**") executed that certain *Purchase and Sale Agreement* whereby Purchaser proposed to purchase all of the right, title, and interest of the Assets of Vendor located in the United States free and clear of all Liens, Claims, and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) (the "**PSA**"), subject to and in accordance with the terms and conditions of the PSA, an abridged copy of which is annexed to this Order as **Exhibit A**.[3]

---

[3]   For the avoidance of doubt, the "Excluded Assets" as defined in the PSA shall be retained by Vendor and not sold and transferred to Purchaser in accordance with the PSA. The Excluded Assets include without limitation (a) all

On May 29, 2020, the Receiver filed with the Canadian Court an *Amended Application (Sale of Eagle Hydrocarbons Inc. Assets to White Oak Global Advisors LLC)* ("**Canadian Sale Motion**").

On June 2, 2020, the Canadian Court entered a *Sale Approval and Vesting Order (Sale by Receiver)* ("**Canadian Sale Order**"), a copy of which is annexed to this Order as **Exhibit B**.

On June 3, 2020, the Receiver filed with this Court the U.S. Sale Motion.

The Court finds that notice of the U.S. Sale Motion and the relief requested therein was proper given the circumstances and that no creditor, equity interest holder, or other party-in-interest made any response in opposition to the U.S. Sale Motion or, if so, the relief requested in any such response was denied for the reasons stated on the record of this Court. Based upon all evidence submitted and argument in support of the U.S. Sale Motion, including all declarations and affidavits filed and the proffer or testimony of witnesses, as well as the record of and docket filings in these Chapter 15 Cases, of which the Court takes judicial notice, the Court further finds that the relief requested is in the best interests of the Debtors, their creditors, equity interest holders, and other parties-in-interest and should be **GRANTED**:

**THE COURT HEREBY FINDS AS FOLLOWS:**

<u>**JURISDICTION, NOTICE, FINAL ORDER, AND STATUTORY BASES**</u>

1.     This Court has jurisdiction to hear and determine the U.S. Sale Motion pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), 1334(a) and sections 1501, 1507, 1520, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"). This is a core proceeding pursuant to 28 U.S.C.

---

employment contracts with any of the Debtors and (b) that certain Lease dated as of September 22, 2017 by and between Energy Tower IV Investments LTD and Eagle Hydrocarbons.

§ 157(b)(2)(A), (N), and (P). Venue is proper in this District and in this Court pursuant to 28 U.S.C. § 1410.

2.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding anything to the contrary, including Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs that this Order constitute an entry of judgment.

3.      The statutory predicates for the relief requested in the U.S. Sale Motion and granted herein are, *inter alia*, sections 105(a), 363(b), (f), (k), and (m), 365, 1501, 1507, 1520 and 1521 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006, 9007, and 9014.

4.      The Canadian Court has duly entered the Canadian Sale Order, a copy of which is annexed to this Order as **Exhibit B**, which, among other things: (i) approves the sale of the Assets to the Purchaser; and (ii) requests aid and recognition from this Court to give effect to the Canadian Sale Order.

5.      Proper, timely, adequate and sufficient notice of the U.S. Sale Motion and the hearing thereon has been provided in accordance with sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 6004, 6006, 9007, and 9014, and in compliance with the Local Rules and the Sale Process Order, including to all parties listed on the Receiver's certificate of service [Dkt. No. [●]] (including without limitation to Energy Tower IV Investments LTD and Billy J. Perryman, Inc.). The foregoing notice was good, sufficient and appropriate under

the circumstances, and no other or further notice of the U.S. Sale Motion, the hearing thereon, the PSA or the Transaction is required. The disclosures made by the Debtors concerning the U.S. Sale Motion, the hearing thereon, the PSA, and the Transaction were sufficient, complete and adequate.

## VALIDITY OF TRANSFER

6.     The Receiver has full corporate power and authority to execute and deliver the PSA and all other documents contemplated thereby, and no further consents or approvals are required for the Vendor or the Receiver to consummate the Transaction contemplated by the PSA, except as otherwise set forth in the PSA.

7.     The sale, transfer, and assignment of each of the Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective sale, transfer, and assignment of such Assets, and each such sale, transfer and assignment vests or will vest the Purchaser with all right, title, and interest of the Vendor and the Receiver in and to the Assets free and clear of all Liens, Claims, Encumbrances, and other interests (other than Permitted Encumbrances and Assumed Liabilities) of any kind or nature whatsoever against the Receiver, the Vendor, the other Debtors, or any of the Assets accruing, arising, or relating to facts or circumstances any time prior to the Closing (collectively, "**Free and Clear**").

## GOOD FAITH OF PURCHASER

8.     Purchaser is not an "insider" of any of the Debtors, as defined in section 101(31) of the Bankruptcy Code.

9.     The Vendor and the Receiver have demonstrated compelling circumstances and a good, and sufficient business purpose and justification for the sale of the Assets Free and Clear to Purchaser.

10.     Purchaser is purchasing the Assets in good faith and is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser is, therefore, entitled

to the full protections of section 363(m) of the Bankruptcy Code and has proceeded in good faith in all respects in connection with this proceeding.

11.     The Purchase Price was not controlled by any agreement among potential bidders at such sale and neither the Vendor or the Receiver, nor the Purchaser engaged in collusion or any other conduct that would cause or permit the PSA or Transaction to be avoidable under section 363(n) of the Bankruptcy Code.

12.     The PSA was negotiated at arm's length and in good faith and represents a fair and reasonable offer to purchase the Assets under the circumstances of these Chapter 15 Cases. The Purchase Price being paid by the Purchaser represents the highest and best offer for the Assets resulting from the sale process, and constitutes a valid and sound exercise of the Receiver's business judgment.

13.     Approval of the U.S. Sale Motion and the PSA, and the consummation of the Transaction are in the best interests of the Vendor, its creditors, equity interest holders and all other parties-in-interest.

## SATISFACTION OF SECTION 363(F) OF THE BANKRUPTCY CODE

14.     In connection with the PSA, the Purchaser expressly negotiated for the protection of obtaining the Assets Free and Clear. The Purchaser would have paid substantially less consideration for the Assets or not purchased the Assets if the Purchaser were not purchasing the Assets Free and Clear.

15.     For the following reasons, the provisions of section 363(f) of the Bankruptcy Code have been satisfied:

    i.      All alleged holders of Liens, Claims, Encumbrances, or other interests who did not object or withdrew their objections to the Transaction contemplated by the PSA are deemed to have consented to the Transaction and the relief provided for in this Order. Alleged holders of Liens, Claims, Encumbrances or other interests who did object either had their objections overruled or

                    resolved or otherwise fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code, including those referenced below.

    ii.      The Receiver is not aware of any remaining Liens, Claims, or Encumbrances against or other interests in the Assets, and, if any such Liens, Claims, or Encumbrances or other interests exist, they are in *bona fide* dispute as to the extent, validity, perfection, and/or viability of those Liens, Claims, or Encumbrances or other interests pursuant to section 363(f)(4) of the Bankruptcy Code.

    iii.     Other parties (if any) could be compelled to accept a money satisfaction of their Liens, Claims, Encumbrances, or other interests, or such Encumbrances (*see* Bankruptcy Code section 363(f)(5)) or such interest is a Lien and the price at which such encumbered property is to be sold under the PSA is greater than the aggregate value of all Liens on such encumbered property (*see* section 363(f)(3) of the Bankruptcy Code).

16.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets will be transferred to the Purchaser Free and Clear. All of the Agent's and/or the Lenders' Liens or Encumbrances in property of the Debtors not constituting the Assets shall remain in full force and effect and in the same order of priority.

17.     Accordingly, the Debtors and the Receiver have satisfied the standard set forth in section 363(f) of the Bankruptcy Code for selling the Assets Free and Clear.

18.     To the greatest extent permitted by law, neither the Purchaser nor its affiliates, officers, directors, members, partners, and principals or any of their respective representatives, professionals, successors, or assigns shall be deemed, as a result of the consummation of the Transaction contemplated by the PSA or otherwise, to (i) be a legal successor, or otherwise be deemed a successor, to the Debtors, (ii) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors, (iii) be an alter ego, a continuation, or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, or (iv) be liable for any Claim based on successor liability, transferee liability, derivative liability, vicarious liability, or any similar theories under applicable state or federal law, or otherwise. Except as expressly set forth in the

PSA with respect to the Permitted Encumbrances and Assumed Liabilities, the Purchaser shall have no liability or obligation of any of the Debtors and the Purchaser is not expressly or impliedly agreeing under the terms and conditions of the PSA to assume any of the debts or obligations of any of the Debtors. Any so-called "bulk sales," "bulk transfer," or other similar laws are not applicable, and compliance with such any such laws in all necessary jurisdictions is not required, including those relating to taxes.

19.     The Purchaser, the Receiver, and the Vendor are not entering into the PSA fraudulently or in order to escape liability for any of the Debtors' debts or obligations.

## COMPELLING CIRCUMSTANCES FOR IMMEDIATE SALE

20.     To maximize the value of the Assets to the Vendor, creditors and parties-in-interest, it is essential that the Closing of the sale occur within the time constraints set forth in the PSA. Time is of the essence in consummating the Transaction as set forth in the PSA, therefore, it is essential that the Closing of the Transaction occur as soon as possible.

21.     Given all of the circumstances of these Chapter 15 Cases and the adequacy and fair value of the Purchase Price under the PSA, the Transaction constitutes a reasonable exercise of the Vendor's and Receiver's business judgment and should be approved.

22.     The consummation of the Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(k), 363(m), and 365 of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Transaction.

## AND THE COURT HEREBY ORDERS THAT:

23.     The relief requested in the U.S. Sale Motion is **GRANTED**. The Transaction contemplated by the U.S. Sale Motion and the PSA are approved as set forth in this Order.

24.     All objections to the U.S. Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled by stipulation filed with this Court or as otherwise provided in this Order are hereby overruled on the merits.

25.     The Canadian Sale Order entered in the Canadian Proceedings, a copy of which is attached to this Order as **Exhibit B**, is hereby granted comity, recognized, and given full force and effect in the United States.

26.     Given all of the circumstances of these Chapter 15 Cases and the record before this Court, the Transaction constitutes a reasonable exercise of the Vendor's and Receiver's business judgment and is approved.

27.     The PSA and all other ancillary documents, if any, and all of the terms and conditions thereof, are hereby approved, including without limitation the releases set forth in section [9.6] of the PSA.

28.     Pursuant to sections 363(b) and (f) and 365 of the Bankruptcy Code, the Vendor and Receiver are authorized, empowered, and directed to take any and all actions necessary or appropriate to: (a) consummate the sale of the Assets pursuant to and in accordance with the terms and conditions of the PSA, (b) close such Transaction as contemplated in the PSA and this Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the PSA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the PSA and the Transaction contemplated thereby, including any ancillary documents or documents as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the PSA and such other ancillary documents. Such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets and shall be Free and Clear.

Upon the Closing, Purchaser shall take title to and possession of the Assets on a Free and Clear basis.

29.     Neither the Purchaser nor their affiliates shall be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the PSA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of the PSA and this Order.

30.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale and payment of applicable Cure Costs identified on **Exhibit J** to the PSA, the Debtors' assumption and assignment of the Assigned Contracts identified on **Exhibit C** to the PSA to Purchaser pursuant to the terms set forth in the PSA, is hereby approved, and the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code) with respect thereto are hereby deemed satisfied. Each counterparty to the Assigned Contracts is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtors, the Receiver, or Purchaser, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinate) arising under or out of, in connection with, or in any way related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing or otherwise.

31.     Purchaser has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy

Code). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment to the Purchaser of the Assigned Contracts have been satisfied.

32.     Purchaser is hereby authorized, in its sole and absolute discretion, pursuant to section 2.6 of the PSA, to (a) deliver to Vendor, within one day prior to the Closing Date, notice of its election to designate any Contract as (1) an Excluded Contract and/or (2) an Assigned Contract and upon such designation such Contract shall constitute an Excluded Contract and/or an Assigned Contract, as the case may be; and (b) within one day prior to the Closing Date, make any corresponding modification to the applicable Cure Costs identified on **Exhibit J** to the PSA.

33.     This Order shall be binding in all respects upon the Receiver, the Debtors, creditors, all holders of equity interests in any of the Debtors, all holders of any Claim(s), whether known or unknown, against any Debtor, any holders of Liens, Claims, Encumbrances and/or other interests against or on all or any portion of the Assets, any parties-in-interest, all contract counter-parties, the Purchaser and all successors and assigns of the Purchaser, and any trustees, examiners, responsible officers, or similar entities for any of the Debtors, if any, subsequently appointed in any of the Debtors' Chapter 15 Cases or upon a conversion to Chapter 11 or Chapter 7 under the Bankruptcy Code or dismissal of any of the Debtors' Chapter 15 Cases. This Order and the PSA shall inure to the benefit of the Receiver, the Vendor, the Debtors, the Purchaser and their respective successors and assigns.

34.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons

and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transaction contemplated by the PSA.

35.    All persons or entities other than the Vendor, if any, that are in possession of some or all of the Assets and any certificates of title, instruments or other indicia of title representing or evidencing ownership of the Assets which have been pledged as security in respect of the Assets (the "**Indicia of Ownership**") are directed to surrender possession of such Assets and Indicia of Ownership. The Receiver and the Vendor shall exercise commercially reasonable efforts to assist the Purchaser in assuring that all persons or entities in possession of some or all of the Assets will surrender possession of the Assets and Indicia of Ownership to (a) the Vendor before the Closing Date or (b) the Purchaser on or after the Closing Date. All persons or entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Receiver and the Vendor to sell and transfer the Assets to Purchaser in accordance with the terms of the PSA and this Order.

36.    Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Assets shall be Free and Clear, including, but not limited to, any and all Claims pursuant to any successor or successor-in-interest liability theory.

37.    All persons and entities holding Liens, Claims, Encumbrances, or other interests in or against all or any portion of the Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtor's businesses prior to the Closing Date or the transfer of the Assets to Purchaser, hereby are forever barred, estopped and

permanently enjoined from asserting against Purchaser or its successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims, Encumbrances, or other interests, in any, in and to the Assets whether by payment, setoff, or otherwise.

38.    On the Closing Date, each party-in-interest is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens, Claims, Encumbrances, and other interests on the Assets, if any, as provided for herein, as such Liens, Claims, Encumbrances, and other interests may have been recorded or may otherwise exist.

39.    This Order shall be effective as a determination that, as of the Closing Date, all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever existing as to the Assets prior to the Closing Date have been unconditionally released, discharged and terminated and that the Free and Clear conveyances described herein have been effected.

40.    If any person or entity that has filed statements or other documents or agreements evidencing Liens, Claims, Encumbrances, or other interests on or in, all or any portion of the Assets (a "**Claim Holder**") has not delivered to the Receiver, the Debtors, or Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to Purchaser for the purpose of documenting the release of all Liens, Claims, Encumbrances, or other interests that such Claim Holder has or may assert with respect to all or any portion of the Assets, then the Debtors, the Receiver, or the Purchaser are authorized to execute and file such statements, instruments, releases, and other documents on behalf of such Claim Holder with respect to the Assets and each and every filing office, agency, clerk, or recorder is authorized and directed to accept same. Purchaser is authorized to file, register, or otherwise record a certified copy of this Order with the appropriate filing office, agency, clerk, or recorder,

which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the sale of the Assets Free and Clear, including the release of all Liens, Claims, Encumbrances, and other interests in the Assets as of the Closing Date of any kind or nature whatsoever.

41.     All Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Vendor or the Receiver to sell and transfer the Assets to Purchaser in accordance with the terms of the PSA and this Order.

42.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel or release any of the Liens, Claims, Encumbrances, or other interests of record.

43.     To the greatest extent permitted by law, neither the Purchaser nor its affiliates, officers, directors, members, partners, and principals or any of their respective representatives, professionals, successors, or assigns shall be deemed, as a result of the consummation of the Transaction contemplated by the PSA or otherwise, to (i) be a legal successor, or otherwise be deemed a successor, to the Debtors, (ii) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors, (iii) be an alter ego, a continuation, or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, or (iv) be liable for any Claim based on successor liability, transferee liability, derivative liability, vicarious liability, or any similar theories under applicable state or federal law, or otherwise. Except as expressly set forth in the PSA with respect to the Permitted Encumbrances and Assumed Liabilities, the Purchaser shall have no liability or obligation of any of the Debtors and the Purchaser is not expressly or impliedly agreeing under the terms and conditions of the PSA to assume any of the debts or obligations of any of the Debtors. Any so-called "bulk sales," "bulk transfer," or other similar laws are not

applicable, and compliance with such any such laws in all necessary jurisdictions is not required, including those relating to taxes.

44.      Purchaser shall not be liable for any Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever in or against the Debtors, the Receiver or any of their predecessors or affiliates, or the Assets, and Purchaser shall have no successor or vicarious liabilities of any kind or character including, but not limited to, liabilities on account of any tax arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing of the Transaction (except as agreed to in the PSA), and Purchaser shall be exonerated of any successor liability to any state or federal taxing authority with regard to any tax, including any sales or property tax.

45.      Under no circumstances shall Purchaser be deemed a successor of or to the Debtors for any Liens, Claims, Encumbrances, or other interests of any kind or nature whatsoever against or in the Debtors or the Assets. The sale, transfer, assignment and delivery of the Assets shall not be subject to any Liens, Claims, Encumbrances, or other interests of any kind or nature whatsoever, which shall remain with, and continue to be obligations of, the Vendor. Following the Closing, no holder of any Lien, Claim, Encumbrance or other interest shall interfere with Purchaser's title to or use and enjoyment of the Assets based on or related to such Lien, Claim, Encumbrance or other interest, or any actions that the Receiver or the Debtors may take in these Chapter 15 Cases.

46.      Purchaser shall be authorized, as of the Closing, to operate under any governmental authority, license, permit, registration, authorization or approval of or given to the Vendor with respect to the Assets, and all such licenses, permits, registrations and authorizations and approvals shall be and shall be deemed to have been transferred to Purchaser as of the Closing.

US 7041926v.12

47.     Except as otherwise expressly set forth in this Order or the PSA, Purchaser shall not have any liability or other obligation of the Debtors or the Receiver arising under or related to any of the Assets.

48.     The Transaction is undertaken by Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transaction, unless such authorization and consummation of the Transaction are duly stayed pending such appeal. Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

49.     Neither the PSA nor the Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.

50.     Purchaser is authorized in connection with consummation of the PSA to allocate the Assets, among its affiliates, designees, assignees, and/or successors in a manner as it in its discretion deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Assets to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded under this Order and the PSA, and the Vendor and the Receiver shall cooperate with and take all actions reasonably requested by Purchaser to effectuate any of the foregoing.

51.     Nothing contained in any plan of reorganization or liquidation, or equivalent-type document, or order of any type or kind entered in (a) the Canadian Proceedings, (b) these Chapter 15 Cases, (c) any subsequent Chapter 7 case into which any such Chapter 15 Cases may be

converted, or (d) any related proceeding subsequent to entry of this Order, shall affect, conflict with or derogate from the provisions of the PSA or the terms of this Order.

52.     No order concerning the distribution of the sale proceeds, no distribution of the sale proceeds, and no allocation in connection with either of the foregoing, whether based upon a valuation of the Assets or otherwise, shall affect or have an effect on:

    i.      Purchaser's tax basis, allocation, or other tax position regarding the Assets;

    ii.     the manner in which the Assets are valued by Purchaser for tax, accounting, or any other purposes; or

    iii.    how Purchaser accounts for the Assets in financial statements, or otherwise.

53.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Receiver, the Vendor and Purchaser are authorized, but are not required, to close the sale immediately upon entry of this Order, and any stay periods under the Bankruptcy Code, in Bankruptcy Rules 7062, 6004(h), or 6006(d) or otherwise, are expressly waived. Pursuant to the PSA, the Receiver may transfer possession of the Assets to the Purchaser immediately upon entry of this Order subject to the terms and conditions of the PSA. Immediately upon entry of this Order, all persons (including Claim Holders, landlords, or lessors) in possession or control of the Assets shall allow access to and possession of such Assets in favor of the Receiver or the Purchaser and shall not interfere with the Receiver's and the Purchaser's access to and possession of such Assets.

54.     To the extent that this Order is inconsistent with any prior order or pleading in these Chapter 15 Cases, the terms of this Order shall govern. To the extent that this Order is inconsistent with the Canadian Sale Order, the terms of this Order shall govern.

55.     To the extent there are any inconsistencies between the terms of this Order and the PSA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

56.     The Receiver and the Vendor are authorized to take all actions necessary or appropriate to effect the relief granted pursuant to this Order.

57.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact set forth herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law set forth herein constitute findings of fact, they are adopted as such.

58.     This Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Order, and to adjudicate, if necessary, any and all disputes concerning or relating to this Order.

# # # End of Order # # #

## Exhibit A

**Purchase and Sale Agreement**

*Execution Version*

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** is executed as of the 28th day of May, 2020 (the "Execution Date") by and between **FTI CONSULTING CANADA INC.**, solely in its capacity as the court-appointed receiver and manager of **EAGLE ENERGY INC.**, **EAGLE ENERGY TRUST**, **EAGLE ENERGY HOLDINGS INC.**, and **EAGLE HYDROCARBONS INC.**, and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., a Delaware corporation, hereinafter referred to as "**Vendor**"), and **AGUILA ENERGY, LLC**, a Delaware limited liability company (hereinafter referred to as "**Purchaser**")

**WHEREAS** pursuant to an order of the Honourable Justice R.A. Neufeld of the Alberta Court of Queen's Bench (the "**Court**") dated November 19, 2019 (the "**Appointment Order**"), FTI Consulting Canada Inc. ("**Receiver**") was appointed receiver and manager of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc., and Vendor (collectively, or any of them as the context requires, "**Eagle Energy**");

**WHEREAS** pursuant to an order dated November 22, 2019, and an order dated December 5, 2019, in each case, granted by the US Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**US Bankruptcy Court**") in the chapter 15 cases being jointly administered under case number 19-33868-hdh (the "**Chapter 15 Case**"), a temporary restraining order and certain relief pursuant to chapter 15 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, and collectively with the Federal Rules of Bankruptcy Procedure, the "**US Bankruptcy Code**") was granted, and the proceedings contemplated by the Appointment Order were recognized as the "foreign main proceeding" pursuant to the US Bankruptcy Code, respectively;

**WHEREAS** Vendor wishes to sell, and Purchaser wishes to purchase, all of the right, title and interest of Vendor in and to the Assets free and clear of all Encumbrances (as defined below), other than Permitted Encumbrances and Assumed Liabilities (each as defined below), and otherwise subject to and in accordance with the terms and conditions hereof; and

**AND WHEREAS** White Oak Global Advisors, LLC, as administrative agent under the Credit Agreement (as defined below), has assigned or will assign at or prior to Closing (as defined below), on behalf of itself and the lenders and other parties thereto, its rights in and to (a) debt outstanding under the Credit Agreement in an amount equal to $11,000,000 and (b) any and all Actions and Claims (each as defined below) arising under, or otherwise relating to, such debt under the Credit Agreement to Purchaser.

**NOW THEREFORE,** in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the Parties have agreed as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1    Definitions

In this Agreement, unless the context otherwise requires:

"**Abandonment and Reclamation Obligations**" means all past, present and future obligations to:

(a)    abandon, shut-down, close, decommission, dismantle or remove any and all Wells and Tangibles, including all structures, foundations, buildings, pipelines, equipment and other facilities located on the Properties or used or previously used in respect of Petroleum Substances produced or previously produced from the Properties; and

(b)    restore, remediate and reclaim the surface and subsurface locations of the Wells and the Tangibles and any lands used to gain access thereto, including such obligations relating

- 2 -

to wells, pipelines and facilities which were abandoned or decommissioned prior to the Closing Date that were located on the Properties or that were located on other lands and used in respect of Petroleum Substances produced or previously produced from the Properties, and including the remediation, restoration and reclamation of any other surface and sub-surface lands affected by any environmental damage, contamination or other environmental issues emanating from or relating to the sites for the Wells or the Tangibles;

all in accordance with generally accepted oil and gas industry practices and in compliance with all Applicable Laws;

"**Action**" means any legal action, demand, Claim, suit, cause of action or arbitration, or any inquiry, proceeding or investigation, in each case, by or before any Governmental Authority;

"**Affiliate**" means, with respect to any Person, any other Person or group of Persons acting in concert, directly or indirectly, that controls, is controlled by or is under common control with such Person.  The term "**control**" as used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person whether through ownership or more than fifty percent (50%) of the voting securities of such Person, by contract or otherwise. Notwithstanding anything to the contrary, in the case of Buyer, "Affiliate" includes White Oak Global Advisors, LLC and its Affiliates;

"**Applicable Law**" means, in relation to any Person, property or circumstance, all Laws, rules, official directives and orders of Governmental Authorities (whether administrative, legislative, executive or otherwise), including judgments, orders and decrees of courts, commissions or bodies exercising similar functions, as amended, and includes the provisions and conditions of any permit, license or other governmental or regulatory authorization, that are in effect as at the relevant time and are applicable to such Person, property or circumstance;

"**Appointment Order**" has the meaning set forth in the recitals;

"**Assets**" means all assets, rights, interests and properties of Vendor and its Affiliates (of whatever kind or character, real or personal, recorded or unrecorded, movable or immovable, tangible or intangible, vested or contingent, or otherwise) including all of Vendor's and its Affiliates' right, title, and interest in and to the following:

(a)    the Leases described in <u>Exhibit A-1</u>, any other Lease held by Vendor in any county listed on <u>Exhibit A-1</u>, and any other Lease on which any of the Wells described in <u>Exhibit B</u> are located or that are pooled or unitized with any of the Leases described in <u>Exhibit A-1</u> or any Wells described in <u>Exhibit B</u> (collectively, the "**Assigned Leases**"), all interests, tenements, hereditaments, and appurtenances belonging to or derived from the Assigned Leases, including all leasehold estates, royalty interests, overriding royalty interests, net revenue interests, executory interests, net profits interests, working interests, reversionary interests, mineral interests, production payments and other similar interests in the Assigned Leases, and the fee mineral interests described in <u>Exhibit A-2</u> (collectively, the "**Assigned Leases and Interests**");

(b)    all oil and gas wells (whether producing, inactive, temporarily or permanently abandoned, shut-in or otherwise) and any injection, disposal, or monitoring wells located on, or used or held for use in connection with, the Assigned Leases and Interests (collectively, and including the wells set forth in <u>Exhibit B</u>, the "**Wells**", and together with the Assigned Leases and Interests, the "**Properties**");

(c)    all Petroleum Substances produced from, allocated to, or attributable to, any or all of the Properties from and after the Effective Time or held in storage or tanks or is line fill as of the Effective Time, and all proceeds therefrom;

- 3 -

(d)    all Contracts, including sales and purchase contracts, unit operating agreements, unit agreements, pooling agreements, communitization agreements, orders and decisions of Governmental Authorities, joint operating agreements, exchange agreements, exploration agreements, development agreements, seismic licenses, balancing agreements, farmout agreements, service agreements, transportation, processing, treatment and gathering agreements, equipment leases and other contracts, agreements and instruments, including the Contracts described on Exhibit C, in each case, insofar as they relate to any other Asset (collectively, the "**Assigned Contracts**");

(e)    all surface leases, subsurface leases, rights-of-way, licenses, easements and other surface or subsurface rights agreements applicable to, or used or held in connection with, the ownership, operation, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Petroleum Substances or produced water from, the Properties, including those set forth on Exhibit A-3, together with all surface fee interests in the lands covered by the Assigned Leases and Interests (collectively, the "**Surface Interests**");

(f)    all tangible personal property, equipment, vehicles (excluding any leased vehicles), vessels, trailers, fixtures, inventory and improvements located on the Properties to the extent used or held for us in connection with the ownership or operation of the Properties or with the production, treatment, sale, or disposal of Petroleum Substances produced from, or attributable to, the Properties, byproducts or waste produced from or attributable to the foregoing, but excluding any such items constituting Excluded Assets (collectively with the Real Property Interests, the "**Tangibles**");

(g)    all information, books, databases, files, records and data, whether in written or electronic format, relating to any Asset or to any Assumed Liability (collectively, the "**Records**"), which Records shall include (i) all reservoir, land, operation and production files and records, inclusive of lease records, well records, division order records, property ownership reports and files, contract files and records, well files, title records (including abstracts of title, title opinions and memoranda, and title curative documents), correspondence, production records, prospect files and other prospect information, accounting records, gas; balancing files, files related to cash settlement of Imbalances, payout status files, supplier lists and files, customer lists and files; and (ii) all other data, including proprietary and non-proprietary engineering, geological, geophysical and seismic data, files and records, and any cores or cuttings (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent), inclusive of maps, logs, core analysis, formation tests, cost estimates, studies, plans, prognoses, surveys and reports, and including raw data and any interpretive data or information relating to the foregoing, and any other proprietary data in the actual possession or control of Vendor or that Vendor has the right to obtain (either without the payment of money or delivery of other consideration or unduly burdensome effort or, upon Purchaser's written election, at Purchaser's expense) and relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Petroleum Substances or produced water from, the other Assets; *provided* that if any Records described in clause (ii) can only be assigned to Purchaser with a fee or penalty, then Purchaser shall bear responsibility for such fee or penalty if Purchaser desires that such Records be assigned to Purchaser;

(h)    all governmental (whether federal, state, tribal, or local) permits, licenses, authorizations, franchises, grants, easements, variances, exceptions, consents, certificates, approvals and related instruments or rights of any Governmental Authority or other Third Party, and any writ, judgment, decree, award, order, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (whether preliminary or final) required of Vendor for the ownership, operation or use of the Properties (collectively, the "**Permits**");

- 4 -

(i)     except to the extent related to the Excluded Assets or the Retained Liabilities, all Claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Vendor;

(j)     all cash call pre-payments associated with any Asset;

(k)     all trade credits, accounts receivable, notes receivable, take or pay amounts receivable, and other receivables attributable to the other Assets;

(l)     all buildings, houses, offices, improvements, appurtenances, field offices, unit facilities, yards, and all other field facilities used in connection with the production, gathering, treatment, compression, transportation, injection, water disposal, measurement, processing, storage or other operations with respect to the Properties and all of Vendor's right, title, and interest in and to the same ("**Real Property Interests**");

(m)     all intellectual property, including all copyrights, patents, and trademarks, owned, used, or licensed in connection with the ownership or operation of the Properties;

(n)     subject to the exclusion of the Retention Amount from the Assets pursuant to clause (d) of the definition of "Excluded Assets," all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits; and

(o)     any refunds due to Vendor by a third party for any overpayment of rentals, royalties, excess royalty interests, or production payments attributable to the Assets;

provided that any item constituting an Excluded Asset shall not be an Asset;

"**Asset Taxes**" has the meaning set forth in section 9.1(a);

"**Assigned Leases**" has the meaning set forth in clause (a) of the definition of "Assets";

"**Assigned Leases and Interests**" has the meaning set forth in clause (a) of the definition of "Assets";

"**Assignment**" means the form of Assignment, Conveyance and Bill of Sale attached hereto as <u>Exhibit D</u>;

"**Assigned Contracts**" has the meaning set forth in clause (d) of the definition of "Assets";

"**Assumed Liabilities**" means, collectively:

(a)     all liabilities and obligations (including all liabilities and obligations of Vendor under the Assigned Contracts) arising from the possession, ownership, use and/or operation of the Assets, to the extent such liabilities and obligations arise from and after the Closing Date;

(b)     Environmental Liabilities;

(c)     Abandonment and Reclamation Obligations;

(d)     all Suspense Funds, together with any escheatment obligations related thereto, to the extent such Suspense Funds are transferred to Purchaser at Closing;

(e)     all Asset Taxes allocable to Purchaser pursuant to section 9.1(a); and

(f)        all Sales Taxes (as set forth in section 2.12);

provided that any item constituting a Retained Liability shall not be an Assumed Liability;

"**Bankruptcy Court Order**" means a recognition order to be granted and entered by the US Bankruptcy Court substantially in the form attached hereto as <u>Exhibit I</u> and otherwise in form and substance reasonably acceptable to Purchaser recognizing the Court Order and authorizing the sale of the Assets free and clear of all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities, to the extent provided under sections 363 and 365 of the US Bankruptcy Code, affording the Purchaser all of the protections of a "good faith purchaser" within the meaning of section 363(m) of the US Bankruptcy Code, and containing findings and conclusions of law that Purchaser is not and shall not be deemed a "successor" in any respect to Eagle Energy in connection with the Transaction under any theory of law or equity;

"**Business Day**" means a day other than a Saturday, a Sunday or a statutory holiday in Calgary, Alberta or Houston, Texas;

"**Cash Portion of the Purchase Price**" has the meaning set forth in section 2.2;

"**Casualty Event**" means (a) any fire, explosion, accident, earthquake, act of the public enemy, act of God, or other similar event or occurrence that results in damage to, or destruction of, any Asset and (b) any taking of any Asset by condemnation or under the right of eminent domain.

"**Chapter 15 Case**" has the meaning set forth in the recitals;

"**Claim**" has the meaning of that term as set forth in section 101(5) of the US Bankruptcy Code;

"**Closing**" has the meaning set forth in section 2.6;

"**Closing Date**" has the meaning set forth in section 2.6;

"**Code**" means the Internal Revenue Code of 1986, as amended;

"**Contract**" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, instrument, license, lease, purchase order or other legally binding agreement) whether written or oral, except for any Leases and Surface Interests;

"**Court**" has the meaning set forth in the recitals;

"**Court Order**" means an order to be granted by the Court, based on the Alberta form of Approval and Vesting Order as attached in <u>Exhibit F</u>, which authorizes, approves and confirms this Agreement and the sale, transfer and conveyance of the Assets by Vendor to Purchaser in accordance with the terms and conditions contained herein, and vests title to the Assets in Purchaser (and its successors and assigns) free and clear of all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities;

"**Credit Agreement**" means that certain Loan and Security Agreement, dated as of March 13, 2017, by and among Eagle Energy Inc., Eagle Hydrocarbons Inc., White Oak Global Advisors, LLC, as administrative agent and the lenders and other parties thereto, as amended, supplemented or otherwise modified;

"**Credit Support**" has the meaning set forth in section 4.1(l);

"**Cure Costs**" means, in respect of any Assigned Contract, all amounts, required to be paid to remedy any and all of the Vendor's or Eagle Energy's monetary defaults under such Assigned

Contract or required to secure a counterparty's or any other necessary Person's consent to the assignment of such Assigned Contract to Purchaser pursuant to its terms or as may be required pursuant to the Court Order and/or the Bankruptcy Court Order, and includes any other fees and expenses required to be paid to a counterparty or any other Person in connection with the assignment of an Assigned Contract to Purchaser pursuant to its terms or Applicable Law, in each case, as set forth on Exhibit J for each such Assigned Contract, but excludes (i) any secured or unsecured creditor Claim against Eagle Energy or any of them other than payments to counterparties under Assigned Contracts as described above; and (ii) Taxes;

"**Dataroom**" means the electronic data room maintained on behalf of Vendor, to the extent made available to Purchaser;

"**Eagle Energy**" has the meaning set forth in the recitals;

"**Effective Time**" means 12:01 a.m., Central Standard Time on the Closing Date;

"**Encumbrance**" means any encumbrance, mortgage, deed of trust, Claim, Liability, security interest, defect, irregularity, pledge, charge or Lien of any kind and character;

"**Environmental Laws**" means any and all present and future Laws, rules, orders, codes, plans, requirements, criteria, standards, decrees, judgments, injunctions, notices, demand letters, permits, licenses or determinations issued, or promulgated by any Governmental Authority now or hereafter in effect, and in each case as amended or supplemented from time to time, and any applicable administrative or judicial interpretation thereof, pertaining to (a) use, storage, emission, discharge, clean-up, release, or threatened release of pollutants, contaminants, NORM, chemicals, or industrial, toxic or hazardous substances (collectively, "**Pollutants**") on or into the environment or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation or handling of Pollutants, (b) the environment or (c) wildlife or natural resources applicable to the Assets and in effect in or for the jurisdiction in which the Assets are located, including the Clean Air Act (Air Pollution Control Act), the Clean Water Act (CWA), the Federal Water Pollution Act, the Rivers and Harbors Act, the Safe Drinking Water Act, the National Environmental Policy Act of 1969 (NEPA), the Endangered Species Act (ESA), the Fish and Wildlife Conservation Act of 1980, the Fish and Wildlife Coordination Act (FWCA), the Oil Pollution Act, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), the Superfund Amendments and Reauthorization Act of 1986 (SARA), the Resources Conservation and Recovery Act (RCRA), the Toxic Substance Control Act, the Occupational, Safety and Health Act (OSHA), the Emergency Planning and Community Right-To-Know Act (EPCRA), the Hazardous Materials Transportation Act, the Hazardous and Solid Waste Amendments of 1984 (HSWA) and all other applicable Laws, permits, licenses or legal determinations whose purpose is to regulate Pollutants or to conserve or protect the environment, wildlife or natural resources as any of the foregoing are now existing or may hereafter be amended or interpreted;

"**Environmental Liabilities**" means all Liabilities under Environmental Law which arise from, relate to or are associated with the Assets and that arise in connection with the ownership or operation thereof, including liabilities related to or arising from:

(a)    transportation or disposal of  Hazardous Substances offsite of the Assets from and after the Closing Date;

(b)    release, spill, escape, emission, leak, discharge, migration or dispersal of  Hazardous Substances on or from the Assets; or

(c)    pollution or contamination of or damage to the environment attributable to operation of the Assets;

including liabilities to compensate Third Parties for damages and Losses resulting from the items described in items (a), (b) and (c) above and obligations to take action to prevent or

rectify damage to or otherwise protect the environment, but excluding damages and Losses that are personal to Vendor such as sanctions for pre-Closing violations of Environmental Laws, off-site transportation or disposal of Hazardous Substances prior to the Closing Date, and personal injury or death attributable to Vendor's pre-Closing actions or omissions. For purposes of this Agreement, "the environment" includes the air, the surface and subsurface of the earth, bodies of water (including rivers, streams, lakes and aquifers) and plant and animal life (including humans);

"**Excluded Assets**" means Vendor's entire right, title and interest in and to the following assets, properties, interests and rights:

(a)  all audit rights and any and all Claims, causes of action and rights (including warranties, indemnitees, guarantees and similar rights made by prior owners, manufacturers, vendors and other Third Parties) in favor of Vendor in respect of any Excluded Contracts, Retained Liabilities or any other Excluded Assets;

(b)  all Excluded Contracts;

(c)  the Cash Portion of the Purchase Price delivered to Vendor in the form stipulated in this Agreement;

(d)  the Retention Amount; and

(e)  any shares of capital stock or other equity interest of Vendor or any of Vendor's subsidiaries or any securities convertible into, or exchangeable or exercisable for, shares of capital stock or other equity interest of Vendor or any of Vendor's subsidiaries;

(f)  all minute books, stock ledgers, corporate seals and stock certificates of Vendor;

(g)  all (i) corporate, financial, Income Tax and legal records of Vendor that relate to Vendor's business generally (excepting the same to the extent relating to the Assumed Liabilities and the Assets) and (ii) books, records and files that relate to any Excluded Assets;

(h)  all claims, non-Asset Tax refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution, or recoupment, counter-claims, cross-claims and defenses of Vendor, to the extent related to the Excluded Assets or the Retained Liabilities;

(i)  any rights, claims or causes of action of Vendor under this Agreement or any other agreement, instrument, or document entered into pursuant to this Agreement; and

(j)  any other assets or properties of Vendor set forth on Exhibit G;

"**Excluded Contract**" means the Contracts set forth on Exhibit G;

"**Execution Date**" has the meaning set forth in the introductory paragraph;

"**Final Order**" means (a) an order or judgment of the US Bankruptcy Court, as entered on the docket in any of the Chapter 15 Cases (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the US Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 15 Cases (or in any related adversary proceeding or contested matter), in each case of clauses (a) and (b) that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for

certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or any local rule of the US Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order;

"**Governmental Authority**" means any federal, national, state, provincial, territorial, municipal, county or other government or quasi-government, any political subdivision and statutory and regulatory body and instrumentality thereof, and any ministry, sub-ministry, agency or sub-agency, court, commission, board, bureau, office, or department, including any government-owned entity, having jurisdiction over a Party, the Assets or the Transaction;

"**Hard Consent**" has the meaning set forth in section 3.1(b)(ii);

"**Hazardous Substance**" means any Pollutant and any "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental Laws;

"**Imbalances**" means over-production or under-production or over-deliveries or under-deliveries with respect to Petroleum Substances produced from or allocated to the Properties, regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline (taking into account any line fill), gathering system, transportation system, processing plant, or other location, and including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Leases, imbalances under gathering or transportation agreements, and imbalances under operating agreements;

"**Income Taxes**" means any income, capital gains, franchise and similar Taxes;

"**Knowledge**" means with respect to any matter in question, in the case of Vendor, the actual knowledge, without any duty of inquiry, of Deryck Helkaa, Dustin Olver and Robert Kleebaum;

"**Law**" means any federal, state, tribal, provincial, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, rule, regulation, decree, statute or treaty;

"**Lease**" means any oil and gas lease, oil, gas and mineral lease or sublease, and other leasehold interest in oil and gas and/or other minerals, leasehold royalty interests, overriding royalty interests, net profits interests, net profit royalty interests, net profit overriding royalty interest, non-exclusive rights, carried interests, reversionary interests (including rights under non-consent provisions), possibilities of reverter, conversion rights and options and other rights of a similar nature and the leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests, and rights to reassignment;

"**Lender-Related Parties**" has the meaning set forth in section 9.6;

"**Liability**" means, without limitation, any and all Claims, debts, defenses, demands, causes of action, liabilities (including civil fines), obligations, offset rights, setoff rights, recoupment rights, damages, Losses, Taxes, fines, penalties, sanctions of every kind and character (including reasonable fees and expenses of attorneys, technical experts and expert witnesses), judgments or proceedings of any kind or character whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, matured, accrued or unaccrued, liquidated or unliquidated, or due or to become due, whether arising or founded in law, equity, statute, contract, tort, strict liability or voluntary settlement, and all reasonable expenses, costs and fees (including reasonable

attorneys' fees) in connection therewith, and all rights and remedies that are available to any such party holding such a Liability;

"**Lien**" has the meaning of that term as set forth in section 101(37) of the US Bankruptcy Code;

"**Losses**" means all losses, costs, Claims, damages, expenses and Liabilities which a Person suffers, sustains, pays or incurs, including reasonable attorneys' fees, but notwithstanding the foregoing shall not include any liability for consequential damages or punitive damages, but shall include any liability for consequential damages or punitive damages to the extent such Person suffers such damages to a Third Party, which damages shall not be excluded by this provision as to recovery hereunder;

"**Material Adverse Effect**" means any change, event or occurrence that individually or in the aggregate (taking into account all other such changes, events or occurrences) that has had or would reasonably be expected to have a material adverse change in, or material adverse effect on, the Assets taken as a whole, but excluding:

(a)     any change or effect to the extent that it results from or arises out of: (i) the pendency of the Chapter 15 Case or the financial condition of Vendor; (ii) the pendency, execution or delivery of this Agreement or any document entered into pursuant to this Agreement, the announcement thereof or consummation of the Transaction, including impacts on relationships with customers, suppliers, employees, labor organizations or Governmental Authorities; (iii) changes in (or proposals to change) Laws, generally accepted accounting principles or other accounting regulations or principles, or the interpretation, enforcement, or implementation thereof; (iv) acts of God, including hurricanes, storms and other natural disasters, epidemics, pandemics, disease outbreaks (including COVID-19), other health crises or public health events and the impacts thereof, including any stay-at-home, quarantine, or other similar orders or recommendations; or (v) any action (1) expressly allowed or contemplated by this Agreement, (2) required by the Court or the US Bankruptcy Court, or (3) taken at the request of Purchaser in writing;

(b)     any change or effect generally applicable to (i) the industries and markets in which Vendor or any of its Affiliates or any of its or their customers operate (including any change in demand for raw materials or finished products or other commodities or the marketing or transportation thereof), or the industries in which the services of Vendor are used, (ii) the Petroleum Substance industry, (iii) economic or political conditions in any country or region, or (iv) interest rates, exchange rates, commodity prices (including any change in the price of Petroleum Substances), raw materials, or the securities or financial markets in any country or region;

(c)     any outbreak or escalation of hostilities or war or any act of terrorism;

(d)     the departure of employees, officers or directors of any Vendor after the Execution Date;

(e)     any objections in the Court or the US Bankruptcy Court to (i) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (ii) the reorganization of Vendor and any related plan of reorganization or disclosure statement, or (iii) the assumption or rejection of any material Assigned Contract;

(f)     the failure by the Assets to meet any internal or third-party projections or forecasts or estimates of revenue, earnings, or other performance measures or operating statistics for any period;

(g)     any order of the US Bankruptcy Court or any actions or omissions of Vendor in compliance therewith;

(h)     any action taken by Vendor at the request of, or with the consent of, Purchaser in writing; and

(i)     any of the matters specifically disclosed on any Exhibit or Schedule to this Agreement.

Any determination as to whether any event, result, occurrence, condition, or circumstance has a Material Adverse Effect shall be made only after taking into account all effective insurance coverages and third-party indemnification or reimbursement rights with respect to such event, result, occurrence, condition, or circumstance. Further, the determination of the dollar impact or value of any event, result, occurrence, condition or circumstance shall be based solely on the actual dollar amount of such event, result, occurrence, condition or circumstance, on a dollar-for-dollar basis, and shall not take into account any multiplier valuations (including any multiple based on earnings or other financial indicia) or any consequential damages or other consequential valuations.

"**Material Contracts**" has the meaning set forth in section 4.1(j);

"**NORM**" means naturally occurring radioactive materials;

"**Offset Amount**" has the meaning set forth in section 2.9;

"**Order**" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority;

"**Outside Date**" has the meaning set forth in section 11.1(a)(iii);

"**Party**" means Vendor or Purchaser, and "**Parties**" means both of them;

"**Permitted Encumbrances**" means:

(a)     all royalties, overriding royalties, net profits interests, carried interests, reversionary interests and other similar burdens that are valid, properly recorded, and run with the Assets;

(b)     conventional rights of reassignment arising upon final intention to surrender or abandonment of any Asset;

(c)     any Right of First Refusal or any similar restriction applicable to any of the Assets;

(d)     the requirement to receive any consent applicable to the Transaction, including all rights to consent by Governmental Authorities in connection with the conveyance of the Assigned Leases and Interests;

(e)     the terms and conditions of the Assigned Leases and Interests, the Permits, and the Assigned Contracts, including the requirement to pay any rentals or royalties to the grantor thereof to maintain the Assigned Leases and Interests in good standing and any royalty or other burden reserved to the grantor thereof;

(f)     mortgages on the lessor's interest under an Assigned Lease and Interest that are not in default or subject to foreclosure and for which the lessee would not customarily seek a subordination of such mortgages or deeds of trust to the applicable leasehold estate;

(g)     defects or irregularities of title as to which the relevant statute(s) of limitations or prescription would bar any attack or Claim against Vendor's title;

(h)     the right reserved to or vested in any grantor, Governmental Authority or other public authority by the terms of any Assigned Lease and Interest, Permit, Surface Interest, or Assigned Contract, or by Applicable Law, to terminate any Assigned Lease and Interest, Permit, Surface Interest or Assigned Contract pursuant to its terms;

(i)     Liens securing Taxes (i) that are not yet delinquent or (ii) if delinquent, that Vendor is contesting in good faith through appropriate proceedings listed on <u>Exhibit H</u>;

(j)     the terms and conditions of all Surface Interests and any other easements, rights of way, surface fee interests, servitudes or other similar rights in land, including rights of way and servitudes for highways, railways, sewers, drains, gas and oil pipelines, gas and water mains, electric light, power, telephone or cable television conduits, pole, wires or cables;

(k)     the right reserved to or vested in any municipality, Governmental Authority or other public authority to control or regulate any of the Assets in any manner, including any directives or notices received from any municipality, Governmental Authority or other public authority pertaining to the Assets;

(l)     plugging and surface restoration obligations that cannot be sold free and clear under Applicable Law and the Abandonment and Restoration Obligations;

(m)     any materialman's, mechanics', repairman's, contractors', operators', or other similar Liens, security interests or charges for operating expenses incurred in the ordinary course of business after the Effective Time that are (i) not yet due and payable or (ii) if delinquent, that Vendor is contesting in good faith through appropriate proceedings listed on <u>Exhibit H</u>;

(n)     any other Encumbrance that Purchaser has expressly agreed in writing to accept;

(o)     Liens granted in the ordinary course of business to a public utility, municipality or Governmental Authority with respect to operations pertaining to any of the Assets; and

(p)     any Encumbrance that will be released by the Bankruptcy Court Order (or other Order of the US Bankruptcy Court);

"**Permits**" has the definition set forth in clause (h) of the definition of "Assets";

"**Person**" means any individual, corporation, limited liability company, joint venture, partnership (limited or general), trust, trustee, executor, Governmental Authority or other entity or organization;

"**Petroleum Substances**" means any of crude oil, crude bitumen and products derived therefrom, synthetic crude oil, petroleum, natural gas, natural gas liquids, and any and all other substances related to any of the foregoing, whether liquid, solid or gaseous, and whether hydrocarbons or not, including sulphur;

"**Phase I Environmental Site Assessment**" means an assessment of the environmental condition of the Assets and their compliance with Environmental Laws that does not include the collection and analysis of environmental samples, and which may comply with the requirements of ASTM International Standard Practice for Environmental Site Assessments (Designation E1527-13 or E2247-16).

"**Pollutants**" has the meaning set forth in the definition of "Environmental Laws";

"**Proceeding**" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority;

"**Properties**" has the meaning set forth in clause (b) of the definition of "Assets";

"**Proposal**" has the meaning set forth in section 8.3;

"**Purchase Price**" has the meaning set forth in section 2.2;

"**Purchaser**" has the meaning set forth in the preamble;

"**Purchaser Termination Notice**" has the meaning set forth in section 11.1(b);

"**Real Property Interests**" has the definition set forth in clause (l) of the definition of "Assets";

"**Receiver**" has the meaning set forth in the recitals;

"**Records**" has the definition set forth in clause (g) of the definition of "Assets";

"**Representative**" means, with respect to any Party, its Affiliates, and its and their respective directors, officers, partners, managers, agents, advisors, counsel, employees and consultants;

"**Retained Liabilities**" means and includes any and all obligations and Liabilities of any kind or character, known or unknown, to the extent that they are attributable to, arise out of, are based upon or are otherwise related to the ownership or operation of the Assets prior to the Closing, and any and all other obligations and Liabilities of Vendor or its Affiliates, other than the Assumed Liabilities, including without limitation the following:

(a)     all Liability, warranty and similar Claim for damages, illness or injury to person (including death) or damage to property and all other obligations and Liabilities, regardless of when made or asserted, to the extent arising out of or incurred in connection with the ownership or operation of the Assets on or before the Closing Date;

(b)     the gross negligence or willful misconduct of Vendor (or any of its Affiliates) or Receiver in the ownership or operation of the Assets on or before the Closing Date;

(c)     any payment, nonpayment or mispayment (save and except as to any Suspense Funds that are transferred to Purchaser at Closing) or accounting for royalties, overriding royalties, production payments, net profits interests and similar burdens upon, measured by, or payable out of Petroleum Substances produced and saved from or attributable to the Assets prior to the Effective Time;

(d)     the Excluded Assets;

(e)     Vendor's, any of its Affiliates' or Receiver's employees, the employment or termination thereof, and the compensation and benefits inuring thereto;

(f)     all obligations and Liabilities arising as a result of any Actions or Proceedings, whether initiated prior to or following the Closing Date, to the extent related to the ownership or operation of the Assets on or prior to the Closing Date, including any actions for breach of contract, product liability, any tort actions or any Action or Proceeding scheduled or required to be scheduled on Schedule 4.1(e);

(g)     any and all Liabilities related to: (i)  Income Taxes imposed by any Applicable Law on Vendor, any of its direct or indirect owners or Affiliates, or any combined, unitary, or consolidated group of which any of the foregoing is or was a member, (ii) Asset Taxes allocable to Vendor pursuant to section 9.1(a), (iii) Taxes imposed on or with respect to the ownership or operation of the Excluded Assets or that are attributable to any asset or business of Vendor that is not part of the Assets, and (iv) any and all other Taxes imposed

on or with respect to the acquisition, ownership or operation of the Assets or the production of Petroleum Substances or the receipt of proceeds therefrom for any Tax period (or portion of any Straddle Period) ending before the Effective Time;

(h)    all off-site disposal or transportation of waste, hazardous substances (including Hazardous Materials) or hazardous waste arising from the operation or use of the Assets prior to the Closing from any of the Assets to any location not on the Assets;

(i)    any civil or administrative fines or penalties or criminal sanctions imposed on Vendor or any of its Affiliates with respect to the Assets in connection with any pre-Closing violation of Laws (including Environmental Laws);

(j)    any and all proceeds from the sale of Petroleum Substances produced from and attributable to the Assets during any period prior to the Effective Time which have been improperly paid to Vendor;

(k)    all Cure Costs;

(l)    any and all indebtedness for borrowed money;

(m)    all obligations and Liabilities of Vendor under this Agreement and each other Contract or document contemplated hereby or entered into in connection herewith;

(n)    all obligations and Liabilities with respect to any costs, fees and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of Vendor in connection with or arising from the Chapter 15 Case or the transactions contemplated by this Agreement and each other Contract or document contemplated hereby or entered into in connection herewith;

(o)    all obligations and Liabilities arising under any Excluded Contract; and

(p)    to the extent not otherwise included, all obligations and Liabilities arising under any employment agreement or real property lease to which Vendor is a party, including without limitation that certain Lease dated as of September 22, 2017 by and between Energy Tower IV Investments LTD and Eagle Hydrocarbons Inc.;

"**Retention Amount**" means an amount in cash equal to $550,000; provided that such amount may be increased or decreased, as applicable (based on Vendor's good faith estimate of the amount necessary or required to cover reasonable wind-down costs and expenses of Vendor), by written consent of the Parties prior to Closing;

"**Right of First Refusal**" means a preferential, pre-emptive or first purchase right that becomes operative by virtue of this Agreement or the Transaction;

"**Sales Taxes**" means all transfer, sales, use, excise, stamp, license, value-added, conveyance, documentary, recording and other like Taxes incurred or imposed with respect to the Purchaser's acquisition of the Assets or to the registration of any documents or instruments of transfer, including the Assignment, related thereto;

"**Straddle Period**" means any Tax period beginning before and ending after the Effective Time;

"**Surface Interests**" has the meaning set forth clause (e) of in the definition of "Assets";

"**Suspense Funds**" means proceeds of production and associated penalties and interest in respect of any of the Assets that are payable to third parties and are being held in suspense by Vendor as the operator of such Assets;

"**Tangibles**" has the meaning set forth in clause (f) of the definition of "Assets";

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**" and "**Taxing**") means (i) any U.S. federal, state, tribal, provincial, local, or non-U.S. tax or other assessment, charge, duty, fee, levy, impost or other similar charge that is in the nature of a tax imposed by a Governmental Authority (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including, but not limited to, income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, production, severance, possessory interest, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding (including backup withholding), and estimated taxes, (ii) any interest, fine, penalty or addition in connection with any item described in clause (i), above, and (iii) any liability in respect of any item described in clauses (i) and (ii), above, that arises by reason of a contract, assumption, transferee or successor liability, operation of Law (including by reason of being a member of a consolidated, combined or unitary group) or otherwise;

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting elections, schedules, statements, attachments, amendments or information) filed or required to be filed in connection with the determination, assessment, enforcement or collection of any Tax or the administration of any Laws relating to Taxes;

"**Third Party**" means any Person other than Receiver, Eagle Energy, Vendor, or Purchaser;

"**Transition Services Agreement**" has the meaning set forth in section 2.6(a)(viii);

"**this Agreement**", "**herein**", "**hereto**", "**hereof**" and similar expressions mean and refer to this Agreement;

"**Transaction**" means the transaction for the purchase and sale of the Assets as contemplated by this Agreement;

"**Treasury Regulations**" means the final or temporary regulations promulgated by the U.S. Department of the Treasury under the Code;

"**US Bankruptcy Code**" has the meaning set forth in the recitals;

"**US Bankruptcy Court**" has the meaning set forth in the recitals;

"**US Sale Agent**" means EnergyNet.com, Inc.;

"**US Sale Motion**" means a motion filed by the Vendor in the US Bankruptcy Court seeking approval of the sale of the Assets free and clear of Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) and the other transactions contemplated hereby including the assumption and assignment of the Assigned Contracts, Assigned Leases and Interests and Surface Interests to Purchaser in accordance with sections 363 and 365 of the US Bankruptcy Code and Rules 2002, 6004, and 6006 of the US Federal Rules of Bankruptcy Procedure, such motion to be in form and substance acceptable to Purchaser in its sole and absolute discretion;

"**Vendor**" has the meaning set forth in the preamble;

"**Vendor Termination Notice**" has the meaning set forth in section 11.1(c);

"**Wells**" has the meaning set forth in clause (b) of the definition of "Assets".

## 1.2    Headings

The expressions "Article", "section", "subsection", "clause", "subclause", "paragraph", "Exhibit" and "Schedule" followed by a number or letter or combination thereof mean and refer to the specified article, section, subsection, clause, subclause, paragraph, exhibit or schedule of or to this Agreement.

## 1.3    Interpretation Not Affected by Headings

The division of this Agreement into Articles, sections, subsections, clauses, subclauses and paragraphs and the provision of headings for all or any thereof are for convenience and reference only and shall not affect the construction or interpretation of this Agreement.

## 1.4    Included Words

When the context reasonably permits, words suggesting the singular shall be construed as suggesting the plural and *vice versa*, and words suggesting gender or gender neutrality shall be construed as suggesting the masculine, feminine and neutral genders.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.  The word "or" shall be disjunctive but not exclusive.

## 1.5    Exhibits and Schedules

There are appended to this Agreement the following Exhibits and Schedules pertaining to the following matters:

| | | |
|---|---|---|
| Exhibit A-1 | - | Assigned Leases |
| Exhibit A-2 | - | Fee Mineral Interests |
| Exhibit A-3 | - | Surface Interests |
| Exhibit B | - | Wells |
| Exhibit C | - | Assigned Contracts |
| Exhibit D | - | Form of Assignment, Conveyance and Bill of Sale |
| Exhibit E | - | Form of Officer's Certificate |
| Exhibit F | - | Alberta Form of Approval and Vesting Order |
| Exhibit G | - | Excluded Assets |
| Exhibit H | - | Permitted Encumbrances |
| Exhibit I | - | Bankruptcy Court Order |
| Exhibit J | - | Cure Costs |
| | | |
| Schedule 4.1(d) | - | Consents |
| Schedule 4.1(e) | - | Actions and Proceedings |
| Schedule 4.1(f) | - | Rights of First Refusal |
| Schedule 4.1(g) | - | Brokers' Fees |
| Schedule 4.1(h) | - | Suspense Funds |
| Schedule 4.1(i) | - | Compliance with Laws |
| Schedule 4.1(j) | - | Material Contracts |
| Schedule 4.1(l) | - | Credit Support |
| Schedule 4.1(m) | - | Well Matters |
| Schedule 4.1(n) | - | Taxes |

Such Exhibits and Schedules are incorporated herein by reference as though contained in the body hereof.  Wherever any term or condition of such Exhibits or Schedules conflicts or is at variance with any term or condition in the body of this Agreement, such term or condition in the body of this Agreement shall prevail.

## 1.6    Damages

All losses, costs, Claims, damages, expenses and liabilities in respect of which a Party has a Claim pursuant to this Agreement include reasonable and verifiable attorneys' fees and expenses.

## 1.7    Derivatives

Where a term is defined herein, a capitalized derivative of such term shall have a corresponding meaning unless the context otherwise requires.

## 1.8    Interpretation if Closing Does Not Occur

In the event Closing does not occur, each provision of this Agreement which presumes that Purchaser has acquired the Assets hereunder shall be construed as having been contingent upon Closing having occurred.

## 1.9    Conflicts

If there is any conflict or inconsistency between a provision of the body of this Agreement and that of a Schedule, an Exhibit, the Assignment, or any other document required to transfer Vendor's right, title and interest in the Assets to Purchaser, the provision of the body of this Agreement shall prevail.  If any term or condition of this Agreement conflicts with any Applicable Law, such Applicable Law shall prevail, and this Agreement shall be amended to the extent required to eliminate any such conflict pursuant to section 11.13.

## 1.10    Currency

All dollar ($) amounts referenced in this Agreement are expressed in the lawful currency of the United States of America.

## 1.11    Days and Month

Unless otherwise expressly provided herein, any reference herein to a "day" and any derivatives thereof shall refer to a calendar day, and any reference herein to a "month" or any derivatives thereof shall refer to a calendar month.

## 1.12    Successors and Assigns

References herein to any Person shall include such Person's heirs, executors, Representatives, administrators, successors and assigns; provided, that nothing contained in this section 1.12 is intended to authorize any assignment or transfer not otherwise permitted by this Agreement.

## 1.13    Laws

References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or provision.

**1.14    Contracts**

References herein to any Contract mean such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof.

**ARTICLE 2**
**PURCHASE AND SALE AND CLOSING**

**2.1    Purchase and Sale**

Vendor, exercising the powers of sale granted pursuant to the Appointment Order, hereby agrees to sell, assign, transfer, convey and set over to Purchaser, and Purchaser hereby agrees to purchase from Vendor, all of the right, title, estate and interest of Vendor (whether absolute or contingent, legal or beneficial) in and to the Assets, free and clear of any and all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), subject to and in accordance with the terms of this Agreement. Notwithstanding any other provision of this Agreement, Vendor shall, at the Closing, retain, Purchaser shall not acquire, and the Assets shall not include, any right, title or interest of Vendor in and to the Excluded Assets.

**2.2    Purchase Price**

The aggregate consideration to be paid by Purchaser to Vendor for Vendor's right, title and interest in and to the Assets shall consist of the following (collectively, the "**Purchase Price**"): (a) a credit bid and equivalent release of Vendor and any applicable guarantors from any and all Actions arising under, or otherwise relating to, the Credit Agreement, in an amount equal to $11,000,000; (b) the assumption of the Assumed Liabilities; and (c) cash in an amount equal to $120,000 (the "**Cash Portion of the Purchase Price**").  The Purchase Price (to the extent applicable) shall be payable by Purchaser to Vendor (or its designee) at Closing in accordance with section 2.6(b)(iv).

**2.3    [Intentionally Omitted.]**

**2.4    Assumption of Abandonment and Reclamation Obligations**

In determining the Purchase Price, the Parties have taken into account the Purchaser's assumption of responsibility for the payment of all costs for existing or future Abandonment and Reclamation Obligations associated with the Assets, as set forth in this Agreement, and the absolute release of Eagle Energy and Vendor of all and any responsibility or liability therefor.

**2.5    Assumed Liabilities**

Following Closing, except for any Retained Liabilities, Purchaser shall assume, perform, discharge and pay when due all of the Assumed Liabilities.  For greater certainty, Purchaser acknowledges and agrees that the Environmental Liabilities and Abandonment and Reclamation Obligations in respect of the Assets are future costs and obligations associated with the ownership of the Assets that are tied and connected to the ownership of the Assets such that they are inextricably linked and embedded with the Assets. For the avoidance of doubt, Vendor shall remain responsible for, and Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of, the Retained Liabilities.

**2.6    Closing**

Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") shall take place at the Dallas, Texas office of Vinson & Elkins, L.L.P. located at 2001 Ross Avenue, Suite 3900, Dallas, TX 75201, or such other place as may be agreed upon in writing by the Parties on June 30, 2020, or if not all of the conditions to Closing in section 3.2, section 3.3, and section 3.4 have been satisfied or (if permissible), waived (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions) by such date, than no later than five Business

Days following the date on which all of the conditions set forth in section 3.2, section 3.3, and section 3.4 have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions). The date and time at which the Closing actually occurs shall be the "**Closing Date**". Subject to all other provisions of this Agreement, (x) possession, risk and beneficial ownership of Vendor's right, title and interest in and to the Assets shall pass from Vendor to Purchaser on the Closing Date, and (y) Purchaser agrees to assume, discharge, perform and fulfil all Assumed Liabilities from and after the Closing Date.

(a)    On the Closing Date, Vendor shall deliver to Purchaser:

(i)    the Assignment in sufficient numbers of duly executed and acknowledged original counterparts to facilitate, to the extent appropriate, recording in all relevant jurisdictions;

(ii)    transfers and assignments, executed and acknowledged as necessary, on appropriate forms and as may be required by any Governmental Authority in order to transfer the Assets from Vendor to Purchaser;

(iii)    the Officer's Certificate, dated and effective as of the Closing Date, substantially in the form attached as <u>Exhibit E</u> duly executed by Vendor;

(iv)    a receipt for the Cash Portion of the Purchase Price, duly executed by Vendor;

(v)    a certified copy of the Court Order and the Bankruptcy Court Order;

(vi)    an executed certificate of non-foreign status that meets the requirements set forth in Treasury Regulations section 1.1445-2(b);

(vii)    (w) releases of all Encumbrances encumbering the Assets that do not constitute Permitted Encumbrances, (x) transfer orders or letters in lieu thereof, on forms provided by Purchaser, directing all purchasers of production to make payment to Purchaser of proceeds attributable to Petroleum Substances produced from or allocable to the Properties and the Wells after the Closing Date, (y) any consents, waivers, and other similar matters pertaining to the Assets, to the extent obtained by Vendor prior to the Closing, and (z) counterparts of Railroad Commission of Texas Form P-4 for each Well as to which a change of operator will occur at the Closing Date, in each case, duly executed and acknowledged by Vendor, as applicable;

(viii)    a transition services agreement, pursuant to which Vendor or Receiver will agree to provide to Purchaser certain transition support services with respect to the Assets (or any portion thereof) as may be reasonably requested by Purchaser, on terms and provisions that are mutually acceptable to the Parties (the "**Transition Services Agreement**"), duly executed by Vendor;

(ix)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer as Purchaser may reasonably request to vest in Purchaser all the right, title and interest of Vendor in, to or under any or all the Assets; and

(x)    any such other items as may be specifically required hereunder or reasonably requested by Purchaser.

Additionally, at or prior to Closing, Vendor shall deliver or cause to be delivered the Records to Purchaser that are in the possession or reasonable control of Vendor, Receiver, or any of their Affiliates. If any of the  Records are stored electronically, Vendor shall deliver or cause to be delivered such Records to Purchaser in the format in which they are currently maintained; provided that, if requested by Purchaser

in writing, Vendor shall use its commercially reasonable efforts to deliver or cause to be delivered such electronic Records in such other format as may be reasonably requested by Purchaser.

(b)     On the Closing Date, Purchaser shall deliver to Vendor:

(i)     the Assignment in sufficient numbers of duly executed and acknowledged original counterparts to facilitate, to the extent appropriate, recording in all relevant jurisdictions;

(ii)    transfers and assignments, executed and acknowledged as necessary, on appropriate forms and as may be required by any Governmental Authority in order to transfer the Assets from Vendor to Purchaser;

(iii)   the Officer's Certificate, dated and effective as of the Closing Date, substantially in the form attached as <u>Exhibit E</u>, duly executed by Purchaser;

(iv)    subject to section 2.9, the Cash Portion of the Purchase Price;

(v)     the Transition Services Agreement, duly executed by Purchaser;

(vi)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Vendor, as Vendor may reasonably request to transfer and assign the Assumed Liabilities and Assets to Purchaser; and

(vii)   any such other items as may be specifically required hereunder or reasonably requested by Vendor.

Additionally, within one day prior to the Closing Date, Purchaser shall deliver to Vendor notice of its election to designate any Contract as (x) an Excluded Contract  and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract and/or (y) an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and, if applicable, shall cease to constitute an Excluded Contract.  Purchaser's right to designate a Contract as an Excluded Contract or as an Assigned Contract may be exercised by Purchaser in its sole and absolute discretion.

**2.7     [Intentionally Omitted.]**

**2.8     Transfer Documents and Instruments**

The Parties shall cooperate in the preparation of all documents and instruments required to transfer Vendor's right, title, and interest in and to the Assets to Purchaser.  At a reasonable time prior to Closing, Purchaser shall use reasonable efforts to prepare and provide for Vendor's review all documents and instruments required to transfer Vendor's right, title, and interest in and to the Assets to Purchaser at Purchaser's own cost and expense, including the Assignment. Promptly after Closing, Purchaser shall register, record, and/or distribute (as applicable) all such documents and instruments, including the Assignment, in the applicable jurisdictions and to the applicable parties, and shall bear all costs incurred therewith and in preparing and registering, recording, and/or distributing any further assurances required to convey the Assets to Purchaser.

**2.9     Form of Payment**

All payments to be made pursuant to this Agreement shall be in the lawful currency of the United States of America.  Except as otherwise expressly provided in this Agreement, all payments to be made pursuant to this Agreement shall be made by certified check, bank draft or wire transfer. Notwithstanding anything to the contrary set forth in this Agreement, to the extent Vendor has cash on hand at Closing

(excluding the Retention Amount), such cash shall be used to offset the Cash Portion of the Purchase Price at Closing, such that (a) the amount of cash that Vendor is required to deliver to Purchaser at Closing as part of the Assets shall be reduced by the amount, if any (not to exceed $120,000), of such cash used to offset the Cash Portion of the Purchase Price (the "**Offset Amount**") and (b) the Cash Portion of the Purchase Price that Purchaser is required to deliver to Vendor at Closing as part of the Purchase Price shall be reduced by such Offset Amount.  Vendor shall use the Offset Amount to pay fees and/or expenses of the US Sale Agent payable pursuant to the US Sale Agent's engagement letter with the Receiver dated as of February 6, 2020. Vendor shall provide evidence of such payment (reasonably satisfactory to Purchaser) as soon as practicable after such payment is made. To the extent any portion of the Offset Amount is not used to pay the US Sale Agent, Vendor shall immediately deliver such unused portion to Purchaser.

**2.10**    **[Intentionally Omitted.]**

**2.11**    **[Intentionally Omitted.]**

**2.12**    **Sales Taxes**

The Parties acknowledge that the Purchase Price is exclusive of all Sales Taxes.  Purchaser shall be solely responsible for all Sales Taxes, if any, which may be imposed by any Governmental Authority and that are not eliminated through the application of Section 1146(a) of the US Bankruptcy Code or another application exemption. The Party primarily responsible under Applicable Law for the filing of any Tax Return in respect of Sales Taxes shall be responsible for the timely filing of all such Tax Return. If Vendor is required under Applicable Law to collect and/or pay any such Sales Taxes, Purchaser shall promptly pay to Vendor the full amount of such Sales Taxes. Vendor and Purchaser shall reasonably cooperate in good faith to determine the portion of the Purchase Price that is allocable to Assets the conveyance of which is subject to Sales Taxes, if any, and to minimize, to the extent permissible under Applicable Law, the amount of any such Sales Taxes.

**ARTICLE 3**
**CONSENTS; QUALIFICATIONS; CONDITIONS OF CLOSING**

**3.1**    **Required Consents; Cure Costs; Governmental Authority Qualifications**

(a)    On or prior to the Closing, Vendor shall (i) pay, or caused to be paid, pursuant to and in accordance with Section 365 of the US Bankruptcy Code and the Bankruptcy Court Order, any Cure Costs, directly to the applicable party and (ii) provide evidence of payment thereof to Purchaser.

(b)    **Hard Consents**

(i)    Promptly after the Execution Date and in no event no later than five days following the Execution Date, Vendor shall prepare and send, or cause to be prepared and sent, on forms reasonably satisfactory to Purchaser and in compliance with the applicable contractual provisions (i) notices to the holders of any consent to assignment triggered by the transactions contemplated by this Agreement requesting consents to the transactions contemplated by this Agreement for which the Court or the US Bankruptcy Court has not entered an Order providing that such consents are not required and (ii) notices to the holders of any applicable Rights of First Refusal triggered by the transactions contemplated by this Agreement for which the Court or the US Bankruptcy Court has not entered an Order providing that such Right of First Refusal is not required, in compliance with the terms of such rights and requesting waivers of such rights. Vendor shall use commercially reasonable efforts to (1) cause any such consents required to be obtained and delivered prior to Closing and (2) cause all such Rights of First Refusal to purchase to be waived prior to Closing.

(ii)     If prior to the Closing Date any consent to assignment applicable to the Transaction (other than governmental consents or approvals customarily obtained post-Closing) has not been obtained, and further, the document setting forth the need to obtain such consent provides that such consent may be withheld for any reason or failure to obtain such third party consent may result in the termination of a Lease, a Surface Interest or a Contract, including causing such Lease, Surface Interest or Contract to be void or voidable (each such third party consent, a "**Hard Consent**"), then, unless the Court or the US Bankruptcy Court has entered an Order providing that such Hard Consent is not required, each Asset affected by such Hard Consent shall be held back from the Assets conveyed at Closing without reduction to the Purchase Price. Any Asset so held back at the Closing will be conveyed to Purchaser within ten Business Days after such Hard Consent has been obtained, waived or otherwise satisfied. At such subsequent closing, Vendor shall contribute, assign, transfer and convey to Purchaser, and Purchaser shall acquire and accept from Vendor, such Asset pursuant to the terms of this Agreement. Except for Hard Consents, if any consents to the assignment of any Asset are not obtained prior to Closing, then with respect to each affected Asset, the affected Assets shall nevertheless be sold and conveyed to Purchaser at the Closing, and Purchaser shall pay for the affected Asset(s) at Closing in accordance with this Agreement as though the consent had been obtained. In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Assets (i) that cannot be transferred or assigned without the Hard Consent of third parties, which Hard Consent has not been obtained prior to the Closing (after giving effect to the Bankruptcy Court Order and the US Bankruptcy Code), Vendor shall, at Purchaser's sole expense and subject to any approval of the US Bankruptcy Court that may be required, reasonably cooperate with Purchaser in endeavoring to obtain such Hard Consent and, if any such Hard Consent is not obtained, Purchaser shall, following the Closing, at Purchaser's sole expense and subject to any approval of the US Bankruptcy Court that may be required, cooperate with Vendor in all reasonable respects to provide to Purchaser the benefits thereof in some other manner, or (ii) that are otherwise not transferable or assignable (after giving effect to the Bankruptcy Court Order and the US Bankruptcy Code), Vendor shall, following the Closing, at Purchaser's sole expense and subject to any approval of the US Bankruptcy Court that may be required, reasonably cooperate with Purchaser to provide to Purchaser the benefits thereof in some other manner (including the exercise of the rights of Vendor thereunder); provided that nothing in this section 3.1(b)(ii) shall (x) require Vendor to make any expenditure or incur any obligation on its own or on behalf of Purchaser for which funds in the full amount of such expenditure or obligation are not provided to Vendor by Purchaser in advance in cash or (y) prohibit Vendor from ceasing operations or winding up its affairs following the Closing.

(iii)    For the avoidance of doubt, except to the extent the Court or the US Bankruptcy Court has entered an Order providing that any applicable Hard Consent is not required in connection with the Transaction, in no event shall there be transferred at Closing any Asset for which a Hard Consent has not been satisfied or obtained.

(c)     **Rights of First Refusal**

(i)     A Right of First Refusal triggered by the transactions contemplated by this Agreement for which the Court or the US Bankruptcy Court has not entered an Order providing that such Right of First Refusal is not required must be exercised subject to all terms and conditions set forth in this Agreement, including the successful Closing of this Agreement on the dates set forth herein.

(ii)     Except to the extent the Court or the US Bankruptcy Court has entered an Order providing that any applicable Right of First Refusal is not required in connection

with the transactions contemplated herewith, if, prior to Closing, any holder of a Right of First Refusal notifies Vendor that it intends to consummate the purchase of that portion of the Assets to which it holds a Right of First Refusal then the portion of Assets relating to any such Right of First Refusal shall be excluded from the Assets identified in this Agreement.

(iii)      Except to the extent the Court or the US Bankruptcy Court has entered an Order providing that any applicable Right of First Refusal is not required in connection with the transactions contemplated herewith, if, prior to Closing, any holder of a Right of First Refusal has not exercised or waived its Right of First Refusal and the time period within which such Right of First Refusal may be exercised has not expired, then the Assets subject to such Right of First Refusal shall be transferred or assigned to Purchaser at the Closing, and Purchaser shall take title to such Assets subject to such Right of First Refusal. In the event any holder of a Right of First Refusal thereafter exercises its Right of First Refusal, then Purchaser shall assign such affected Assets to the holder of such Right of First Refusal, and such holder shall pay Purchaser all proceeds generated from the exercise of such Right of First Refusal.

(d)      Subject to the terms of this Agreement, prior to Closing, and only to the extent that any such qualification is required by Applicable Law to own or operate the Assets, Purchaser shall (i) become qualified with the applicable Governmental Authorities to hold oil and gas leases, rights-of-way, and right-of-use easements and to meet any other requirements under Law to receive and hold such assets and properties and (ii) provide Vendor evidence of such qualification, including copies of all filings and material correspondence submitted to or received from the Governmental Authorities to obtain such registration and qualification.

(e)      Subject to the terms of this Agreement, prior to Closing, Purchaser shall (i) become qualified and approved (in each case, only to the extent that any such qualification or approval is required by Applicable Law to own or operate the Assets) by the applicable Governmental Authorities as an operator of all Assigned Contracts (as applicable) and all other Assets that Purchaser becomes the operator of as a result of, this Agreement, and (ii) provide Vendor evidence of such qualifications and approvals, including copies of all filings and material correspondence submitted to or received from the applicable Governmental Authorities.

(f)      To the extent it is not possible to do so prior to the Closing, as soon as possible following the Closing, Purchaser shall (i) be qualified and approved (in each case, only to the extent that any such qualification or approval is required by Applicable Law to own or operate the Assets) by the applicable Governmental Authorities as an operator of any applicable Assets that Purchaser becomes the operator of as a result of, this Agreement and (ii) provide Vendor evidence of such qualifications and approvals including evidence of all filings and material correspondence submitted to or received from the applicable Governmental Authorities.

(g)      Vendor shall use commercially reasonable efforts to support Purchaser's efforts to be appointed, or to  cause Purchaser's designee to be appointed, the successor operator of each Well operated by Vendor or its Affiliate, to the extent permitted under any applicable joint operating agreement and to designate and/or appoint by assignment, to the extent legally possible and permitted under any such applicable joint operating agreement, Purchaser or the Purchaser's designee as successor operator with respect to the Assets on or after the Closing Date.

**3.2      Mutual Conditions**

The obligation of Purchaser to purchase Vendor's right, title and interest in and to the Assets, and of Vendor to sell its right, title and interest in and to the Assets to Purchaser, is subject to the following conditions precedent:

(a)    Vendor obtaining the Court Order and such Court Order being in full force and effect and not subject to a stay;

(b)    Vendor obtaining the Bankruptcy Court Order and such order becomes a Final Order in full force and effect and not subject to a stay (unless the requirement that the Bankruptcy Court Order be a Final Order is waived in writing by Purchaser); and

(c)    there shall not have been instituted any legal proceedings to obtain, and no court or Governmental Authority of competent jurisdiction shall have issued, promulgated, enforced or entered any judgment, decree, injunction or other order, whether temporary, preliminary or permanent, that restrains, enjoins or otherwise prohibits consummation of the Transaction.

## 3.3    Purchaser's Conditions

The obligation of Purchaser to purchase Vendor's right, title and interest in and to the Assets is subject to the following conditions precedent, which are inserted herein and made part hereof for the exclusive benefit of Purchaser and may be waived by Purchaser in writing (in its sole discretion) in whole or in part:

(a)    the representations and warranties of Vendor herein contained shall be true and correct (without giving effect to any limitation or qualification as to materiality or Material Adverse Effect or other similar qualifiers) when made and as of the Closing Date; provided that in the event of a breach or inaccuracy in the representations and warranties of Vendor contained in this Agreement, the condition set forth in this section 3.3(a) shall be deemed satisfied unless the effect of all such breaches or inaccuracies in such representations and warranties taken together results in a Material Adverse Effect;

(b)    all covenants and obligations of Vendor contained in this Agreement to be performed prior to or at Closing shall have been timely performed in all material respects; and

(c)    Vendor shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in section 2.6(a).

## 3.4    Vendor's Conditions

The obligation of Vendor to sell its right, title and interest in and to the Assets to Purchaser is subject to the following conditions precedent, which are inserted herein and made part hereof for the exclusive benefit of Vendor and may be waived by Vendor in writing (it its sole discretion) in whole or in part:

(a)    the representations and warranties of Purchaser herein contained shall be true and correct in all material respects when made and as of the Closing Date;

(b)    all covenants and obligations of Purchaser contained in this Agreement to be performed prior to or at Closing shall have been timely performed in all material respects;

(c)    the Cash Portion of the Purchase Price shall have been paid by Purchaser to Vendor in the form stipulated in this Agreement; and

(d)    Purchaser shall have delivered, or caused to be delivered, to Vendor all of the items set forth in section 2.6(b).

## 3.5    Efforts to Fulfil Conditions Precedent

Purchaser and Vendor shall proceed diligently and in good faith and use all commercially reasonable efforts to satisfy and comply, and assist in the satisfaction and compliance, with the foregoing conditions precedent.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

**4.1    Representations and Warranties of Vendor**

Vendor makes the following representations to Purchaser as of the Execution Date and as of the Closing Date:

(a)    Receiver has been appointed by the Court as receiver and manager of Eagle Energy and such appointment is valid and subsisting;

(b)    Vendor is a corporation duly incorporated, validly existing, and in good standing under the Laws of the State of Delaware and is qualified to do business as a foreign corporation and is in good standing under the Laws of the State of Texas and the State of Oklahoma. Vendor has all requisite corporate power and authority to own and operate the Assets and to carry on its business as now conducted, except for such failures to be so qualified, maintain such power and authority, or be in good standing as would not, individually or in the aggregate, have a Material Adverse Effect;

(c)    subject to obtaining, and pursuant to, the Bankruptcy Court Order and the Court Order, Vendor has full corporate capacity, power, and authority to enter into and perform this Agreement, the documents executed in connection herewith to which Vendor is a party, the transactions contemplated herein and therein and to complete the Transaction. The execution, delivery, and performance by Vendor of this Agreement and the documents executed in connection herewith to which Vendor is a party have been duly and validly authorized and approved by all necessary corporate action on the part of Vendor. Subject to obtaining, and pursuant to, the Court Order and the Bankruptcy Court Order, this Agreement and the documents executed in connection herewith to which Vendor is a party are, or upon their execution and delivery will be, the valid and binding obligations of Vendor and enforceable against Vendor in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a Proceeding at law or in equity;

(d)    the execution, delivery, and performance by Vendor of this Agreement and the documents executed in connection herewith to which Vendor is a party and the performance of the transactions contemplated herein and therein will not: (i) conflict with or result in a breach of any provisions of the organizational documents of Vendor or (ii) subject to completion of the actions described in clauses (v) through (z) of this section 4.1(d), result in a material breach of, or material default under, or give rise to any right of termination, revocation, cancellation, or acceleration under, any of the terms of any Material Contract; or (iii) subject to completion of the actions described in clauses (v) through (z) of this section 4.1(d), violate any order, writ, injunction, judgment, decree, or Law applicable to Vendor or the Assets, except as would not, in the case of each of clauses (i), (ii), and (iii) above, individually or in the aggregate, have a Material Adverse Effect. Except for (v) any applicable notices, filings, consents or approvals under any applicable antitrust, competition or trade regulation Laws, (w) the entry of the Court Order and the Bankruptcy Court Order, (x) notices, filings, and consents required in connection with the Chapter 15 Case, (y) consents under the Assigned Contracts set forth on Schedule 4.1(d), and (z) approvals by Governmental Authorities customarily obtained after the Closing, Vendor is not required to give any notice to, make any filing with, or obtain any consent from any Person (including any Governmental Authority) in connection with the execution, delivery, and performance by Vendor of this Agreement, the documents executed in connection herewith to which Vendor is a party and the transactions contemplated herein and therein;

(e)    except as set forth on Schedule 4.1(e), other than the Chapter 15 Case and any adversary proceedings or contested motions commenced in connection therewith, there is no material Action by any Person or Governmental Authority, and no material legal, administrative, or arbitration

Proceeding pending or, to Vendor's Knowledge, threatened in writing against Vendor or any of the Assets, or to which Vendor is a party;

(f)     except as set forth on Schedule 4.1(f), to Vendor's Knowledge, none of the Assigned Leases and Interests, Surface Interests, or the Assigned Contracts is subject to a Right of First Refusal that would be triggered by this Agreement and under which a notice would be required due to the Parties entering into this Agreement;

(g)     except as set forth on Schedule 4.1(g), Vendor has incurred no obligation or liability for brokers' or finders' fees relating to the matters provided for in this Agreement that will be the responsibility of Purchaser, and any such obligation or liability that might exist shall be the sole obligation of Vendor;

(h)     to Vendor's Knowledge, Schedule 4.1(h) sets forth a list, true and correct as of the date set forth therein, of all Suspense Funds and the name or names of the parties to whom such funds are owed;

(i)     except as set forth on Schedule 4.1(i), to Vendor's Knowledge, Vendor is not in violation of, or in default under, in any material respect, any Law (including Environmental Law) applicable to Vendor's ownership or operation of the Assets;

(j)     to Vendor's Knowledge, Schedule 4.1(j) sets forth a true, correct and complete list, as of the Execution Date, of all Contracts binding on the Assets after Closing that cannot be terminated without penalty on 60 or fewer days' notice or that provide for an expenditure or aggregate expenditures by or revenues to Vendor in excess of $50,000 during the current or any future year, based solely on the terms thereof and without regard to any expected increases in volumes, revenues, or activities (collectively, the "**Material Contracts**"). Assuming the assumption thereof, payment of all Cure Costs, and provision of adequate assurance of future performance, to Vendor's Knowledge, (i) all such Material Contracts are the valid and legally binding obligations of Vendor and the other parties thereto and (ii) are enforceable in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally; and the obligation to pay Cure Costs. Excluding provisions that cause or constitute a breach or default upon the commencement or filing of bankruptcy proceedings or insolvency, to Vendor's Knowledge, (A) Vendor is not in breach or default in any material respect of any of its obligations under any such Material Contract, nor (B) has any event occurred which constitutes, or which with notice or lapse of time or both would constitute, a material breach or default by Vendor under any such Material Contract. To Vendor's Knowledge, Vendor has not given or received written notice of any action to terminate, cancel, rescind, not renew or procure a judicial reformation of any such Material Contract or any provision thereof;

(k)     as of the Effective Time, there are no outstanding authorities for expenditures or other commitments for capital expenditures with respect to any of the Assets that have been proposed by any Person having authority to do so that exceed $50,000 (net to Vendor's interest in such Asset);

(l)     except as set forth on Schedule 4.1(l), no bonds, letters of credit or other similar credit support instruments are maintained by Vendor with any Person with respect to Vendor's ownership or operation of the Assets (collectively, the "**Credit Support**");

(m)     Except as set forth on Schedule 4.1(m), to Vendor's Knowledge, there are no Wells that: (i) Vendor is obligated by any Applicable Law or Contract to currently plug, dismantle or abandon; or (ii) have been plugged, dismantled or abandoned in a manner that does not comply in all respects with applicable Law or Contract. Schedule 4.1(m) contains a list of (A) all Wells operated by Vendor that are inactive as of the Execution Date and (B) the Wells of which Vendor is the operator as of the Execution Date;

(n)     except as set forth on Schedule 4.1(n) or Exhibit H, (i) all Tax Returns with respect to Asset Taxes required to be filed by Vendor have been duly and timely filed; (ii) all Asset Taxes owed by Vendor

have been paid in full; (iii) Vendor does not have in force any waiver of any statute of limitations in respect of Asset Taxes or any extension of time with respect to an Asset Tax assessment or deficiency; (iv) no extension of time within which to file any Tax Return by Vendor with respect to any Asset Tax is currently in effect; (v) there are no Liens on any of the Assets related to any unpaid Taxes other than Permitted Encumbrances; (vi) no audit, litigation or other similar proceeding against Vendor with respect to Asset Taxes is presently pending, and Vendor has not received written notice of any pending claim against it (which remains outstanding) from any applicable Governmental Authority for assessment of Asset Taxes and, to Vendor's Knowledge, no such claim has been threatened; and (vii) none of the Assets is subject to any tax partnership agreement or is otherwise treated, or to Vendor's Knowledge required to be treated, as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code;

(o)     To the extent that Vendor has made any representations or warranties in this section 4.1 in connection with matters relating to non-operated Assets, each and every such representation and warranty shall be deemed to be qualified by the phrase "to Vendor's Knowledge".

**4.2     Representations and Warranties of Purchaser**

Purchaser makes the following representations and warranties to Vendor as of the Execution Date and as of the Closing Date:

(a)     Purchaser is a limited liability company, duly formed, validly existing and is authorized to carry on business in the jurisdiction(s) in which the Properties are located;

(b)     Purchaser has full limited liability company capacity, power and authority to purchase and acquire the right, title and interest of Vendor in and to the Assets according to the terms and provisions of this Agreement;

(c)     except for obtaining the Court Order and the Bankruptcy Court Order, the execution, delivery and performance of this Agreement has been duly and validly authorized by any and all requisite limited liability company actions and will not result in any violation of, be in conflict with, or constitute a default under, any organizational document to which Purchaser is bound;

(d)     the execution, delivery and performance of this Agreement will not result in any violation of, be in conflict with, or constitute a default under, any term or provision of any agreement or document to which Purchaser is party or by which Purchaser is bound, nor under any Order, statute, regulation, rule or license applicable to Purchaser;

(e)     provided the Court Order and the Bankruptcy Court Order are obtained, this Agreement and any other agreements delivered in connection herewith to which Purchaser is a party constitute valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms;

(f)     no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body exercising jurisdiction over Purchaser or the Assets is required for the due execution, delivery and performance by Purchaser of this Agreement, other than authorizations, approvals or exemptions from requirement therefor previously obtained and currently in force or to be obtained prior to or after Closing;

(g)     Purchaser has access to funds in an aggregate amount sufficient to pay: (i) all amounts required to be paid by Purchaser under this Agreement; and (ii) all expenses which have been or will be incurred by Purchaser in connection with this Agreement and the Transaction; and

(h)     Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokers' or finders' fees in respect of this Agreement or the Transaction for which Vendor shall have any obligation or liability.

- 27 -

**4.3    Limitation of Representations by Vendor**

(a)    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, VENDOR EXPRESSLY NEGATES ANY REPRESENTATIONS OR WARRANTIES EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT AND IN THE OFFICER'S CERTIFICATE DELIVERED BY VENDOR PURSUANT TO SECTION 2.6(a)(iii), WHETHER WRITTEN OR VERBAL, MADE BY VENDOR OR ITS REPRESENTATIVES AND IN PARTICULAR, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, VENDOR DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY SUCH REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED, WHETHER VERBAL OR IN WRITING, TO PURCHASER OR ANY OF ITS REPRESENTATIVES.  EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT AND IN THE OFFICER'S CERTIFICATE DELIVERED BY VENDOR PURSUANT TO SECTION 2.6(a)(iii), VENDOR'S INTEREST IN AND TO THE ASSETS SHALL BE PURCHASED ON A STRICTLY "AS IS, WHERE IS" BASIS AND IN THEIR PRESENT CONDITION "WITH ALL FAULTS AS TO ALL MATTERS," AND, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT AND IN THE OFFICER'S CERTIFICATE DELIVERED BY VENDOR PURSUANT TO SECTION 2.6(a)(iii), THERE ARE NO COLLATERAL AGREEMENTS, CONDITIONS, REPRESENTATIONS OR WARRANTIES OF ANY NATURE WHATSOEVER MADE BY VENDOR, EXPRESS OR IMPLIED, ARISING AT LAW, BY STATUTE, IN EQUITY OR OTHERWISE, WITH RESPECT TO THE ASSETS AND IN PARTICULAR, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT AND IN THE OFFICER'S CERTIFICATE DELIVERED BY VENDOR PURSUANT TO SECTION 2.6(a)(iii), THERE ARE NO COLLATERAL AGREEMENTS, CONDITIONS, REPRESENTATIONS OR WARRANTIES MADE BY VENDOR, EXPRESS OR IMPLIED, ARISING AT LAW, BY STATUTE, IN EQUITY OR OTHERWISE WITH RESPECT TO:

(i)    ANY ENGINEERING, GEOLOGICAL OR OTHER INTERPRETATION OR ECONOMIC EVALUATIONS RESPECTING THE ASSETS;

(ii)    THE QUALITY, QUANTITY OR RECOVERABILITY OF PETROLEUM SUBSTANCES WITHIN OR UNDER THE PROPERTIES OR ANY LANDS POOLED OR UNITIZED THEREWITH;

(iii)    ANY ESTIMATES OF THE VALUE OF THE ASSETS OR THE REVENUES OR CASH FLOWS FROM FUTURE PRODUCTION FROM THE PROPERTIES;

(iv)    THE RATES OF PRODUCTION OF PETROLEUM SUBSTANCES FROM THE PROPERTIES;

(v)    THE ENVIRONMENTAL STATE OR CONDITION OF THE PROPERTIES;

(vi)    THE AVAILABILITY OR CONTINUED AVAILABILITY OF FACILITIES, SERVICES OR MARKETS FOR THE PROCESSING, TRANSPORTATION OR SALE OF ANY PETROLEUM SUBSTANCES;

(vii)    THE QUALITY, CONDITION, FITNESS, SUITABILITY, SERVICEABILITY OR MERCHANTABILITY OF ANY TANGIBLE DEPRECIABLE EQUIPMENT OR PROPERTY INTERESTS WHICH COMPRISE THE ASSETS (INCLUDING THE TANGIBLES);

(viii)    THE ACCURACY OR COMPLETENESS OF THE DATAROOM INFORMATION OR ANY OTHER DATA OR INFORMATION SUPPLIED BY THE VENDOR OR ANY OF ITS REPRESENTATIVES IN CONNECTION WITH THE ASSETS;

(ix)    THE SUITABILITY OF THE ASSETS FOR ANY PURPOSE;

(x)    THE VALIDITY OR ENFORCEABILITY OF THE ASSIGNED CONTRACTS OR THE ABILITY TO ASSIGN ANY OF THE ASSIGNED CONTRACTS;

(xi)    THE NATURE AND QUANTUM OF THE ASSUMED LIABILITIES;

(xii)    COMPLIANCE WITH APPLICABLE LAWS; OR

(xiii)    THE TITLE AND INTEREST OR OWNERSHIP OF VENDOR IN AND TO THE ASSETS.

(b)    AFTER AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF ITS OWN SELECTION, PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS AND WAIVERS GIVEN IN AND UNDER THIS AGREEMENT SHALL BE CONSIDERED MATERIAL AND INTEGRAL PARTS OF THIS AGREEMENT, WITH CONSIDERATION GIVEN THEREFOR, AND ACKNOWLEDGES THAT ALL DISCLAIMERS AND WAIVERS ARE "CONSPICUOUS" AND, HAVE BEEN BROUGHT TO THE ATTENTION OF PURCHASER, AND THAT PURCHASER HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO ALL DISCLAIMERS AND WAIVERS.

(c)    Without restricting the generality of the foregoing, Purchaser acknowledges that it has made (or will make prior to Closing) its own independent investigation, analysis, evaluation and inspection of Vendor's interests in the Assets and the state and condition thereof and that it is satisfied with, and has relied solely on, such investigation, analysis, evaluation and inspection as to its assessment of the condition, quantum and value of the Assets and those matters specifically enumerated in section 4.3(a).

(d)    Except with respect to the representations and warranties in section 4.1 of this Agreement and in the Officer's Certificate delivered by Vendor pursuant to section 2.6(a)(iii) or in the event of fraud, Purchaser forever releases and discharges Vendor and its Representatives from any Claims and all liability to Purchaser or Purchaser's assigns and successors, as a result of the use or reliance upon advice, information or materials pertaining to the Assets which was delivered or made available to Purchaser by Vendor or its Representatives prior to or pursuant to this Agreement, including any evaluations, projections, reports and interpretive or non-factual materials prepared by or for Vendor, or otherwise in Vendor's possession.

(e)    **PURCHASER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF OIL, GAS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER HAZARDOUS SUBSTANCES LOCATED ON, UNDER OR ASSOCIATED WITH THE ASSETS AND THE ASSETS MAY ALSO CONTAIN PREVIOUSLY PLUGGED AND ABANDONED WELLS, BURIED PIPELINES, STORAGE TANKS, AND OTHER EQUIPMENT, WHETHER OR NOT OF A SIMILAR NATURE, THE LOCATIONS OF WHICH MAY NOT BE KNOWN BY VENDOR OR BE READILY APPARENT BY A PHYSICAL INSPECTION OF THE ASSETS. EQUIPMENT AND SITES INCLUDED IN THE ASSETS MAY CONTAIN NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS SUBSTANCES; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS SUBSTANCES MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS SUBSTANCES, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE ASSETS. FROM AND AFTER THE CLOSING, PURCHASER SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM AND OTHER WASTES), PRESENT AFTER THE CLOSING DATE,**

**IN A SAFE AND PRUDENT MANNER AND IN ACCORDANCE WITH ALL APPLICABLE ENVIRONMENTAL LAWS.**

**ARTICLE 5**
**SURVIVAL**

**5.1     Survival of Representations and Warranties and Covenants**

Each Party acknowledges that the other may rely on the representations and warranties made by such Party pursuant to section 4.1 or 4.2, as the case may be. The representations and warranties in sections 4.1 and 4.2 shall terminate upon, and not survive, the Closing. The covenants and agreements of the Parties contained in this Agreement to be performed at or prior to the Closing Date shall terminate upon, and not survive, the Closing. All covenants and agreements of the Parties contained in this Agreement to be performed after the Closing Date shall survive the Closing until fully performed, and each Party shall be liable to the other after the Closing for any breach thereof.

**ARTICLE 6**
**[INTENTIONALLY OMITTED]**

**ARTICLE 7**
**[INTENTIONALLY OMITTED]**

**ARTICLE 8**
**MAINTENANCE OF ASSETS**

**8.1     Maintenance of Assets**

From the Execution Date until the Closing Date, Vendor shall, to the extent that the nature of its interest permits, taking into account Vendor's status as the receiver and manager over Eagle Energy and its assets pursuant to the Appointment Order, and subject to the Assigned Leases and Interests, Permits, Surface Interests, and the Assigned Contracts:

(a)     (i) maintain and operate the Assets as a reasonably prudent operator and (ii) act with respect to the Assets in good faith and in the ordinary course of business consistent with past practices of Vendor, in each case, in material compliance with all Applicable Laws and Orders;

(b)     to the extent permitted by Applicable Law, timely pay all Taxes that are imposed on or with respect to the Assets that become due and payable, excluding Taxes that Vendor is contesting in good faith through appropriate proceedings and which are listed on <u>Schedule 4.1(n)</u> and <u>Exhibit H</u>; and

(c)     pay all associated operating costs incurred by the Vendor in a timely fashion.

**8.2     Consent of Purchaser**

Notwithstanding section 8.1 and subject to Applicable Laws and Orders (including in relation to the receivership proceedings of Eagle Energy and such proceedings themselves), Vendor shall not from the Execution Date to the Closing Date, without the written consent of Purchaser, which consent shall not be unreasonably withheld by Purchaser and which, if provided, shall be provided in a timely manner, or unless as ordered or authorized by the Court or the US Bankruptcy Court:

(a)     make any commitment or propose, initiate or authorize any capital expenditure with respect to the Assets of which Vendor's share is in excess of $50,000.00, except in case of an emergency required to protect life, property or the environment or in respect of amounts which Vendor may be committed to expend or be deemed to authorize for expenditure without its consent pursuant to any applicable joint operating agreement;

(b)     surrender or abandon any of the Assets (except for the surrender or abandonment of any Assigned Lease and Interest to the extent such Assigned Lease and Interest terminates pursuant to its terms), unless an expenditure of money is required to avoid the surrender or abandonment and Purchaser does not agree to pay same in a timely fashion;

(c)     materially amend or terminate any Assigned Leases and Interests or Material Contract or enter into any new Contract relating to the Assets;

(d)     sell, encumber or otherwise dispose of any of the Assets or any part or portion thereof excepting sales of Petroleum Substances in the normal course of business;

(e)     settle any material Proceeding or waive any material Claims or rights of material value, in each case, attributable to the Assets and affecting the period after the Effective Time; or

(f)     voluntarily relinquish its position as operator with respect to any of the Assets that Vendor operates as of the Execution Date.

Vendor shall from the Execution Date to the Closing Date give written notice to Purchaser as soon as practicable of any written notice received or given by Vendor with respect to any (i) alleged breach by Vendor or any Third Party of any Lease or Material Contract, (ii) alleged violation of Law by Vendor, any of its Affiliates or a Third Party operator with respect to any of the Assets, (iii) lawsuit, Proceeding or Claim with respect to any of the Assets or (iv) termination of any Lease (other than as a result of the expiration of such Lease pursuant to its terms).

## 8.3     Proposed Actions

If an operation or the exercise of any right or option respecting the Assets is proposed in circumstances in which such operation or the exercise of such right or option would require Purchaser's consent as set forth in section 8.2, the following shall apply to such operation or the exercise of such right or option (hereinafter referred to as the "**Proposal**"):

(a)     Vendor shall promptly give Purchaser notice of the Proposal, describing the particulars in reasonable detail;

(b)     Purchaser shall, not later than twenty four (24) hours prior to the time Vendor is required to make its election with respect to the Proposal, advise Vendor, by notice, whether Purchaser consents to the exercise by Vendor of its rights with respect to the Proposal, provided that Purchaser's failure to make such election within such period shall be deemed to be Purchaser's election not to participate in the Proposal;

(c)     Vendor shall make the election authorized by Purchaser with respect to the Proposal within the period during which Vendor may respond to the Proposal; and

(d)     Purchaser's election not to participate in any Proposal required to preserve the existence of any of the Assets and any termination of Vendor's interest therein as a result of such election shall not constitute a failure of Vendor's representations and warranties pertaining to such Assets.

## 8.4     [Intentionally Omitted.]

## 8.5     Transfer of Operatorship

Insofar as Vendor operates any of the Assets, subject to sections 3.1(e) and 3.1(g), Purchaser acknowledges that Vendor has made no representations or warranties respecting Vendor's ability to transfer operatorship of some or all of such Assets to Purchaser at or after Closing.

## ARTICLE 9
## ADDITIONAL AGREEMENTS

**9.1     Taxes**

(a)     Vendor shall be allocated, bear and pay all ad valorem, property, excise, severance, production, sales, use and similar Taxes based upon acquisition, operation or ownership of the Assets or the production of Petroleum Substances or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, Income Taxes and Sales Taxes) (collectively, the "**Asset Taxes**") attributable to (i) any Tax period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending prior to the Effective Time.  Purchaser shall be allocated, bear and pay all Asset Taxes attributable to (i) any Tax period beginning at or after the Effective Time and (ii) the portion of any Straddle Period beginning at the Effective Time.  For purposes of the foregoing allocations between Vendor and Purchaser of Asset Taxes, (1) Asset Taxes that are attributable to the severance or production of Petroleum Substances (other than such Asset Taxes described in clause (3), below) shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (2) Asset Taxes that are based upon or related to sales or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (1) or (3)), shall be shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred; and (3) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending immediately prior to the Effective Time (which shall be Vendor's responsibility) and the portion of such Straddle Period beginning at the Effective Time (which shall be Purchaser's responsibility) by prorating each such Asset Tax based on the number of days in the applicable Straddle Period that occur before the Effective Time, on the one hand, and the number of days in such Straddle Period that occur on or after the Effective Time, on the other hand.

(b)     The Parties shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation, or other Proceeding with respect to Taxes, in each case, relating to the Assets.  Such cooperation shall include, upon request, as promptly as practicable, furnishing to each other records and information that is in their or their Affiliates' possession (including providing access to books and records and Tax Returns and related working papers related to pre-Closing Tax periods) and providing assistance that is relevant to any such Tax Returns or audit, litigation or other Proceeding; provided, however, that neither Purchaser nor Vendor shall be required to disclose the contents of its Income Tax Returns to any Person.

**9.2     Financial Assurance and Credit Support**

It shall be the sole obligation of Purchaser, at Purchaser's sole cost and expense, to provide any and all financial assurances and other documentation required by Governmental Authorities or Third Parties under the Assigned Leases and Interests, Assigned Contracts or Applicable Law to permit the transfer to Purchaser, and registration of Purchaser as owner and/or operator (as the context requires), of any of the Assets. Purchaser acknowledges that Vendor has no duty to maintain any Credit Support or other financial assurance following the Closing, and Purchaser agrees to use commercially reasonable efforts to cooperate with Vendor's efforts to secure the release of any Credit Support or other financial assurance posted by Vendor, such cooperation to include, if necessary, the provision by Purchaser of a guaranty or letter of credit to secure Purchaser's payment and/or performance under any Assigned Contracts or Assigned Leases and Interests after the Closing. If any Credit Support or other financial assurance remains outstanding as of the Closing Date, then Purchaser shall indemnify Vendor and hold it harmless against any losses that Vendor may incur under any such Credit Support or other financial assurance from and after the Effective Time.

**9.3    Bankruptcy Court Approval**

(a)    Vendor and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests are subject to approval of the US Bankruptcy Court and the Court.

(b)    Purchaser agrees that it will promptly take all such actions as are reasonably requested by Vendor to assist in obtaining US Bankruptcy Court approval and approval of the Court of the sale of the Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests, including furnishing affidavits or other documents or information for filing with the US Bankruptcy Court or the Court and making witnesses available to testify, for the purposes, among others, of (i) providing necessary assurances of performance by Purchaser under this Agreement, (ii) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the US Bankruptcy Code and (iii) establishing adequate assurance of future performance within the meaning of section 365 of the US Bankruptcy Code.

(c)    If an appeal is taken or a stay pending appeal is requested from the Court Order or the Bankruptcy Court Order, then Vendor promptly shall notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or Order of stay. Vendor also shall provide Purchaser with written notice of any motion or application filed in connection with any appeal from either such orders. In the event the entry of the Court Order or Bankruptcy Court Order is appealed, Vendor and Purchaser shall use their respective reasonable efforts to defend such appeal.

(d)    Vendor shall  provide proper and timely notice of the sale of the Assets free and clear of Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) and the other Transactions contemplated hereby, the US Sale Motion and the hearing on the US Sale Motion before the US Bankruptcy Court in accordance with the requirements of the US Bankruptcy Code including, but not limited to, Rules 2002, 6004 and 6006 of the US Federal Rules of Bankruptcy Procedure on: (a) all creditors of Eagle Energy, (b) all counterparties to Assigned Contracts, Excluded Contracts and Assigned Leases and Interests, (c) all parties holding Hard Consents or a Right of First Refusal, and (d) all other parties in interest in the Chapter 15 Cases.

**9.4    Casualty Loss**

If, after the Execution Date but prior to the Closing Date any material part of the Assets suffers a Casualty Event or if proceedings for condemnation or under the right of eminent domain are pending or threatened after the Execution Date but prior to Closing, then:

(a)    Vendor promptly shall give notice to Purchaser of such occurrence, including reasonable particulars with respect thereto;

(b)    this Agreement shall remain in full force and effect, and Purchaser nevertheless shall be required to complete the Transaction; and

(c)    without recourse against Vendor, Vendor shall transfer to Purchaser all right, title and interest of Vendor to insurance and other Claims against Third Parties, including condemnation proceeds, arising out of such occurrence.

Notwithstanding anything to the contrary herein, at the Closing, the Assets affected by a Casualty Event or any pending or threatened proceedings for condemnation or under the right of eminent domain shall be included in the Closing, and there shall be no reduction to the Purchase Price in relation to such Casualty Event or pending or threatened proceeding. Except as set forth in this section 9.4, Vendor shall have no other liability or responsibility to Purchaser with respect to a Casualty Event, EVEN IF SUCH CASUALTY EVENT SHALL HAVE RESULTED FROM, OR SHALL HAVE ARISEN OUT OF, THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR VIOLATION OF AN APPLICABLE LAW BY VENDOR OR ANY OF ITS AFFILIATES OR REPRESENTATIVES.

**9.5     Post-Closing Revenue**

Following Closing and to the extent to which Purchaser must be novated into or assigned the Assigned Contracts or otherwise recognized as the owner of the Assets, until that novation, assignment or recognition has been effected, Vendor shall receive any and all trade credits, accounts receivable and other proceeds, income or revenues attributable to the Assets as bare trustee and shall promptly remit such proceeds, income and revenues to Purchaser. Notwithstanding any other provision of this Agreement, the terms and provisions of this section 9.5 shall survive the Closing without limitation.

**9.6     Release and Covenant not to Sue**

ON THE CLOSING DATE, EACH OF RECEIVER AND VENDOR (IN ITS OWN RIGHT AND ON BEHALF OF ITS AFFILIATES, OFFICERS, EMPLOYEES, ATTORNEYS AND AGENTS) WILL BE DEEMED TO EXPRESSLY AND UNCONDITIONALLY ACKNOWLEDGE AND AGREE THAT IT HAS NO SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, DEFENSES, CLAIMS, CAUSES OF ACTION, ACTIONS OR DAMAGES OF ANY CHARACTER OR NATURE, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT, OR INDIRECT, AGAINST PURCHASER, THE ADMINISTRATIVE AGENT OR ANY LENDER UNDER THE CREDIT AGREEMENT, ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, ATTORNEYS OR REPRESENTATIVES OR ANY OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS OR ASSIGNS (COLLECTIVELY, THE "**LENDER-RELATED PARTIES**"). FROM AND AFTER THE CLOSING DATE, EACH OF RECEIVER AND VENDOR WILL BE DEEMED TO KNOWINGLY AND UNCONDITIONALLY WAIVE AND FULLY AND FINALLY RELEASE AND FOREVER DISCHARGE THE LENDER-RELATED PARTIES FROM, AND TO COVENANT NOT TO SUE THE LENDER-RELATED PARTIES FOR, ANY AND ALL SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, CLAIMS, CAUSES OF ACTION, ACTIONS, GROUNDS, CAUSES, DAMAGES, COSTS AND EXPENSES OF EVERY NATURE AND CHARACTER, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT OR INDIRECT, ARISING OUT OF OR FROM OR RELATED TO THE CREDIT AGREEMENT OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION THEREWITH, THE CHAPTER 15 CASES AND THE RECEIVERSHIP PROCEEDINGS OF EAGLE ENERGY BEFORE THE COURT WHICH EACH OF RECEIVER OR VENDOR OR ANY OF ITS AFFILIATES NOW OWNS AND HOLDS, OR HAS AT ANY TIME HERETOFORE OWNED OR HELD, SUCH WAIVER, RELEASE AND DISCHARGE BEING MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CIRCUMSTANCES AND EFFECTS OF SUCH WAIVER, RELEASE AND DISCHARGE AND AFTER HAVING CONSULTED LEGAL COUNSEL OF ITS OWN CHOOSING WITH RESPECT THERETO. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, NOTHING CONTAINED IN THIS SECTION 9.6 SHALL CONSTITUTE A RELEASE OR WAIVER OF ANY RIGHTS OF RECEIVER OR VENDOR EXPLICITLY PROVIDED FOR IN THIS AGREEMENT.

**ARTICLE 10**
**PURCHASER'S REVIEW AND ACCESS TO BOOKS AND RECORDS**

**10.1     Vendor to Provide Access**

(a)     Until the date that is two Business Days prior to the Closing Date, Vendor shall, subject to contractual restrictions in favour of Third Parties relative to disclosure applicable to Vendor (provided that Vendor shall use commercially reasonable efforts to obtain waivers of any such restrictions from the applicable parties) and Applicable Law, at the offices of Vendor during normal business hours and, to the extent reasonably requested by Purchaser by no less than two Business Days' prior written notice, provide reasonable access for Purchaser and its authorized Representatives to Vendor's records, books, accounts, documents, files, reports, information, materials, filings, and data, to the extent they relate to the Assets (insofar as Vendor can reasonably

provide such access) for the purpose of Purchaser's review of the Assets and title thereto; provided, however, that such access shall not interfere with the ordinary conduct of business or the operation of the Assets and at all times during such access, Purchaser and/or its authorized Representatives shall be accompanied by at least one Representative of Vendor.

(b)     Until the date that is two Business Days prior to the Closing Date, upon at least two Business Days' prior written notice, Purchaser shall have the right, at its sole cost, liability, and expense, to conduct a Phase I Environmental Site Assessment; provided, however that (i) any entry by Purchaser onto the Assets and such Phase I Environmental Site Assessment shall not interfere with the ordinary conduct of business or operation of the Assets and (ii) at all times during such entry, Purchaser's authorized Representatives shall be accompanied by at least one Representative of Vendor. Such Phase I Environmental Site Assessment shall be conducted during Vendor's normal business hours, and Purchaser and any of its Representatives participating in such Phase I Environmental Site Assessment shall be accompanied at all times by a Vendor Representative. No sampling or other invasive inspections of the Assets may be conducted without Vendor's prior written consent. Vendor shall have the right, which it may exercise at its sole discretion, (1) to observe any such investigation by Purchaser or its Representative and (2) promptly receive a copy of all results, analyses, reports, and reviews resulting from any such investigation (except to the extent that attorney-client privilege applies to any such information). All information obtained or reviewed by Purchaser shall be maintained confidential by Purchaser and shall be governed by the terms of the Confidentiality Agreement.

## 10.2     Access to Information

After Closing and subject to contractual restrictions in favour of Third Parties relative to disclosure, Purchaser shall, on reasonable request from Vendor, provide reasonable access to Vendor at Purchaser's offices, during its normal business hours, to the agreements and documents to which the Assets are subject and the contracts, agreements, records, books, documents, licenses, reports and data included in the Records which are then in the possession or control of Purchaser and to make copies thereof (at Vendor's sole cost), as Vendor may reasonably require, including for purposes relating to:

(a)     Eagle Energy's or Vendor's ownership of the Assets, including Tax matters and Liabilities and Claims that arise from or relate to acts, omissions, events, circumstances or operations on or before the Closing Date, to the extent relating to any of the Retained Liabilities or Excluded Assets;

(b)     enforcing its rights under this Agreement;

(c)     matters related to compliance with Applicable Law, to the extent relating to any of the Retained Liabilities or Excluded Assets; or

(d)     any Claim commenced or threatened in writing by any Third Party against Eagle Energy or Vendor, to the extent relating to any of the Retained Liabilities or Excluded Assets.

## 10.3     Maintenance of Information

All of the information, materials and other records relating to the Assets (a) delivered to Purchaser pursuant to the terms hereof shall be maintained in a reasonably accessible location by Purchaser for a period of two years from the Closing Date or (b) if kept by or delivered to Vendor after the Closing pursuant to the terms hereof shall be kept confidential by Vendor and shall not be disclosed by Vendor to any Third Party, except as otherwise required under Applicable Law or pursuant to any legal, administrative, judicial or arbitral process, for a period of two years from the Closing Date or the date of such delivery, as applicable.

## ARTICLE 11
## GENERAL

**11.1    Termination**

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)    by Vendor or Purchaser:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the transactions contemplated hereby, where such ruling or Order was not requested, encouraged, or supported by Vendor or Purchaser;

(ii)    by mutual written consent of Vendor and Purchaser;

(iii)    if the Closing has not occurred by the close of business on July 31, 2020 (the "**Outside Date**"); provided, however, that (1) Purchaser shall be permitted to terminate this Agreement pursuant to this section 11.1(a)(iii) only if (x) Purchaser is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein and (y) Purchaser has provided written notice to Vendor of its intention to exercise its rights under this section 11.1(a)(iii), and Vendor has not provided written notice to Purchaser that it is ready, willing, and able to close the Transaction on or before the date that is five Business Days after the date of such notice from Purchaser, and (2) Vendor shall be permitted to terminate this Agreement pursuant to this section 11.1(a)(iii) only if (x) Vendor is not in material breach of any of its representations, warranties, covenants or agreements contained herein and (y) Vendor has provided written notice to Purchaser of its intention to exercise its rights under this section 11.1(a)(iii), and Purchaser has not provided written notice to Vendor that it is ready, willing and able to close the Transaction on or before the date that is five Business Days after the date of such notice from Vendor; or

(iv)    if the US Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the US Bankruptcy Code, any of the Chapter 15 Cases, where such Order was not requested, encouraged, or supported by Vendor;

(b)    By Purchaser, if Vendor breaches any of Vendor's agreements, covenants, representations or warranties contained herein, and such breach would result in the failure of a condition set forth in section 3.3(a) or section 3.3(b) or a material breach by Vendor of the Bankruptcy Court Order or the Court Order, and, in each case, the failure of Vendor to cure such breach within 10 days after receipt of the Purchaser Termination Notice; provided, however, that (i) Purchaser is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Bankruptcy Court Order or the Court Order, (ii) Purchaser notifies Vendor in writing (the "**Purchaser Termination Notice**") of its intention to exercise its rights under this section 11.1(b) as a result of such breach, and (iii) Purchaser specifies in the Purchaser Termination Notice the representation, warranty, covenant, or agreement contained herein or in the Bankruptcy Court Order or the Court Order of which Vendor is allegedly in breach and a description of the specific factual circumstances to support the allegation; or

(c)    By Vendor, if Purchaser breaches any of Purchaser's agreements, covenants, representations or warranties contained herein, and such breach would result in the failure of a condition set forth in section 3.4(a) or 3.4(b) to be satisfied or a material breach by Purchaser of the Bankruptcy Court Order or the Court Order, and, in each case, the failure of Purchaser to cure such breach within 10 days after receipt of the Seller Termination Notice; provided, however, that Vendor (i) is not itself in material breach of any of its representations, warranties, covenants, or agreements contained herein or in the Bankruptcy Court Order or the Court Order, (ii) notifies Purchaser in writing (the

"**Vendor Termination Notice**") of its intention to exercise its rights under this section 11.1(c) as a result of such breach, and (iii) specifies in the Vendor Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bankruptcy Court Order or the Court Order of which Purchaser is allegedly in breach and a description of the specific factual circumstances to support the allegation;

provided that, notwithstanding anything to the contrary set forth above, either Party may, if it is unable to terminate this Agreement pursuant to Sections 11.1(a)(iii), 11.1(b) or 11.1(c) solely due to the reasons set forth in sections 11.1(a)(iii)(1)(x), 11.1(a)(iii)(2)(x), 11.1(b)(i) or 11.1(c)(i), as applicable (in a circumstance where such Party would otherwise have the right to terminate this Agreement), terminate this Agreement prior to Closing under section 11.1(a)(iii), 11.1(b) or 11.1(c), as applicable, at any time following the thirtieth (30th) day after the Outside Date unless, in the case of Vendor as a terminating Party, prior to Vendor so terminating this Agreement, Purchaser has commenced an appropriate proceeding to enforce its rights of specific performance hereunder.

In the event of a termination of this Agreement pursuant to this section 11.1, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of either Party to the other Party; provided, however, that nothing herein shall relieve either Party from Liability for breach of this Agreement prior to such termination. The provisions of this paragraph and, to the extent applicable to the interpretation or enforcement of the same, Article 1 and the other provisions of this Article 11, shall expressly survive the termination of this Agreement.

## 11.2   Further Assurances

Each Party will, from time to time and at all times after Closing, without further consideration, do such further acts and deliver all such further assurances, deeds, documents and instruments as shall be reasonably required to fully perform and carry out the terms of this Agreement and to consummate the Transaction.

## 11.3   No Merger

The covenants, representations, warranties and indemnities contained in this Agreement shall be deemed to be restated in any and all assignments, conveyances, transfers and other documents conveying the rights, title and interests of Vendor in and to the Assets to Purchaser, subject to any and all time and other limitations contained in this Agreement.   There shall not be any merger of any covenant, representation, warranty or indemnity in such assignments, conveyances, transfers and other documents notwithstanding any rule of law, equity or statute to the contrary and such rules are hereby waived.

## 11.4   Receiver

Purchaser acknowledges that Receiver is acting solely in its capacity as the Court-appointed receiver and manager of Eagle Energy, and not in its personal or corporate capacity.   Under no circumstances shall Receiver or any of its Representatives have any liability pursuant to this Agreement, or in relation to the Transaction, in its or their personal or corporate capacity, whether such liability be in contract, tort or otherwise, except in the case of fraud, gross negligence or willful misconduct of Receiver.

## 11.5   Entire Agreement

The provisions contained in any and all documents and agreements collateral hereto shall at all times be read subject to the provisions of this Agreement and, in the event of conflict, the provisions of this Agreement shall prevail.   This Agreement, the Schedules and Exhibits hereto and any and all documents and agreements of the Parties delivered in connection herewith supersede all other agreements, documents, writings and verbal understandings between the Parties relating to the subject matter hereof and express the entire agreement of the Parties with respect to the subject matter hereof.

**11.6    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver**

(a)    Except to the extent the mandatory provisions of the US Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Texas applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the US Bankruptcy Court, (i) the US Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all Claims relating to the foregoing shall be filed and maintained only in the US Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the US Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Chapter 15 Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas state court or a federal court sitting in the United States District Court for the Northern District of the State of Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding.  The Parties consent to service of process by mail (in accordance with section 11.10) or any other manner permitted by Applicable Law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF VENDOR, PURCHASER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

**11.7    Signs and Notifications**

Within 90 days following Closing, Purchaser shall remove any signage which indicates Eagle Energy's ownership or operation of the Assets.  It shall be the responsibility of Purchaser to erect or install any signage required by applicable Governmental Authorities indicating Purchaser to be the owner or operator of the Assets.

**11.8    Assignment**

This Agreement may not be assigned by a Party without the prior written consent of the other Party; provided, that Purchaser shall be permitted, upon notice to Vendor and Receiver, to assign all or part of its rights or obligations hereunder (including obligations related to the Assumed Liabilities) to one or more of its Affiliates. Any such assignment by Purchaser to its Affiliate shall not relieve Purchaser of any of its obligations under this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective administrators, trustees, receivers, successors and permitted assigns.

**11.9    Time of Essence**

Time shall be of the essence in this Agreement.

**11.10    Notices**

The addresses and email addresses of the Parties for delivery of notices hereunder shall be as follows:

- 38 -

Vendor -  FTI Consulting Canada Inc.
Suite 1610, 520 – 5th Avenue SW
Calgary, AB  T2P 3R7

Attention:  Deryck Helkaa / Dustin Olver
Email:  deryck.helkaa@fticonsulting.com /
dustin.olver@fticonsulting.com

with a copy (which shall not constitute notice) to -

Norton Rose Fulbright Canada LLP
400 3rd Avenue SW, Suite 3700
Calgary Alberta T2P 4H2 Canada

Attention:  Howard A. Gorman / Thomas R. Collopy
Email:  howard.gorman@nortonrosefulbright.com/
thomas.collopy@nortonrosefulbright.com

Purchaser -  White Oak Global Advisors, LLC
Suite 550, 3 Embarcadero Center
San Francisco, CA 94111
Attention:  Kyle Landau
Email:  klandau@whiteoaksf.com

with a copy (which shall not constitute notice) to -

Vinson & Elkins L.L.P.
2001 Ross Avenue
Suite 3900
Dallas, TX 75201
Attention:  Cris Dewar
Email:  cdewar@velaw.com

All notices, communications and statements required, permitted or contemplated hereunder shall be in writing, and shall be delivered as follows:

(a)     by delivery to a Party between 8:00 a.m. and 4:00 p.m. on a Business Day at the address of such Party for notices, in which case, the notice shall be deemed to have been received by that Party when it is delivered;

(b)     by email to a Party to the email address of such Party for notices, in which case, if the notice was sent prior to 4:00 p.m. on a Business Day, the notice shall be deemed to have been received by that Party when it was sent and if it is sent on a day which is not a Business Day or is sent after 4:00 p.m. on a Business Day, it shall be deemed to have been received on the next following Business Day; or

(c)     except in the event of an actual or threatened postal strike or other labour disruption that may affect mail service, by first class registered postage prepaid mail to a Party at the address of such Party for notices, in which case, the notice shall be deemed to have been received by that Party on the fourth (4th) Business Day following the date of mailing.

A Party may from time to time change its address for service, email address or designated representative by giving written notice of such change to the other Party.

**11.11    Invalidity of Provisions**

In case any of the provisions of this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. Upon any such determination that any of the provisions of this Agreement should be invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the Transaction is fulfilled to the extent possible, and the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

**11.12    Waiver**

No failure on the part of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any right or remedy in law or in equity or by statute or otherwise conferred.   No waiver by any Party of any breach (whether actual or anticipated) of any of the terms, conditions, representations or warranties contained herein shall take effect or be binding upon that Party unless the waiver is delivered in writing by such Party.   Any waiver so given shall extend only to the particular breach so waived and shall not limit or affect any rights with respect to any other or future breach.

**11.13    Amendment**

This Agreement shall not be varied in its terms or amended by oral agreement or by representations or otherwise other than by an instrument in writing dated subsequent to the date hereof, executed by a duly authorized representative of each Party.

**11.14    Confidentiality and Public Announcements**

Until Closing has occurred, each Party shall keep confidential all information obtained from the other Party in connection with the Assets and the Transaction and shall not release any information concerning this Agreement and the Transaction without the prior written consent of the other Party, which consent shall not be unreasonably withheld.   Nothing contained in this section 11.14 shall prevent a Party at any time from furnishing information (i) to any Governmental Authority or regulatory authority or to the public or otherwise if required by Applicable Law or as directed or requested by any Governmental Authority or regulatory authority (including in relation to the receivership proceedings of Eagle Energy and such proceedings themselves); (ii) in connection with obtaining the Court Order and the Bankruptcy Court Order; (iii) to its professional advisors on a need-to-know basis; or (iv) as required to Eagle Energy's secured creditors.

**11.15    No Third Party Beneficiaries**

Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to, or shall, confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**11.16    Specific Performance**

Each Party hereby acknowledges and agrees that the rights of each Party to consummate the transactions contemplated hereby (including the satisfaction of any condition to Closing) are special, unique and of extraordinary character and that, if any Party violates or fails or refuses to perform any covenant or agreement made by it herein, the non-breaching Party will be without an adequate remedy at law. If any Party violates or fails or refuses to perform any covenant or agreement made by such Party herein, the non-breaching Party, subject to the terms hereof, may, except to the extent that this Agreement has been validly terminated, institute and prosecute an Action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief without the necessity of

proving actual damages and without any requirement to post a bond; provided that, notwithstanding anything to the contrary set forth herein, Vendor shall not be permitted, and shall have no right, to seek specific performance of Purchaser's obligation to consummate the Transaction. If any such Action is brought to enforce the provisions of this Agreement, then no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law. The Parties further agree that by seeking any remedy provided for in this section 11.16, a Party shall not in any respect waive its right to seek any other form of relief that may be available to such Party under this Agreement and nothing in this section 11.16 shall require any Party to institute any Action for (or limit such Party's right to institute any Action for) specific performance under this section 11.16 before exercising any other right under this Agreement.

## 11.17    Expenses

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its own costs and expenses incurred in anticipation of, relating to, and in connection, with the negotiation and execution of this Agreement and any other agreement, document or instrument contemplated hereby and the transactions contemplated hereby and thereby.

## 11.18    Non-Recourse

No past, present or future director, officer, employee, contractor, agent, incorporator, member, partner or equityholder of the Parties shall have any liability for any obligations or liabilities of Vendor or Purchaser, as applicable, under this Agreement or any other agreement, document or instrument entered into in connection herewith or for any Claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.  Any Claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties to this Agreement, no other party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or for any Action or Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a Claim by or on behalf of a Party hereto or another Person or otherwise.

## 11.19    Counterpart Execution

This Agreement may be executed and delivered in counterpart and transmitted by facsimile or other electronic means and all such executed counterparts, including electronically transmitted copies of such counterparts, shall together constitute one and the same agreement.

*[Remainder of page intentionally left blank. Signature pages to follow.]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**FTI CONSULTING CANADA INC.**, solely in its capacity as the court-appointed receiver and manager of **EAGLE ENERGY INC.**, **EAGLE ENERGY TRUST**, **EAGLE ENERGY HOLDINGS INC.**, and **EAGLE HYDROCARBONS INC.**, and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc. "**Vendor**")

By:

Name: DERYCK HELKAA

Title: SR MANAGING DIRECTOR

**AGUILA ENERGY, LLC ("Purchaser")**
By: Aguila Energy Partners, LLC, its sole member

By:

Name: Kyle Landau

Title: Manager

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**FTI CONSULTING CANADA INC.**, solely in its capacity as the court-appointed receiver and manager of **EAGLE ENERGY INC.**, **EAGLE ENERGY TRUST**, **EAGLE ENERGY HOLDINGS INC.**, and **EAGLE HYDROCARBONS INC.**, and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc. "**Vendor**")

**AGUILA ENERGY, LLC ("Purchaser")**
By: Aguila Energy Partners, LLC, its sole member

By: _____

Name:

Title:

By: _____

Name:  Kyle Landau

Title:  Manager

**EXHIBIT A-1**

**ASSIGNED LEASES**

See attached.

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| ROBERT E BROWN TRUSTEE | PLACID OIL COMPANY | 7/12/1993 | 333 | 40 | Hardeman | TX | **Tract 1**: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, MIL. **TRACT 2**: BEING THE S/2 NE/4; AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES MIL. **TRACT 3**: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, MIL. |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 11/7/2000 | 386 | 643 | Hardeman | TX | EL&RR CO SURVEY, CERT. NO. 1418, A-1672, SEC. 10, THE EAST 320 ACS |
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 11/7/2000 | 386 | 713 | Hardeman | TX | EL&RR CO SURVEY, CERT. NO. 1418, A-1672, SEC. 10, THE EAST 320 ACS |
| EDWIN J JOHNSON & BETTY JO JOHNSON | GAEDEKE OIL & GAS OPERATING LLC | 9/30/2008 | DI08 | 49108 | Hardeman | TX | BEING THE SOUTH 160 ACRES , SEC 1, HE&WTRR CO SVY, A-598, HARDEMAN CO, TX |
| GENE GILLIAM | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49112 | Hardeman | TX | ALL OF THE NORTH 293 ACRES OF SECTION 1, A-598, HE&WTRR CO SVY, HARDEMAN CO, TX & ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| GINGER GILLIAM GENDRON | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49110 | Hardeman | TX | ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| GINGER GILLIAM GENDRON, ET AL | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49114 | Hardeman | TX | ALL OF THE NORTH 293 ACRES OF SECTION 1, A-598, HE&WTRR CO SVY, HARDEMAN CO, TX & ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| RONNIE LYNN HANNERS JR ET AL | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49109 | Hardeman | TX | ALL OF THE NORTH 293 ACRES OF SECTION 1, A-598, HE&WTRR CO SVY, HARDEMAN CO, TX & ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| RUTH GILLIAM HATCHER | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49111 | Hardeman | TX | ALL OF THE NORTH 341 ACRES OF SECTION 1, A-598, HE&WTRR CO SVY, HARDEMAN CO, TX & ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| TEDDY GILLIAM & BARBARA GILLIAM | GAEDEKE OIL & GAS OPERATING LLC | 10/1/2008 | DI08 | 49113 | Hardeman | TX | ALL OF SEC 4, ABSTRACT NOS 1655 & 1535, HE&WT RR CO SVY,  HARDEMAN CO, TX CONTAINING 452 ACRES |
| JW CONN IV | GAEDEKE OIL & GAS OPERATING LLC | 10/4/2008 | DI08 | 49107 | Hardeman | TX | BEING THE SOUTH 160 ACRES , SEC 1, HE&WTRR CO SVY, A-598, HARDEMAN CO, TX |
| MOLLIE EVANS HEIRS TRUST | CHOLLA PETROLEUM INC | 11/20/2009 | DI09 | 50501 | Hardeman | TX | ALL OF SEC 2, A-1513, HE&WT RR CO SVY, HARDEMAN CO, TX & ALL OF SEC 74, A-1514, BLK H, W&NW SVY, S/E A 91.375 ACRE TRACT DESCRIBED IN VOL 420/PG 870 DEED RECORDS HARDEMAN CO, TX |
| PAMELA LYNN RAMSEY, ET AL | CHOLLA PETROLEUM INC | 12/3/2009 | DI10 | 50873 | Hardeman | TX | ALL OF SEC 2, A-1513, HE&WT RR CO SVY, HARDEMAN CO, TX & ALL OF SEC 74, A-1514, BLK H, W&NW SVY, S/E A 91.375 ACRE TRACT DESCRIBED IN VOL 420/PG 870 DEED RECORDS HARDEMAN CO, TX |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | State | County | Legal Description |
|---|---|---|---|---|---|---|---|
| WILLIAM ROBINSON TRUST | CHOLLA PETROLEUM INC | 12/18/2009 | DI10 | 50666 | TX | Hardeman | ALL OF SEC 2, A-1513, HE&WT RR CO SVY, HARDEMAN CO, TX & ALL OF SEC 74, A-1514, BLK H, W&NW SVY, S/E A 91.375 ACRE TRACT DESCRIBED IN VOL 420/PG 870 DEED RECORDS HARDEMAN CO, TX |
| RONNIE D. MOTT, ET UX | Tex-Brit Corporation | 12/28/15 | DI16-60601 | | Texas | Hardeman | Tract 1: 82.0 acres of land, more or less, being all of the W/2 of a 164.0 acre tract of land out of the SE corner of Section 132, Block H, W&NW RR. Co. Survey, A-957, Hardeman County, Texas, being the same land more particularly described in that certain Warranty Deed dated June 7, 2003, from Jimmie Don Ray to Ronnie Mott, recorded in Volume 403, Page 750, Official Public Records of Hardeman County, Texas. Tract 2: 204.0 acres of land, more or less, being all of the East 204.0 acres of the N/2 of Section 132, Block H, W&NW RR. Co. Survey, A-957, Hardeman County, Texas, being the same land more particularly described in that certain Warranty Deed dated December 8, 1999, from Wendell Loyd Tucker and wife, Sarah Ann Tucker, to Ronnie D. Mott and wife, Jennifer K. Mott, recorded in Volume 379, Page 253, Official Public Records of Hardeman County, Texas. |
| ANN MARIE JUDD MORRIS | Tex-Brit Corporation | 01/18/16 | DI16-60606 | | Texas | Hardeman | 320.0 acres of land, more or less, being the West Half (W/2) of Section 111, Block H, W. & N.W. R.R. Co. Survey, A-427, Hardeman County, Texas. |
| THE SAMUEL R. JUDD, JR. TRUST | Tex-Brit Corporation | 01/18/16 | DI16-60605 | | Texas | Hardeman | 320.0 acres of land, more or less, being the West Half (W/2) of Section 111, Block H, W. & N.W. R.R. Co. Survey, A-427, Hardeman County, Texas. |
| STEPP RANCH, L.P. | Tex-Brit Corporation | 01/19/16 | DI16-60600 | | Texas | Hardeman | 708.0 acres of land, more or less, being all of Section 110, Block H, W. & N.W./R.R. Co. Survey A-1697, LESS AND EXCEPT: all the lands located within the boundaries of the following: (1) Stepp 110 No. 1, 80 acre Unit, (2) Stepp-Hurst 110 No. 1, 40 acre Oil Unit, (3) Stepp-Hurst 110 No. 2, 40 acre Oil Unit, (4) Stepp 110 No. 3  Well, 80 acre Unit (5) Summerlee-Stepp Unit No. 1H, 200 acre Oil & Gas Unit, Leaving herein, 396.00 acres, more or less. |
| KAREN WHITE | Tex-Brit Corporation | 04/01/16 | DI16-60602 | | Texas | Hardeman | Tract 1: 160.0 acres of land, more or less, being the NW/4 of Section 395, Block A, H&TC RR. Co. Survey, A-207, Hardeman County, Texas. Tract 2: 560.0 acres, being all of Section 399, Block A, H & TCRR Survey, A-205, SAVE AND EXCEPT 40 acres of land, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 22, 1995 and recorded in Volume 353, Page 153 of the Official Public Records of Hardeman County, Texas, and further SAVE AND EXCEPT 40 acres of land, more or less, ebing the Drilling Unit for the Judd "A" Lease Well 1, AP/# 19731715 Tract 3: 160.0 acres of land, more or less, being the NE/4 of Section 400, Block A, H&TC RR. Co. Survey, A-1777, Hardeman County, Texas. |
| WILLIAM ROBINSON TRUST | TEX-BRIT CORPORATION | 9/6/2016 | DI16 | 60997 | TX | Hardeman | 640 ACRES OF LAND, MORE OR LESS, BEING ALL OF SECTION 75, BLK H, W&NW RR SURVEY, A-456, HARDEMAN COUNTY, TX. |
| MILLIGAN FAMILY TRUST | CHARLESTON ENERGY, INC. | 12/26/16 | DI17-51614 | | Texas | Hardeman | Tract 1: 200.00 acres, more or less, situated in the Northwest corner of Section 134, Block H, W&NW RR Co. Survey and being that same acreage described in that certain Warranty Deed dated November 18, 1994 from Kenneth Wayne Milligan to Charles Edgar Milligan recorded in File No. 28133 of the Deed Records of Hardeman County, Texas. Tract 2: 206.00 acres, more or less, situated in the Southwest corner of Section 134, Block H, W&NW RR Co. Survey and being that same acreage described in that certain Warranty Deed dated November 18, 1994 from Kenneth Wayne Milligan to Charles Edgar Milligan recorded in File No. 28133 of the Deed Records of Hardeman County, Texas. The aggregate of the above two (2) tracts is 406.00 acres, more or less. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| RICHARD WAYNE MILLIGAN | CHARLESTON ENERGY, INC. | 12/27/16 | D117-61615 | | Hardeman | Texas | Tract 1: 200.00 acres, more or less, situated in the Northwest corner of Section 134, Block H, W&NW RR Co. Survey and being that same acreage described in that certain Warranty Deed dated November 18, 1994 from Kenneth Wayne Milligan to Charles Edgar Milligan recorded in File No. 28133 of the Deed Records of Hardeman County, Texas.<br><br>Tract 2: 206.00 acres, more or less, situated in the Southwest corner of Section 134, Block H, W&NW RR Co. Survey and being that same acreage described in that certain Warranty Deed dated November 18, 1994 from Kenneth Wayne Milligan to Charles Edgar Milligan recorded in File No. 28133 of the Deed Records of Hardeman County, Texas.<br><br>The aggregate of the above two (2) tracts is 406.00 acres, more or less. |
| JACKIE HANNERS, a/k/a Jacky Wayland Hanners | CHARLESTON ENERGY, INC. | 05/23/17 | D117-61946 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning.<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| HAYDEN SOMERVILLE | CHARLESTON ENERGY, INC. | 06/05/17 | DI17-61951 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas; LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning; LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,331.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,331.5 feet back to the Point of Beginning; and LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning; Leaving a balance of 475.46 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|--------|--------|------------|-------------|------|--------|-------|-------------------|
| JANA SUE HANNERS TURNER, ET AL | CHARLESTON ENERGY, INC. | 06/05/17 | D#17-61950 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning;<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |
| LISA ANN HANNERS GLIDEWELL | CHARLESTON ENERGY, INC. | 06/05/17 | D#17-61949 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning; and<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| RUTH GILLIAM HATCHER | CHARLESTON ENERGY, INC. | 06/05/17 | DI17-61947 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas; LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning; LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run in a Southerly direction parallel with the West boundary line of Section 76 a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning; Leaving a balance of 475.46 acres, more or less, being described herein. |
| SUSAN ALICE RAMEY GILLIAM | CHARLESTON ENERGY, INC. | 06/05/17 | DI17-61948 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas; LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning; LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run in a Southerly direction parallel with the West boundary line of Section 76 a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning; Leaving a balance of 475.46 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| TEDDY GILLIAM, ET UX | CHARLESTON ENERGY, INC. | 06/05/17 | D/17-62237 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning;<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |
| WILLIAM ROBINSON TRUST | CHARLESTON ENERGY, INC. | 06/08/17 | D/17-61952 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning;<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| GINGER GENDRON | CHARLESTON ENERGY, INC. | 06/09/17 | D/17-61953 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning;<br><br>LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and<br><br>LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning.<br><br>Leaving a balance of 475.46 acres, more or less, being described herein. |
| THE JONES FAMILY INHERITANCE TRUST | CHARLESTON ENERGY, INC. | 06/19/17 | D/17-62224 | | Hardeman | Texas | Tract 1: 90.0 acres of land, situated in the North Half (N2) of Section 132, Block H, W & NW RR Co. Survey, Abstract 957, Hardeman County, Texas and being more fully described as Tract 4 referenced in that certain partition recorded in Deed Record Book 99, Page 482 of the records for the Clerk of Court of Hardeman County, Texas.<br><br>Tract 2: 60.0 acres of land, situated in the North Half (N2) of Section 132, Block H, W & NW RR Co. Survey, Abstract 957, Hardeman County, Texas and being more fully described as Tract 5 referenced in that certain partition recorded in Deed Record Book 99, Page 482 of the records for the Clerk of Court of Hardeman County, Texas.<br><br>Tract 3: 90.0 acres of land, situated in the Southwest Quarter (SW/4) of Section 132, Block H, W & NW RR Co. Survey, Abstract 957, Hardeman County, Texas and being more fully described as Tract 6 referenced in that certain partition recorded in Deed Record Book 99, Page 482 of the records for the Clerk of Court of Hardeman County, Texas.<br><br>Tract 4: 320.0 acres of land, situated in the North Half (N2) of Section 133, Block H, W & NW RR Co. Survey, Abstract 438, Hardeman County, Texas and being more fully described as Tract 4 referenced in that certain partition recorded in Deed Record Book 136, Page 70 of the records for the Clerk of Court of Hardeman County, Texas.<br><br>Tract 5: 100.0 acres of land, situated in the South Half (S/2) of Section 132, Block H, W & NW RR Co. Survey, Abstract 957, Hardeman County, Texas and being that same acreage described in that certain Warranty Deed recorded in Deed Record Book 120, Page 206 of the records for the Clerk of Court of Hardeman County, Texas. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|--------|--------|-----------|-------------|------|--------|-------|-------------------|
| LINDA SCHOLL | CHARLESTON ENERGY, INC. | 07/03/17 | DI17-61944 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| ROBERT CLEMENT | CHARLESTON ENERGY, INC. | 07/03/17 | DI17-61943 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| JOE DON ANDERSON | CHARLESTON ENERGY, INC. | 07/14/17 | DI17-62225 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| JOHN WAYNE ANDERSON | CHARLESTON ENERGY, INC. | 07/18/17 | DI17-62227 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| JUDY ROWE | CHARLESTON ENERGY, INC. | 07/18/17 | DI17-62229 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| KARLA JO ANDERSON WILSON, ET AL | CHARLESTON ENERGY, INC. | 07/18/17 | D117-62226 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas; <br> LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and <br> LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715; <br> LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| CONNIE G. ROBISON | CHARLESTON ENERGY, INC. | 07/19/17 | D117-62228 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas; <br> LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and <br> LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715; <br> LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| JAYNE L. BUMP | CHARLESTON ENERGY, INC. | 07/29/17 | D117-62233 | | Hardeman | Texas | Tract 1: 121.0 acres, more or less, in Section 7, H. E. & W. T. RR Co. Survey, Abstract 596, Hardeman County, Texas and being more full described as follows:  Beginning at the Southwest corner of said Section 7; thence run North 741 varas to the Northwest corner of this tract at B. D. post; thence run South 79 degrees 55 minutes East a distance of 1,034 varas to B. D. post for the Northeast corner of this tract; thence run South 9 degrees 45 minutes West a distance of 278 varas; thence run South 37 degrees 37 minutes West a distance of 89 varas; thence run North 38 degrees West a distance of 888 varas back to the point of beginning.  Being that same acreage described as Tract 2 in that certain Warranty Deed from T. E. Jackson, et ux to Ivan Jackson, et al dated July 18, 1981 and recorded in Book 307, Page 209 under Entry No. 18357 in the public records of Hardeman County, Texas. <br> +115Tract2: 220.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows:  Beginning at the Southeast corner of said Section 73 for the Southeast corner of this tract; thence run North a distance of 452.84 varas to a point on the East line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 1,099.5 varas for a point; thence run North a distance of 514.66 varas to a point being the most Northern Northeast corner of this tract; thence run West a distance of 770.0 varas to a point on the West line of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.5 varas to the Southwest corner of said Section 73 and being the Southwest corner of this tract; thence run East a distance of 1,870 varas back to the point of beginning.  Being that same acreage being described as Tract 4 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. D112-56111 in the public records of Hardeman County, Texas. <br> Tract 3:  140.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows:  Beginning at the Northwest corner of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.0 varas to a point on the West line of said Section 73 for the Southwest corner of this tract; thence run East a distance of 818.5 varas to a stake being the Southeast corner of this tract; thence run North a distance of 967.0 varas to a point on the North line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 818.5 varas back to the point of beginning.  Being that same acreage being described as Tract 5 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. D112-56111 in the public records of Hardeman County, Texas. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| PEQUITA JACKSON HUTCHISON | CHARLESTON ENERGY, INC. | 07/29/17 | DI17-62234 | | Hardeman | Texas | Tract 1: 121.0 acres, more or less, in Section 7, H. E. & W. T. RR Co. Survey, Abstract 596, Hardeman County, Texas and being more full described as follows: Beginning at the Southwest corner of said Section 7; thence run North 741 varas to the Northwest corner of this tract at B. D. post for the Northeast corner of this tract; thence run South 79 degrees 55 minutes East a distance of 1,034 varas to B. D. post for the Northeast corner of this tract; thence run South 9 degrees 45 minutes West a distance of 278 varas; thence run South 37 degrees 37 minutes West a distance of 89 varas; thence run North 38 degrees West a distance of 888 varas back to the point of beginning.  Being that same acreage described as Tract 2 in that certain Warranty Deed from T. E. Jackson, et ux to Ivan Jackson, et al dated July 18, 1981 and recorded in Book 307, Page 209 under Entry No. 18357 in the public records of Hardeman County, Texas.

Tract 2: 220.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows:  Beginning at the Southeast corner of said Section 73 for the Southeast corner of this tract; thence run North a distance of 452.84 varas to a point on the East line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 1,099.5 varas for a point; thence run North a distance of 514.66 varas to a point being the most Northern Northeast corner of this tract; thence run West a distance of 770.0 varas to a point on the West line of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.5 varas to the Southwest corner of said Section 73 and being the Southwest corner of this tract; thence run East a distance of 1,870 varas back to the point of beginning.  Being that same acreage being described as Tract 4 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump, dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas.

Tract3:  140.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows:  Beginning at the Northwest corner of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.0 varas to a point on the West line of said Section 73 for the Southwest corner of this tract; thence run East a distance of 818.5 varas to a stake being the Southeast corner of this tract; thence run North a distance of 967.0 varas to a point on the North line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 818.5 varas back to the point of beginning.  Being that same acreage being described as Tract 5 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas. |
| ALINE KALINA | CHARLESTON ENERGY, INC. | 08/09/17 | DI17-62230 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;

LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and

LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;

LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| JIMMY JACKSON | CHARLESTON ENERGY, INC. | 08/09/17 | DI17-62235 | | Hardeman | Texas | Tract 1: 121.0 acres, more or less, in Section 7, H. E. & W. T. RR Co. Survey, Abstract 596, Hardeman County, Texas and being more full described as follows: Beginning at the Southwest corner of said Section 7; thence run North 741 varas to the Northwest corner of this tract at B. D. post; thence run South 79 degrees 55 minutes East a distance of 1,034 varas to B. D. post for the Northeast corner of this tract; thence run South 9 degrees 45 minutes West a distance of 278 varas; thence run South 37 degrees 37 minutes West a distance of 89 varas; thence run North 38 degrees West a distance of 888 varas back to the point of beginning. Being that same acreage described as Tract 2 in that certain Warranty Deed from T. E. Jackson, et ux to Ivan Jackson, et al dated July 18, 1981 and recorded in Book 307, Page 209 under Entry No. 18357 in the public records of Hardeman County, Texas.<br><br>Tract 2: 220.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows: Beginning at the Southeast corner of said Section 73 for the Southeast corner of this tract; thence run North a distance of 452.84 varas to a point on the East line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 1,099.5 varas for a point; thence run North a distance of 514.66 varas to a point being the most Northern Northeast corner of this tract; thence run West a distance of 770.0 varas to a point on the West line of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.5 varas to the Southwest corner of said Section 73 and being the Southwest corner of this tract; thence run East a distance of 1,870 varas back to the point of beginning. Being that same acreage being described as Tract 4 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas.<br><br>Tract 3: 140.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows: Beginning at the Northwest corner of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.0 varas to a stake being the Southwest corner of this tract; thence run East a distance of 818.5 varas to a point on the West line of said Section 73 for the Northeast corner of this tract; thence run North a distance of 967.0 varas to a point on the North line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 818.5 varas back to the point of beginning. Being that same acreage being described as Tract 5 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas. |
| DEBORAH CARLSON | CHARLESTON ENERGY, INC. | 08/15/17 | DI17-62232 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |
| LINDA L. MONROE | CHARLESTON ENERGY, INC. | 08/15/17 | DI17-62231 | | Hardeman | Texas | 640.0 acres, more or less, and being more fully described as all of Section 399, Block A, H & TC RR Co. Survey, Abstract 205, Hardeman County, Texas;<br><br>LESS AND EXCEPT: 40.0 acres, more or less, as described in that certain Designation of Unit and Release of Oil and Gas Lease dated November 25, 1995 and recorded in Volume 353, Page 153 of the records of Hardeman County, Texas; and<br><br>LESS AND EXCEPT: 40.0 acres, more or less, being the Drilling Unit for the Judd "A" Lease Well No. 1 (API No. 19731715;<br><br>LEAVING A BALANCE of 560.0 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| KEVIN LEE BROOKMOLE | CHARLESTON ENERGY, INC. | 09/07/17 | DI17-62236 | | Hardeman | Texas | Tract 1: 121.0 acres, more or less, in Section 7, H. E. & W. T. RR Co. Survey, Abstract 596, Hardeman County, Texas and being more full described as follows: Beginning at the Southwest corner of said Section 7; thence run North 741 varas to the Northwest corner of this tract at B. D. post; thence run South 79 degrees 55 minutes East a distance of 1,034 varas to B. D. post for the Northeast corner of this tract; thence run South 9 degrees 45 minutes West a distance of 278 varas; thence run South 37 degrees 37 minutes West a distance of 89 varas; thence run North 38 degrees West a distance of 888 varas back to the point of beginning. Being that same acreage described as Tract 2 in that certain Warranty Deed from T. E. Jackson, et ux to Ivan Jackson, et al dated July 18, 1981 and recorded in Book 307, Page 209 under Entry No. 18357 in the public records of Hardeman County, Texas. |
| | | | | | | | Tract 2: 220.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows: Beginning at the Southeast corner of said Section 73 for the Southeast corner of this tract; thence run North a distance of 452.84 varas to a point on the East line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 1,099.5 varas for a point; thence run North a distance of 514.66 varas to a point being the most Northern Northeast corner of this tract; thence run West a distance of 770.0 varas to a point on the West line of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.5 varas to the Southwest corner of said Section 73 and being the Southwest corner of this tract; thence run East a distance of 1,870 varas back to the point of beginning. Being that same acreage being described as Tract 4 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas. |
| | | | | | | | Tract 3: 140.0 acres, more or less, in Section 73, Block H, W & NW RR Co. Survey, Abstract 455, Hardeman County, Texas and being more full described as follows: Beginning at the Northwest corner of said Section 73 for the Northwest corner of this tract; thence run South a distance of 967.0 varas to a point on the West line of said Section 73 for the Southwest corner of this tract; thence run East a distance of 818.5 varas to a stake being the Southeast corner of this tract; thence run North a distance of 967.0 varas to a point on the North line of said Section 73 for the Northeast corner of this tract; thence run West a distance of 818.5 varas back to the point of beginning. Being that same acreage being described as Tract 5 in that certain Warranty Deed from Jayne L. Bump, Trustee to Jayne L. Bump dated July 12, 2012 and recorded under Entry No. DI12-56111 in the public records of Hardeman County, Texas. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| MOLLIE EVANS HEIRS TRUST | CHARLESTON ENERGY, INC. | 09/17/17 | D17-62223 | | Hardeman | Texas | 731.0 acres, more or less, being all of Section 76, Block H, W & NW RR. Co. Survey, Abstract No. 1548 and 1511, Hardeman County, Texas; LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at the Southeast corner of Section 76; thence run a distance of 1,865.0 feet North along the East line of said Section 76 to a point; thence run West and parallel with the South line of said Section 76 a distance of 438.0 feet for the Point of Beginning; thence run West and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run North and parallel with the East line of Section 76 a distance of 1,290.0 feet to a point; thence run East and parallel with the South line of Section 76 a distance of 2,705.0 feet to a point; thence run South and parallel with the East line of Section 76 a distance of 1,290.0 feet back to the Point of Beginning; LESS AND EXCEPT: 95.54 acres, more or less, being more particularly described as follows: Beginning at a point on the South boundary line a distance of 1,868.5 feet West of the Southeast corner of said Section 76; thence run in a Northerly direction parallel with the East boundary line of said Section 76 a distance of 1,865.0 feet; thence run in a Westerly direction parallel with the South boundary line of Section 76 a distance of 2,231.5 feet; thence run in a Southerly direction parallel with the East boundary line of Section 76 a distance of 1,865.0 feet; thence run in an Easterly direction along the South boundary line of Section 76 a distance of 2,231.5 feet back to the Point of Beginning; and LESS AND EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a point on the West boundary line of Section 76 with said point being 2,324.36 feet South of the Northwest corner of said Section 76; thence run South 87 degrees 40 minutes 34 seconds East a distance of 2,780.5 feet; thence run South 2 degrees 15 minutes 35 seconds West a distance of 1,253.0 feet; thence run North 87 degrees 40 minutes 34 seconds West a distance of 2,781.9 feet to the West boundary line of Section 76; thence run North along the West boundary line of Section 76 a distance of 1,253.0 feet to the Point of Beginning. Leaving a balance of 475.46 acres, more or less, being described herein. |
| GINGER GENDRON | CHARLESTON ENERGY, INC. | 10/10/17 | D18-62419 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H. E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning. LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| HAYDEN SOMERVILLE | CHARLESTON ENERGY, INC. | 10/10/17 | D#18-62425 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-698 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| JACKIE HANNERS, a/k/a Jacky Wayland Hanners | CHARLESTON ENERGY, INC. | 10/10/17 | D#18-62418 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-698 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|--------|--------|-----------|-------------|------|--------|-------|-------------------|
| JANA SUE HANNERS TURNER, ET AL | CHARLESTON ENERGY, INC. | 10/10/17 | D#18-62424 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| LISA ANN HANNERS GLIDEWELL | CHARLESTON ENERGY, INC. | 10/10/17 | D#18-62423 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.T. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| RUTH GILLIAM HATCHER | CHARLESTON ENERGY, INC. | 10/10/17 | DI18-62420 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| SUSAN ALICE RAMEY GILLIAM | CHARLESTON ENERGY, INC. | 10/10/17 | DI18-62421 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.T. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning; LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|--------|--------|-----------|-------------|------|--------|-------|-------------------|
| TEDDY GILLIAM, ET UX | CHARLESTON ENERGY, INC. | 10/10/17 | DI18-62422 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning. LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| CARL W. ALLGOOD, ET UX | CHARLESTON ENERGY, INC. | 11/02/17 | DI18-62427 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas; LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning. LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| PERRY E. STOVER, ET UX | CHARLESTON ENERGY, INC. | 11/02/17 | DI18-62426 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas;<br><br>LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and<br><br>LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning;<br><br>LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| MARTY J. MARTIN REVOCABLE TRUST | CHARLESTON ENERGY, INC. | 03/02/18 | DI18-62689 | | Hardeman | Texas | 452.0 acres, more or less, being all of Section 4, A-1655 and A-1535, H.E.&W.T. RR Co. Survey, Hardeman County, Texas;<br><br>LESS and EXCEPT: 80.0 acres, more or less, being more particularly described as follows: Beginning at a pk nail found at the Southeast corner of said Survey 4, A-1535, said nail being in the center of F.M. Highway No. 2533 and in the North Line of W. & NW. Railroad Company Survey, Block H, Section 97, A-420, for the Southeast corner and Point of Beginning of the herein described tract; thence run North 87 degrees 36 minutes 59 seconds West with the South line of said Survey 4, A-1535, a total distance of 1408.88 feet to a point in the said South line for the Southwest corner of this tract; thence leaving the said South line of Survey 4, run North 00 degrees 21 minutes 41 seconds East, passing the North line of Survey 4, A-1535 and the South line of H.E. & W.T. Railroad Company Survey, Survey 4, A-1655, a total distance of 2450.14 feet to a point for the Northwest corner of this tract; thence run South 89 degrees 38 minutes 19 seconds East, a distance of 1408.00 feet to a point in the East line of said H.E. & W.T. Railroad Company Survey No. 4, A-1655 and being the West line of H.E. & W.T. Railroad Company Survey No. 1, A-598 for the Northeast corner of this tract; thence run South 00 degrees 21 minutes 41 seconds West with the East line of Survey 4, A-1655 and Survey 4, A-1535, a total distance of 2499.85 feet to the Point of Beginning; and<br><br>LESS and EXCEPT: 5.52 acres, more or less, being more particularly described as follows: Beginning at the Northeast Corner of Section 98, Block H, W. & N.F. RR Co., as now established; thence run West with the present public road 230.60 feet to the Southwest Corner of Section 4, H.E. & W.T. RR Co.; thence run North with the Western boundary line of said Section No. 4, a distance of 3907.80 feet to a stake for corner; thence run Easterly 2179.10 feet to an iron stake for the Point of Beginning; thence run North 400.0 feet to a stake; thence run East 600.0 feet to a stake; thence run South 400.0 feet to a stake; thence run West 600.0 feet to the Point of Beginning;<br><br>LEAVING A BALANCE of 366.48 acres, more or less, being described herein. |
| THOMAS T. HOLLEY, III, ET AL | CHARLESTON ENERGY, INC. | 03/05/18 | DI18-62690 | | Hardeman | Texas | 212.032 acres, more or less, situated in the West Half (W/2) of Section 135 (A-439) of Block H; W & NW RR Co. Survey, Hardeman County, Texas and being that same acreage described in that certain Warranty Deed with Vendor's Lien from Weldon Davis and Yuvonna Davis, as Co-Trustees and the Successor Trustees of the Weldon and Yuvonna Davis Living Trust, et al to Alvin O'Neal and Kimberly Ann O'Neal, as dated December 12, 2005 and recorded in Book 419, Page 832 in the public records of Hardeman County, Texas;<br><br>LESS AND EXCEPT: 18.581 acres, more or less, being that certain acreage described as Tract No. 2 of that certain Designation of Pooled Unit, Conley Unit No. 1, as recorded in Book 392, Page 208 in the public records of Hardeman County, Texas and being attributed to the Conley Unit No. 1 Well (API No. 197-31501);<br><br>LEAVING A BALANCE of 193.451 acres, more or less, being described herein. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| BILL NEAL, ET AL | QZ Energy, LLC | 03/07/18 | D118-62686 | | Hardeman | Texas | 160.0 acres, more or less, being more fully described as the Southeast Quarter (SE/4) of Section 155 (A-449), Block H, W & NW RR Co. Survey, Hardeman County, Texas. |
| ANN FAVOR HARRIS | QZ Energy, LLC | 03/16/18 | D118-62688 | | Hardeman | Texas | 160.0 acres, more or less, being more particularly described as the Northwest Quarter (NW/4) of Section 155, Block H, W & NWRR Co. Survey (A-449), Hardeman County, Texas. |
| ANN GREENING KIRKSEY | QZ Energy, LLC | 03/19/18 | D118-62836 | | Hardeman | Texas | 160.0 acres, more or less, being more particularly described as the Northeast Quarter (NE/4) of Section 156, Block H, W & NW RR Co. Survey (A-1820), Hardeman County, Texas. |
| BEN RILEY, ET UX | QZ Energy, LLC | 03/20/18 | D118-62833 | | Hardeman | Texas | 160.0 acres, more or less, being more particularly described as the Northeast Quarter (NE/4) of Section 155, Block H, W & NW RR Co. Survey, Hardeman County, Texas. |
| STANLEY R. WATSON, ET AL | CHARLESTON ENERGY, INC. | 03/23/18 | D118-62831 | | Hardeman | Texas | Tract 1: The North Half of the South Half (N/2 S/2) of Section 133, in Block H, W & NW RR Co. Survey, Abstract 438, Certificate No. 167, Patent No. 442, Vol. 104, less the East 40 acres of said tract, leaving a total of 120 acres of land, more or less. Tract 2:  The Southeast Quarter (SE/4) of Section No. 112, in Block H, of the W & NW RR. Co. Survey, Abstract 1613, Certificate No. 1156, Patent No. 191, Vol. 56, containing 160 acres of land, more or less. The 2 tracts described above comprise a total of 280 acres of land, more or less. |
| BERTHA MAY WOODS | CHARLESTON ENERGY, INC. | 04/02/18 | D118-62835 | | Hardeman | Texas | 80.0 acres, more or less, being described as the North Half of the Northwest Quarter (N/2 NW/4) of Section 156, Block & N W RR Co. Survey, A-1009, in Hardeman County, Texas and being described as "Third Tract" in that Deed dated February 24, 1995, to Frank O'Neal and wife Essie May O'Neal, recorded in Volume 346, Page 32 of the Official Public Records of Hardeman County, Texas. |
| JIMMY DEAN O'NEAL | QZ Energy, LLC | 04/18/18 | D118-63103 | | Hardeman | Texas | 160.0 acres, more or less, being the Southwest Quarter (SW/4) of Section 155, Block H, W & NW RR Co. Survey, Abstract No. 449, Hardeman County, Texas. |
| JOE MARK O'NEAL | QZ Energy, LLC | 04/18/18 | D118-62834 | | Hardeman | Texas | 160.0 acres, more or less, being the Southwest Quarter (SW/4) of Section 155, Block H, W & NW RR Co. Survey, Abstract No. 449, Hardeman County, Texas. |
| DONALD PEYTON RAMEY | EAGLE HYDROCARBONS INC. | 11/14/2018 | D19-63948 | | Hardeman | TX | 40 ACRES IN SEC. 72, BLK H, W&NW RR CO. SURVEY, A-1685, HARDEMAN COUNTY, TX. BEING FURTHER DESCRIBED IN THAT CERTAIN DOCUMENT RECORDED UNDER ENTRY NO. D112-54758 IN THE RECORDS OF HARDEMAN COUNTY, TX. |
| JEANETTE COOK RAMEY, ET AL | EAGLE HYDROCARBONS INC. | 11/14/2018 | D19-63947 | | Hardeman | TX | 40 ACRES IN SEC. 72, BLK H, W&NW RR CO. SURVEY  A-1685, HARDEMAN COUNTY, TX. BEING FURTHER DESCRIBED IN THAT CERTAIN DOCUMENT RECORDED UNDER ENTRY NO. D112-54758 IN THE RECORDS OF HARDEMAN COUNTY, TX. |
| KATIE RENEE RAMEY | EAGLE HYDROCARBONS INC. | 11/14/2018 | D19-63946 | | Hardeman | TX | 40 ACRES IN SEC. 72, BLK H, W&NW RR CO. SURVEY  A-1685, HARDEMAN COUNTY, TX. BEING FURTHER DESCRIBED IN THAT CERTAIN DOCUMENT RECORDED UNDER ENTRY NO. D112-54758 IN THE RECORDS OF HARDEMAN COUNTY, TX. |
| CLIFF HENDERSON | DMC PETROLEUM INC | 01/05/1995 | | 267 | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, MIL. TRACT 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES MIL. TRACT 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, MIL. |
| SAMMY LANE RESTON COPE | DMC PETROLEUM INC | 01/05/1995 | | 414 | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, MIL. TRACT 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES MIL. TRACT 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, MIL. |
| STEPP RANCH, L.P. | CIMAREX ENERGY CO | 01/06/2005 | 329 | 497 | Hardeman | TX | W&NW RR CO. SVY, BLOCK H, A-1697, SEC. 110: ENTIRE, LESS & EXCEPT 232 ACS. |
| BEATRICE STEPP, A WIDOW | E P OPERATING LIMITED PARTNERSHIP | 01/08/1993 | 329 | | Hardeman | TX | W&NW RR CO., BLK-H, SEC. 110, 708 ACS, MIL, BEING ALL OF SEC. 110, BLOCK H, W&NW RR CO. SURVEY, A-1697 |
| CHERYL MORTON JOHNSON | CIMAREX ENERGY CO | 01/14/2003 | 400 | 635 | Hardeman | TX | S. D. GUTHRIE SURVEY, CERT. 1698, SEC. 2, BEING CALLED 19 ACRES, MIL |
| JERRY WAYNE MORTON | CIMAREX ENERGY CO | 01/14/2003 | 400 | 223 | Hardeman | TX | S. D. GUTHRIE SURVEY, CERT. 1698, SEC. 2, BEING CALLED 19 ACRES, MIL |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 01/15/2002 | 393 | 505 | Hardeman | TX | EL&RR CO., 677, SECS. 11 AND 12; EL&RR CO., 1672, SEC. 10 |
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 01/15/2002 | 395 | 48 | Hardeman | TX | EL&RR CO., 677, SECS. 11 AND 12; EL&RR CO., 1672, SEC. 10 |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| FARIS E. WEST, ET AL | ENSERCH EXPLORATION, INC. | 01/16/1995 | 346 | 886 | Hardeman | TX | 80 ACRES, M/L OUT OF THE N 217 ACS OF W/2 OF SEC. 67, BLOCK 16, H&TC RR |
| THE SUMMERLEE FOUNDATION | KEY PRODUCTION COMPANY, INC. | 01/16/2002 | 397 | 192 | Hardeman | TX | EL& RR CO., A-575, SEC. 9, EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575 |
| ALBIN GEORGE PECHACEK, JR. | EP OPERATING L.P. | 01/17/1995 | 345 | 443 | Hardeman | TX | 50 ACS, M/L BEING THE E 50 ACS OF THE S 100 ACS OF N/2 OF SEC. 72, BLOCK 16, H&TC RR CO. SURVEY, A-962 |
| BETTY MAE ARLEDGE | ENSERCH EXPLORATION, INC. | 01/17/1995 | 346 | 874 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| BEVERLY SUE YOUNG RODGERS | ENSERCH EXPLORATION, INC. | 01/17/1995 | 346 | 882 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| JAY YOUNG | ENSERCH EXPLORATION, INC. | 01/17/1995 | 346 | 870 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| JERRELL J. YOUNG | ENSERCH EXPLORATION, INC. | 01/17/1995 | 347 | 853 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| MARY Y. NEWBURY | ENSERCH EXPLORATION, INC. | 01/17/1995 | 347 | 485 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| MAUDE MAY YOUNG | ENSERCH EXPLORATION, INC. | 01/17/1995 | 346 | 878 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| JOHN YOUNG ; AND JIM YOUNG | ENSERCH EXPLORATION, INC. | 01/17/1998 | 370 | 904 | Hardeman | TX | 100 ACS M/L, BEING THE W 100 ACS OF THE S/2 OF SEC. 71, BLOCK 16, H&TC RR CO.SURVEY |
| JOAN BULLINGTON SQUIRES | KEY PRODUCTION COMPANY, INC. | 01/18/2002 | 397 | 203 | Hardeman | TX | SEC. 9, A-575 |
| NANCY HUFF BRADFORD | KEY PRODUCTION COMPANY, INC. | 01/18/2002 | 397 | 381 | Hardeman | TX | EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575, SEC. 9 |
| SAMMY LANE COPE | KEY PRODUCTION COMPANY, INC. | 01/18/2002 | 397 | 198 | Hardeman | TX | EL&RR CO. SURVEY, CERT. NO. 1418, A-575, SEC. 9 |
| RUTH LOVE SEAMSTER, A WIDOW | ENSERCH EXPLORATION, INC. | 01/25/1979 | 224 | 792 | Hardeman | TX | W/2 SE/4, S/2 SW/4 OF SEC. 18, N2 NW/4 OF SEC. 19; |
| SUE LOVE SAFFORD, ET VIR | ENSERCH EXPLORATION INC | 01/25/1979 | 224 | 798 | Hardeman | TX | W/2 SE/4, S/2 SW/4 OF SEC. 18, N2 NW/4 OF SEC. 19; W 248.5 ACS OF THE N/2 OF SEC. 20, LESS & EXCEPT 10 ACS, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| GRADY ADCOCK AND, ET UX | ALLEN AND MCCORMICK OIL & GAS CO. | 02/13/1981 | 245 | 868 | Hardeman | TX | 640 ACS, M/L, BEING ALL OF SEC. 398, BLOCK A, H&TC RR CO. SURVEY, A-1492 & A-1597 |
| JAMES EVERETT LONG, ET UX | ALLEN AND MCCORMICK OIL & GAS CO. | 02/13/1981 | 245 | 870 | Hardeman | TX | 80 ACS, M/L OUT OF SEC. 398, BLOCK A, H&TC RR CO SURVEY, A-1592 & A-1597 |
| FRANCES DAVIS BALLEW, ET AL | ENSERCH EXPLORATION, INC. | 02/21/1979 | 225 | 565 | Hardeman | TX | 84.25 ACS, M/L, BEING THE N/2 SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 02/21/2001 | 388 | 577 | Hardeman | TX | S. D. GUTHRIE SURVEY, A-1698 SEC. 2: 90.44 ACS, M/L |
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 02/21/2001 | 389 | 906 | Hardeman | TX | S. D. GUTHRIE SURVEY, A-1698 SEC. 2: 90.44 ACS, M/L |
| THOMAS H. SHIVE, ET AL | ENSERCH EXPLORATION, INC. | 02/27/1979 | 225 | 562 | Hardeman | TX | 84.25 ACS, M/L, BEING THE N/2 SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| RICHARD WILSON, ET AL | EEX OPERATING L.P. | 03/01/1998 | 374 | 693 | Hardeman | TX | 84 ACS, M/L, BEING THE N/2 SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099, SAVE & EXCEPT 31.8 ACS |
| PETER C. BOWES, ET UX | WPH OPERATING COMPANY | 03/05/1999 | 374 | 510 | Hardeman | TX | 160 ACS, M/L, OUT OF SURVEY 5, EL&RR RR CO. SURVEY, A-576, CERT. NO. 1417 |
| STEPP RANCH, L. P. | KEY PRODUCTION COMPANY, INC. | 03/05/2003 | 401 | 111 | Hardeman | TX | W&NW RR SVY., 1697, BLK-H, SEC. 110 |
| ALLYN WELLS, ET AL | EEX OPERATING L.P. | 03/09/1998 | 367 | 885 | Hardeman | TX | 80 AS, M/L, BEING THE N 80 ACS OF THE SW/4, SEC. 96, BLOCK H, W&NW RR CO. SURVEY |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 03/23/2000 | 382 | 213 | Hardeman | TX | S. D. GUTHRIE SURVEY, A-1698, SEC. 2, THE E 320 ACS LESS & EXCEPT 64.72 ACS, BEING CALLED 255.28 ACS |
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 03/23/2000 | 382 | 001 | Hardeman | TX | S. D. GUTHRIE SURVEY, A-1698, SEC. 2, THE E 320 ACS LESS & EXCEPT 64.72 ACS, BEING CALLED 255.28 ACS |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO. | 03/26/2003 | 401 | 773 | Hardeman | TX | W&NW RR SVY., 426, BLK H, SEC. 109: S/2 OF NE/4 SE/4 NW/4, N/2 SW/4, N/2 SE/4 AND SW/4 SW/4, W&NW RR SVY., 1697, BLK H, SEC. 110 |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| F. H. MCNABB, ET UX | DAN P. COLWELL | 03/28/1977 | 218 | 835 | Hardeman | TX | 1553.75 ACS, M/L, BEING ALL OF SEC. 29, A-498 CONTAINING 640 ACS, ALL OF SEC. 28, A-1713 AND A-1205, CONTAINING 731 ACS, AND ALL OF THE NW/4 OF SEC. 26, A-1783, CONTAINING 182.75 ACS, ALL IN BLOCK H, W&NW RR CO. SURVEY |
| CLIFF HENDERSON | GUM TREE DEVELOPMENT, NO. 3 | 04/08/1980 | 236 | 139 | Hardeman | TX | THAT CERTAIN 160 AC TRACT SITUATED IN SEC. 9, EL&RR RR CO SURVEY, A-578 |
| M. R. RESTON | GUM TREE DEVELOPMENT, NO. 3 | 04/08/1980 | 236 | 145 | Hardeman | TX | THAT CERTAIN 160 AC TRACT SITUATED IN SEC. 9, EL&RR RR CO SURVEY, A-575 |
| SAMMY LANE RESTON COPE | GUM TREE DEVELOPMENT, NO. 3 | 04/08/1980 | 236 | 151 | Hardeman | TX | THAT CERTAIN 160 AC TRACT SITUATED IN SEC. 9, EL&RR RR CO SURVEY, A-577 |
| BILL NEAL, A MARRIED MAN | CIMAREX ENERGY CO. | 04/12/2005 | 416 | 698 | Hardeman | TX | H&TC RR CO. SVY, BLOCK A, A-148, SEC. 321 |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO. | 04/12/2005 | 416 | 441 | Hardeman | TX | EL&RR RR CO. SVY, CERT. NO. 1418, A-575, SEC. 9 |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO. | 04/12/2005 | 416 | 437 | Hardeman | TX | W&NW RR CO. SVY, BLOCK H, SEC. 62, A-1527: W/2 & NE/4, SEC. 85, A-414: E/2 |
| KENNETH J B HOLMES, ET UX | ENSERCH EXPLORATION, INC. | 04/21/1983 | 254 | 518 | Hardeman | TX | 640 ACS, M/L, BEING ALL OF SEC. 284, BLOCK A, H&TC RR CO. SURVEY, A-1474 |
| JOHN N. HUFF, III | KEY PRODUCTION COMPANY, INC. | 04/24/2002 | 397 | 208 | Hardeman | TX | FIRST TRACT: ALL OF FRACTION SURVEY NO. 8 OF THE EL&RR CO. SURVEY, CERT. NO. 1422, A-1526, SECOND TRACT: ALL SEC. 9 OF THE EL&RR RY CO. SURVEY, CERT. NO. 1418, A-575, THIRD TRACT: ALL OF THE JOHN MCAFEE SURVEY NO. 1; CERT. NO. 1952, A-1742, FOURTH TRACT: S/2 OF SEC. 85 IN BLOCK H OF THE W&NW RR CO. SURVEY, CERT. NO. 1/43; A-414, FIFTH TRACT: ALL OF SEC. 3 OF THE TT RR CO SURVEYS, CERT. NO. 504, A-533 |
| MARQUERITE RESTON VON TRESS | CIMAREX ENERGY CO. | 04/25/2003 | 402 | 848 | Hardeman | TX | EL&RR CO. 575, SEC. 9, MCAFEE, JOHN, A-1742, SEC. 2, TT&RR CO., 533, EL&RR CO., 1526, SEC. 8, MCAFEE, JOHN, A-1742, SEC. 2, TT&RR CO., 533, EL&RR CO. 1526, SEC. 8 |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO. | 04/25/2003 | 402 | 694 | Hardeman | TX | EL&RR CO. 1526, SEC. 8, E. L. RR CO., 575, SEC. 9, MCAFEE, JOHN, A-1742, SEC. 2, TT &RR CO., 533, W&NW RR SVY, 1528, BLK H, SEC. 86, EL&RR CO., 575, SEC. 9, MCAFEE, JOHN, A-1742, SEC. 2, TT&RR CO., 533, W&NW RR SVY, 1528, BLK H, SEC. 86, W&NW RR SVY., 599 |
| GLENN M. TERRELL | ENSERCH EXPLORATION, INC. | 05/08/1995 | 349 | 326 | Hardeman | TX | 52.20 ACS, M/L, BEING 84 ACS OUT OF THE N/2 SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099, SAVE & EXCEPT 31.8 ACS |
| GLYNN LOVE, ET AL | ENSERCH EXPLORATION, INC. | 05/10/1978 | 224 | 415 | Hardeman | TX | 682.5 ACS, M/L, BEING THE E/2 SE/4, W/2 SE/4, S2 SW/4 OF SECTION 18; N/2 NW/4 OF SEC. 19, THE W 248.5 ACS OF THE N/2, N2 SE/4 AND SW/4 SE/4 OF SEC. 20, ALL LOCATED IN BLOCK H, W&NW RR CO. SURVEY LESS 10 ACRES |
| NANCY HUFF BRADFORD | CIMAREX ENERGY CO. | 05/13/2005 | 417 | 112 | Hardeman | TX | EL&RR RR CO SVY, CERT. 1418, A-575, SEC. 9 |
| MARY VIRGINIA BULLINGTON | KEY PRODUCTION COMPANY, INC. | 06/28/2002 | 397 | 680 | Hardeman | TX | EL&RR CO, A-575, SEC. 9, MCAFEE, JOHN, A-1742, SEC 2 |
| HERBERT B. STORY, JR., TRUSTEE | CIMAREX ENERGY CO. | 07/02/2003 | 404 | 089 | Hardeman | TX | TRACT 1: ALL OF FRACTIONAL SURVEY NO. 8 OF THE EL&RR RR CO. SURVEY, CERT. NO. 1422, A-1526 TRACT 2: ALL OF SEC. 9 OF THE EL&RR RR CO SURVEY, CERT. NO. 1418, A-575, TRACT 3: ALL OF THE JOHN M. MCAFEE SURVEY NO. 1, CERT. NO. 1952, A-1742, TRACT 4: S/2 OF SEC. 85 IN BLOCK H OF THE W&NW RR CO. SURVEY, CERT. NO. 1/43, A-414; TRACT 5: ALL OF SEC. 3 OF THE TT&RR CO SURVEY, CERT. NO. 504, A-533 |
| CHRIS A. SCHMOKER | CIMAREX ENERGY CO. | 07/10/2003 | 404 | 338 | Hardeman | TX | N 100 ACS, M/L, OF A 201 AC TRACT, BEING A PART OF RR CO. SURVEY, A-1474 |
| GEORGE WAYNE SCHMOKER, JR. | CIMAREX ENERGY CO. | 07/10/2003 | 404 | 609 | Hardeman | TX | N 100 ACS, M/L, OF A 201 AC TRACT, BEING A PART OF THE WHEELER CO. SCHOOL LAND SURVEY, A-653 |
| KARI EHRINGER | CIMAREX ENERGY CO. | 07/10/2003 | 405 | 455 | Hardeman | TX | N 100 ACS, M/L, OF A 201 AC TRACT, BEING A PART OF THE WHEELER CO. SCHOOL LAND SURVEY, A-653 |
| MARY ANN DAVIS, ET VIR | CIMAREX ENERGY CO. | 07/10/2003 | 404 | 601 | Hardeman | TX | N 100 ACS, M/L, OF A 201 AC TRACT, BEING A PART OF THE WHEELER CO. SCHOOL LAND SURVEY, A-653 |
| NANCY HUFF BRADFORD | ROB FEATHERSTONE | 08/02/2002 | 397 | 570 | Hardeman | TX | 80 ACRES FOUND IN THE FOLLOWING SURVEYS: JOHN M. MCAFEE SURVEY NO. 2, CERT NO. 1952, ABS NO. 1742 EL & RR CO SURVEY, CERT NO. 1418, ABS NO. 575 |
| CLIFF C. HENDERSON | KEY PRODUCTION COMPANY, INC. | 08/05/2002 | 397 | 379 | Hardeman | TX | EL& RR CO., A-575, SEC. 9, EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575 |
| HERBERT B STORY JR TRUSTEE | ROB FEATHERSTONE | 08/05/2002 | 397 | 566 | Hardeman | TX | 80 ACRES FOUND IN THE FOLLOWING SURVEYS: JOHN M. MCAFEE SURVEY NO. 2, CERT NO. 1952, ABS NO. 1742 EL & RR CO SURVEY, CERT NO. 1418, ABS NO. 575 |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| TEDDY GENE GILLIAM, ET AL | CIMAREX ENERGY CO. | 08/11/2010 | DI10 | 52263 | Hardeman | TX | ALL OF SEC. 3, HE& WT RR CO. SURVEY, A-597, SAVE & EXCEPT 17.67 ACS OUT OF THE NW/C |
| NANCY SINGLETON | EP OPERATING L.P. | 08/15/1994 | 343 | 384 | Hardeman | TX | 44 ACS, M/L, BEING ALL OF THE N E 48 ACS OF THE N E 96 ACS OF THE N 214 ACS OF SEC. 72, BLOCK 16, H&TC 44 CO. SURVEY, A-962, SAVE & EXCEPT A 4 AC TRACT |
| PANSY CRAIG MEHARG | EP OPERATING L.P. | 08/15/1994 | 343 | 379 | Hardeman | TX | 48 ACS, M/L, BEING THE S 48 ACS OF THE E 96 ACS OF THE N 214 ACS OF SEC.72, BLOCK 16, H&TC RR CO. SURVEY, A-962 |
| GLENN HABERN | ENSERCH EXPLORATION, INC. | 08/20/1997 | 366 | 751 | Hardeman | TX | 52.20 ACS, M/L, BEING 84 ACS OUT OF THE N/2 SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099, SAVE & EXCEPT 31.8 ACS |
| MARIAN ELIZABETH WEBB MILLER | KEY PRODUCTION COMPANY, INC. | 08/20/2002 | 398 | 493 | Hardeman | TX | TRACT 1: A TRACT OF LAND OUT OF THE JOHN MCAFEE SURVEY, CERT. NO. 1952, A-1742, TRACT 2: A TRACT OF LAND OUT OF SEC. 9, EL&RR RR CO. SURVEY CERT. NO. 1418, A-575, TRACT 3: W&NW RR CO. SURVEY, BLOCK H, A-426, SEC. 109, TRACT 4: EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575, SEC. 9 |
| MELISSA WEBB HOGAN | KEY PRODUCTION COMPANY, INC. | 08/20/2002 | 398 | 488 | Hardeman | TX | TRACT 1: A TRACT OF LAND OUT OF THE JOHN MCAFEE SURVEY CERT. NO. 1952, A-1742, TRACT 2: A TRACT OF LAND OUT OF SEC. 9, EL&RR RR CO. SURVEY CERT. NO. 1418, A-575, TRACT 3: W&NW RR CO. SURVEY, BLOCK H, A426, SEC. 109, TRACT 4: EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575, SEC. 9 |
| ROBIN WEBB STREET | KEY PRODUCTION COMPANY, INC. | 08/20/2002 | 404 | 719 | Hardeman | TX | TRACT 1: A TRACT OF LAND OUT OF THE JOHN MCAFEE SURVEY, CERT. NO. 1952, A-1742, TRACT 2: A TRACT OF LAND OUT OF SEC. 9, EL&RR RR CO. SURVEY CERT. NO. 1418, A-575, TRACT 3: W&NW RR CO. SURVEY, BLOCK H, A-426, SEC. 109, TRACT 4: EL&RR RR CO. SURVEY, CERT. NO. 1418, A-575, SEC. 9 |
| JAMES E. LONG, ET UX | EP OPERATING LIMITED PARTNERSHIP | 08/24/1993 | 335 | 615 | Hardeman | TX | 80 ACS, M/L, OUT OF SEC. 398, BLOCK A, H&TC RR CO SURVEY, A-1592 & A-1597 |
| ALICE C. FLYNN, ET AL | ENSERCH EXPLORATION, INC. | 08/25/1978 | 223 | 831 | Hardeman | TX | 164.5 ACS, M/L, BEING ALL OF THE SW/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| EVA MAE HURST | E P OPERATING LIMITED PARTNERSHIP | 09/01/1994 | 343 | 658 | Hardeman | TX | 1787.04 ACS, M/L, DESCRIBED AS: S.D. GUTHRIE SURVEY, A-1698, SEC. 2: ALL OF THE E 555 ACS; EL&RR RR CO. SURVEY, A-1696 CONTAINING 286 ACS; EL&RR RR CO. SURVEY, A-577 CONTAINING 320 ACS; EL&RR RR CO. SURVEY, A-1672 CONTAINING 590 ACS; WILLIAM P. HUFF SURVEY, A-1129 CONTAINING 36.04 ACS; |
| HERBERT B STORY, JR., TRUSTEE | CIMAREX ENERGY CO | 09/12/2007 | DI07 | 47832 | Hardeman | TX | A TRACT OF 16.609 ACS OF LAND OUT OF THE NW/C OF THE EL&RR RR CO SURVEY 9, A-576 |
| NANCY HUFF BRADFORD | CIMAREX ENERGY CO | 09/12/2007 | DI07 | 47833 | Hardeman | TX | A TRACT OF 16.609 ACS OF LAND OUT OF THE NW/C OF THE EL&RR RR CO SURVEY 9, A-577 |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO | 09/12/2007 | DI07 | 47791 | Hardeman | TX | A TRACT OF 16.609 ACS OF LAND OUT OF THE NW/C OF THE EL&RR RR CO SURVEY 9, A-575 |
| THE SUMMERLEE FOUNDATION | VISTA RESOURCES | 09/15/1999 | 379 | 717 | Hardeman | TX | APPROX. 110.5 ACRES, M/L, OUT OF THE SE/4 OF SEC. 109, BLOCK H, W&NW RY. CO. SURVEY, ASBST. NO. 426 |
| BILLY JOE WORD, ET UX PATSY RUTH | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 849 | Hardeman | TX | 660 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| EDGAR WORD RD FRENCH ET UX KENDALL FRENCH | ENSERCH EXPLORAITON, INC. | 09/20/1978 | 223 | 840 | Hardeman | TX | 657 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| ERMA WORD HARRIS ET VIR, W. L. HARRIS | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 843 | Hardeman | TX | 658 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| FRED WORD, ET UX, DOYLEENE WORD | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 846 | Hardeman | TX | 659 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| MILLARD S. WORD, ET UX, FLORA ANN | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 855 | Hardeman | TX | 662 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| RUTH WORD SHERMAN ET VIR M. T. | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 852 | Hardeman | TX | 661 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| TOM WORD ET UX, TOMAREE WORD | ENSERCH EXPLORATION, INC. | 09/20/1978 | 223 | 858 | Hardeman | TX | 663 ACS, M/L, BEING ALL OF SEC. 24, BLOCK H, W&NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| FARIS E. WEST, ET AL | EEX OPERATING L.P. | 09/20/1998 | 372 | 658 | Hardeman | TX | 49.40 ACS, M/L, OUT OF THE W/2 OF SEC. 67, BLOCK 16, H&TC RR CO SURVEY, A-259, HARDEMAN CO., TX |
| BONILEE KEY GARRETT, ET AL | ENSERCH EXPLORATION, INC. | 09/27/1978 | 224 | 577 | Hardeman | TX | 640 ACRES, M/L BEING ALL OF SEC. 25, BLOCK H, W& NW RR CO. SURVEY, LESS A 317 ACRE TRACT |
| THE SUMMERLEE FOUNDATION | CIMAREX ENERGY CO | 09/27/2006 | DI06 | 46334 | Hardeman | TX | JM MCAFEE SURVEY, A-1742, SEC. 2 |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 10/16/2002 | 399 | 198 | Hardeman | TX | TRACT NO. 1, SEC. 10 CONTAINING 89.42 ACS, M/L, TRACT 2, SEC. 10, BEING CALLED 14.54 ACS, M/L |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 10/16/2002 | 399 | 193 | Hardeman | TX | TRACT NO. 1, SEC. 10 CONTAINING 89.42 ACS, M/L, TRACT 2, SEC. 10, BEING CALLED 14.54 ACS, M/L |
| CAROLINE GORE GRAUFMAN | C. WAYNE ATCHISON | 10/18/2002 | 399 | 328 | Hardeman | TX | GC &SF RY CO., 1079, SEC. 2 ALL OF THE 296 AC DURHAM TRACT OUT OF SEC. 2, TRACT 1 LIMITED INSOFAR ONLY AS TO LANDS WITHIN THE 60 AC SUBJECT TO DURHAM FARMS UNIT NO. 2 |
| HELEN GORE WOOD | C. WAYNE ATCHISON | 10/18/2002 | 399 | 316 | Hardeman | TX | GC &SF RY CO., 1079, SEC. 2 ALL OF THE 296 AC DURHAM TRACT OUT OF SEC. 2, TRACT 1 LIMITED INSOFAR ONLY AS TO LANDS WITHIN THE 60 AC SUBJECT TO DURHAM FARMS UNIT NO. 1 |
| NANCY GORE FRY | C. WAYNE ATCHISON | 10/18/2002 | 399 | 324 | Hardeman | TX | GC &SF RY CO., 1079, SEC. 2 ALL OF THE 296 AC DURHAM TRACT OUT OF SEC. 2, TRACT 1 LIMITED INSOFAR ONLY AS TO LANDS WITHIN THE 60 AC SUBJECT TO DURHAM FARMS UNIT NO. 3 |
| REBECCA DAVENPORT | C. WAYNE ATCHISON | 10/18/2002 | 399 | 320 | Hardeman | TX | GC &SF RY CO., 1079, SEC. 2 ALL OF THE 296 AC DURHAM TRACT OUT OF SEC. 2, TRACT 1 LIMITED INSOFAR ONLY AS TO LANDS WITHIN THE 60 AC SUBJECT TO DURHAM FARMS UNIT NO. 1 |
| JERRY WAYNE MORTON | KEY PRODUCTION COMPANY, INC. | 10/22/2001 | 393 | 355 | Hardeman | TX | EL& RR RR CO. SURVEY, A-1672 SEC. 10 AND S. D. GUTHRIE SURVEY, A-1698 SEC. 2 |
| CHERYL MORTON JOHNSON | KEY PRODUCTION COMPANY, INC. | 10/23/2001 | 393 | 523 | Hardeman | TX | EL& RR RR CO. SURVEY, A-1672 SEC. 10 AND S. D. GUTHRIE SURVEY, A-1698 SEC. 2 |
| CECILE GRANGE | EP OPERATING LIMITED PARTNERSHIP | 11/01/1994 | 343 | 814 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| FRANKIE JEAN GRANGE, ET AL | EP OPERATING LIMITED PARTNERSHIP | 11/01/1994 | 343 | 806 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| JANE GRANGE DARLING | EP OPERATING LIMITED PARTNERSHIP | 11/01/1994 | 343 | 810 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| SAM D. GRANGE | EP OPERATING LIMITED PARTNERSHIP | 11/01/1994 | 343 | 431 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| JOHN N HUFF III | VISTA RESOURCES | 11/01/1999 | 379 | 342 | Hardeman | TX | A TRACT OF LAND OUT OF SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ASBST. NO. 1742 AND A TRACT OF LAND OUT OF SEC. 9, E.L.& R.R. RY. CO. SURVEY, ABST. NO. 575 |
| ANN PERKINS KAKER | EP OPERATING LIMITED PARTNERSHIP | 11/03/1994 | 344 | 533 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| C. B. CHRISTIE, JR. | EP OPERATING LIMITED PARTNERSHIP | 11/04/1994 | 343 | 428 | Hardeman | TX | 28 ACS, M/L OUT OF SEC. 3, EL & RR CO SURVEY, A-638 |
| GLENN M.TERRELL | ENSERCH EXPLORATION, INC. | 11/10/1982 | 251 | 322 | Hardeman | TX | 31.8 ACS, M/L, OUT OF THE SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1101 |
| LACY D. TERRELL, JR., ET AL | ENSERCH EXPLORATION, INC. | 11/10/1982 | 251 | 319 | Hardeman | TX | 31.8 ACS, M/L, OUT OF THE SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| NINA RUTH TERRELL HABERN | ENSERCH EXPLORATION, INC. | 11/10/1982 | 251 | 328 | Hardeman | TX | 31.8 ACS, M/L, OUT OF THE SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1099 |
| SARAH ELIZABETH TERRELL WILSON | ENSERCH EXPLORATION, INC. | 11/10/1982 | 251 | 325 | Hardeman | TX | 31.8 ACS, M/L, OUT OF THE SE/4 OF SEC. 20, BLOCK H, W&NW RR CO. SURVEY, A-1100 |
| MARY ANN SORENSEN, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF IVAN H. SORENSEN, DECEASED | EP OPERATING LIMITED PARTNERSHIP | 11/10/1994 | 344 | 829 | Hardeman | TX | 365.5 ACRES, M/L BEING ALL OF THE E/2 OF SEC. 70, BLOCK H, W&NW RR CO. SURVEY, A-1644 |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|---|---|---|---|---|---|---|---|
| RUTH G. EBBERT AND HUSBAND, JOHN D. EBBERT | EP OPERATING LIMITED PARTNERSHIP | 11/10/1994 | 345 | 413 | Hardeman | TX | 365.5 ACRES, M/L BEING ALL OF THE E/2 OF SEC. 70, BLOCK H, W&NW RR CO. SURVEY, A-1644 |
| MICHAEL BARROWS | CIMAREX ENERGY CO. | 11/20/2010 | | 52767 | Hardeman | TX | ALL OF SEC. 399, BLOCK A, H&TC RR CO. SURVEY, A-205 |
| JYME CLAUDENE LONG, A WIDOW | CIMAREX ENERGY CO. | 11/26/2004 | 414 | 638 | Hardeman | TX | H&TC RR CO SVY, BLOCK A, A-1597 SEC. 398, ENTIRE, LESS & EXCEPT THAT CERTAIN 40 ACRE PRORATION UNIT FOR THE LONG NO. 3X UNIT |
| HERMAN E. CARPENTER | CIMAREX ENERGY CO. | 12/01/2010 | DI11 | 52771 | Hardeman | TX | ALL OF SEC. 399, BLOCK A, H&TC RR CO. SURVEY, A-206 |
| THE ESSIE WILSON GREEN TRUST | CIMAREX ENERGY CO. | 12/01/2010 | DI11 | 52769 | Hardeman | TX | ALL OF SEC. 399, BLOCK A, H&TC RR CO. SURVEY, A-205 |
| CANDICE BULLINGTON BEST | DMC PETROLEUM INC | 12/09/1995 | | 576 | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, M/L. Tract 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES M/L. Tract 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, M/L. |
| THE ESTHER JUDD TRUST #2. | EP OPERATING LIMITED PARTNERSHIP | 12/11/1992 | 327 | 748 | Hardeman | TX | 640 ACS, M/L, BEING ALL OF SEC. 399, BLOCK A, H&TC RR CO SURVEY, A-205 |
| HYSON WELLS AND WIFE ALLYN WELLS | CHARLES MILLION | 12/13/1973 | 205 | 576 | Hardeman | TX | 365.5 ACS, M/L, BEING ALL OF THE N/2 OF SEC. 96, BLOCK H, W&NW RR CO SURVEY, A-1699 |
| NAOMI G. NICHOLS, ET AL | CHARLES MILLION | 12/14/1973 | 205 | 567 | Hardeman | TX | 320 ACS, M/L, BEING ALL OF THE E/2 OF SEC. 97, BLOCK H, W&NW RR CO SURVEY, A-420 |
| THOMAS WARREN MURPHY, A WIDOWER | CIMAREX ENERGY CO. | 12/17/2010 | | 567 | Hardeman | TX | 80 ACS OF LAND RETAINED BY THE BOTTOMS "11" NO. 1 ST 1 UNIT. BEING 29.8426 ACRES IN SURVEY NO. 14, C&M RR CO SURVEY, A-1465, AND 50.1574 ACRES IN SURVEY NO. 11, C&M RR CO SURVEY, A-552, AND BEING |
| JOHN N HUFF III | DMC PETROLEUM INC | 12/20/1994 | 347 | 928 | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, M/L. Tract 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES M/L. Tract 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, M/L. |
| HERBERT B STORY JR TRUSTEE | DMC PETROLEUM INC | 12/26/1994 | 347 | 762 | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, M/L. Tract 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES M/L. Tract 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, M/L. |
| MARIAN E WEBB MILLER | DMC PETROLEUM INC | 12/26/1994 | | | Hardeman | TX | Tract 1: BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, M/L. Tract 2: BEING THE S/2 NE/4, AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES M/L. Tract 3: TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, M/L. |

Exhibit A-1

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State | Legal Description |
|--------|--------|-----------|-------------|------|--------|-------|-------------------|
| MARY VIRGINIA BULLINGTON | DMC PETROLEUM INC | 12/26/1994 | | | Hardeman | TX | **Tract 1:** BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, MIL. **TRACT 2:** BEING THE S/2 NE/4; AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES MIL. **TRACT 3:** TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, MIL. |
| NANCY HUFF BRADFORD | DMC PETROLEUM INC | 12/26/1994 | 347 | 787 | Hardeman | TX | **Tract 1:** BEING ALL OF THE S/2 OF SEC. 85, A-414, W&NW RR CO. SURVEY, CONTAINING 320 ACRES, MIL. **TRACT 2:** BEING THE S/2 NE/4; AND S/2 SE/4 OF SEC. 3, A-533, TT RR CO SURVEY, HARDEMAN CO., TX; AND THE N/2 NE/4 OF SEC. 4, A-1422, TT RR CO. SURVEY, CONTAINING 240 ACRES MIL. **TRACT 3:** TWO TRACT OF LAND OUT OF THE SURVEY NO. 2 OF THE JOHN M. MCAFEE SURVEY, CERT. NO. 1952, ABST. 1742, CONTAINING 146.92 ACRES, MIL. |

**EXHIBIT A-2**

**FEE MINERAL INTERESTS**

See attached.

**EXHIBIT A-2**

**FEE MINERAL INTERESTS**


- **Tract 1** – 80 acres out of Section 62 (A-1527) and 85 (A-414) Block H, W&NW Ry. Co. Survey, being further described in Volume 368, Page 748, File No. 34081, Hardeman County, Texas.


- **Tract 2** – 160 acres out of the J.M. McAfee Survey No. 2, A-1742, and the E.L. & R. R. RR Co. Survey No. 8, A-575, being further described in Volume 368, Page 748, File No. 34081, Hardeman County, Texas.


- **Tract 3** – All of Section 399, Block A, Abstract No. 205, Certificate No. 31/2800, H&TC RR Co. Survey, Hardeman County, Texas containing 640 acres, more or less, being the same interest acquired by Cimarex Energy, Co. in those certain Mineral Deeds recorded at Document No. DI11-51866, DI11-52527, and DI11-53201 in the official records, Hardeman County, Texas.

**EXHIBIT A-3**

**SURFACE INTERESTS**

See attached.

Case 19-33868-hdh15 Doc 69-2 Filed 06/03/20   Entered 06/03/20 13:42:37   Page 76 of 109

Exhibit A-3

| Grantor | Grantee | Date | Book/Inst.No. | Page | County | State | Document Type/Comments |
|---|---|---|---|---|---|---|---|
| D.A. Loveless | Cimarex Energy Co. | 1/21/2005 | 414 | 590 | Hardeman | Texas | Pipeline Right of Way |
| K.D. McNabb | Cimarex Energy Co. | 12/22/2004 | 414 | 303 | Hardeman | Texas | Pipeline Right of Way |
| William D. Welch | Cimarex Energy Co. | 1/21/2005 | 415 | 63 | Hardeman | Texas | Pipeline Right of Way |
| Trent Tabor | Cimarex Energy Co. | 1/20/2005 | 414 | 573 | Hardeman | Texas | Pipeline Right of Way |
| Townly Christanelli | Cimarex Energy Co. | 1/19/2005 | 414 | 577 | Hardeman | Texas | Pipeline Right of Way |
| Carrie B. Watson | Cimarex Energy Co. | 1/5/2005 | 414 | 553 | Hardeman | Texas | Pipeline Right of Way |
| Ida G. Berngen Estate Trust | Cimarex Energy Co. | 1/18/2005 | 414 | 561 | Hardeman | Texas | Pipeline Right of Way |
| Charles G. Conley Trust, et al | Cimarex Energy Co. | 3/1/2005 | 415 | 903 | Hardeman | Texas | Pipeline Right of Way |
| Frank E. Berngen | Cimarex Energy Co. | 12/15/2004 | 414 | 287 | Hardeman | Texas | Pipeline Right of Way |
| Glenn C. Cato | Cimarex Energy Co. | 12/27/2004 | 414 | 295 | Hardeman | Texas | Pipeline Right of Way |
| Glenn C. Cato | Cimarex Energy Co. | 3/3/2005 | 415 | 914 | Hardeman | Texas | Pipeline Right of Way |
| Sam R. Judd, et ux | Cimarex Energy Co. | 12/14/2004 | 414 | 299 | Hardeman | Texas | Pipeline Right of Way |
| Sam R. Judd, et ux | Cimarex Energy Co. | 2/11/2005 | 415 | 606 | Hardeman | Texas | Pipeline Right of Way |
| Sam R. Judd, et ux | Cimarex Energy Co. | 2/17/2005 | 416 | 106 | Hardeman | Texas | Pipeline Right of Way |
| Ronnie D. Mott, et ux | Cimarex Energy Co. | 1/10/2005 | 414 | 565 | Hardeman | Texas | Pipeline Right of Way |
| James E. Jones | Cimarex Energy Co. | 12/16/2004 | 414 | 291 | Hardeman | Texas | Pipeline Right of Way |
| Leon O'Neal, et ux | Cimarex Energy Co. | 1/12/2005 | 414 | 569 | Hardeman | Texas | Pipeline Right of Way |
| Zacaweista Land & Cattle Company | Cimarex Energy Co. | 1/19/2005 | 414 | 581 | Hardeman | Texas | Pipeline Right of Way |
| Milligan Family Trust | Cimarex Energy Co. | 2/2/2005 | 416 | 110 | Hardeman | Texas | Pipeline Right of Way |
| Quail Trails, L.L.C. | Cimarex Energy Co. | 5/11/2005 | 416 | 314 | Hardeman | Texas | Pipeline Right of Way |
| Joseph A. Baller, Jr., et ux | Eagle Hydrocarbons Inc. | 6/15/2015 | DI15-60020 | | Hardeman | Texas | Pipeline Right of Way |
| Jere Lynne Jeffrey Rickman | Cimarex Energy Co. | 1/20/2005 | 414 | 585 | Hardeman | Texas | Pipeline Right of Way |
| Joe D. Bloodworth, et al | Cimarex Energy Co. | 2/13/2006 | 422 | 56 | Hardeman | Texas | Pipeline Right of Way |
| Christy Long Kirk, et al | Cimarex Energy Co. | 3/9/2006 | 422 | 46 | Hardeman | Texas | Pipeline Right of Way |
| Elsie M. Turner | Cimarex Energy Co. | 2/14/2006 | 422 | 53 | Hardeman | Texas | Pipeline Right of Way |
| Joel D. McClellan, et ux | E.G. Operating | 4/11/1997 | 362 | 22 | Hardeman | Texas | Pipeline Right of Way |
| C.G. Conley Trust, et al | E.G. Operating | 3/7/1997 | 362 | 66 | Hardeman | Texas | Pipeline Right of Way |
| Garland Caldwell | E.G. Operating | 4/2/1997 | 362 | 63 | Hardeman | Texas | Pipeline Right of Way |
| Diane Waldo | E.G. Operating | 4/3/1997 | 362 | 60 | Hardeman | Texas | Pipeline Right of Way |
| Ann Marie Judd Morris | QZ Energy, LLC | 5/3/2018 | DI18-62829 | | Hardeman | Texas | Pipeline Right of Way |
| BNSF Railway Company | Cimarex Energy Services, Inc. | 4/11/2005 | 04-27865 | | Hardeman | Texas | Pipeline Right of Way |
| Kevin Thomas, et ux | Eagle Hydrocarbons Inc. | 10/6/2017 | DI18-62559 | | Hardeman | Texas | Pipeline Right of Way |
| Zacaweista Land & Cattle Company | Eagle Hydrocarbons Inc. | 10/23/2015 | DI15-60239 | | Hardeman | Texas | Pipeline Right of Way |
| Compress Partners LTD, et al | Eagle Hydrocarbons Inc. | 7/15/2019 | DI19-64593 | | Hardeman | Texas | Water Pipeline Right of Way |
| Quail Trails, L.L.C., et al | Eagle Hydrocarbons Inc. | 5/10/2019 | DI19-64362 | | Hardeman | Texas | Road Way Access Agreement - Quail Lane |
| Holmes Properties, LTD | Eagle Hydrocarbons Inc. | 1/1/2017 | Not Recorded | | Hardeman | Texas | Saltwater Disposal Agreement |
| Glynn W. Love, et ux | Key Production Company, Inc. | 11/30/1999 | 379 | 466 | Hardeman | Texas | Saltwater Disposal Agreement |
| Quail Trails, L.L.C., et al | Eagle Hydrocarbons Inc. | 5/10/2019 | DI19-64594 | | Hardeman | Texas | Road Way Access Agreement - Summerlee 8 |
| Helen F. Parker | Eagle Hydrocarbons Inc. | 12/13/2016 | Not Recorded | | Hardeman | Texas | Saltwater Disposal Agreement |
| D.A. Loveless | Brock Gas Systems & Equipment, Inc. | 10/8/2002 | 398 | 939 | Hardeman | Texas | Plant Site Lease |
| Cimarex Energy Co., et al | Eagle Energy Acquisitions LP | 10/1/2013 | DI13-57870 | | Hardeman | Texas | Warranty Deed |
| Stepp Ranch, LP | Eagle Hydrocarbons Inc. | 1/20/2015 | Not Recorded | | Hardeman | Texas | Saltwater Disposal Agreement |

**EXHIBIT B**

**<u>WELLS</u>**

See attached.

| Well Name | API | County | State |
|-----------|-----|--------|-------|
| Angelo 4-2H | 42-197-31676 | Hardeman | Texas |
| DURHAM FARMS UNIT 1 | 42-197-31547 | Hardeman | Texas |
| GERALD UNIT #1 | 42-197-31185 | Hardeman | Texas |
| GILLIAM C J #1 SWD | 42-197-30048 | Hardeman | Texas |
| GILLIAM C J #3 | 42-197-30278 | Hardeman | Texas |
| GILLIAM CJ #5ST | 42-197-31710 | Hardeman | Texas |
| HOLMES #7 | 42-197-31276 | Hardeman | Texas |
| HOLMES 284 #3 SWD | 42-197-31277 | Hardeman | Texas |
| HOLMES 284 #4ST | 42-197-31280 | Hardeman | Texas |
| HOLMES 284 #5 | 42-197-31281 | Hardeman | Texas |
| HOLMES 284-6 | 42-197-31286 | Hardeman | Texas |
| HOLMES-NEAL 284 UNIT 1 | 42-197-31265 | Hardeman | Texas |
| HURST #2H | 42-197-31313 | Hardeman | Texas |
| JMOJ #3 (F.K.A. HURST #3) | 42-197-31479 | Hardeman | Texas |
| HURST #4 | 42-197-30453 | Hardeman | Texas |
| HURST 10 #1 | 42-197-31328 | Hardeman | Texas |
| JMOJ #12H (F.K.A. HURST 12H) | 42-197-31565 | Hardeman | Texas |
| HURST 6H | 42-197-00133 | Hardeman | Texas |
| HURST B 9H | 42-197-31541 | Hardeman | Texas |
| HURST C 5H | 42-197-31489 | Hardeman | Texas |
| HURST D 7H | 42-197-31521 | Hardeman | Texas |
| JAMES LONG 1 | 42-197-30646 | Hardeman | Texas |
| Johnson 1-1H | 42-197-31662 | Hardeman | Texas |
| JUDD 1A | 42-197-30765 | Hardeman | Texas |
| JUDD 399 #1 | 42-197-31366 | Hardeman | Texas |
| LONG 398 3X | 42-197-31316 | Hardeman | Texas |
| LONG 398 A4 | 42-197-31364 | Hardeman | Texas |
| LONG 6 | 42-197-31581 | Hardeman | Texas |
| LONG 7 | 42-197-31580 | Hardeman | Texas |
| LONG 8 | 42-197-31585 | Hardeman | Texas |
| LOVE 20 ST1 3 | 42-197-30567 | Hardeman | Texas |
| LOVE 20 4 SWD | 42-197-30589 | Hardeman | Texas |
| LOVE UNIT #1 | 42-197-31433 | Hardeman | Texas |
| MCMICHAEL 59 #1 | 42-197-31393 | Hardeman | Texas |
| MCNABB #4H | 42-197-31470 | Hardeman | Texas |
| MEHARG UNIT NO. 1 | 42-197-31444 | Hardeman | Texas |
| MILLIGAN 1 | 42-197-31744 | Hardeman | Texas |
| NEAL 2-1 | 42-197-31318 | Hardeman | Texas |
| ROBINSON 1H | 42-197-31739 | Hardeman | Texas |
| ROBINSON 2H | 42-197-31755 | Hardeman | Texas |
| SORENSON 70 #1 | 42-197-31322 | Hardeman | Texas |
| Spanky 2-2H | 42-197-31678 | Hardeman | Texas |
| STEPP 110 #1 | 42-197-31325 | Hardeman | Texas |
| STEPP JUDD 1H | 42-197-31745 | Hardeman | Texas |
| STEPP-HURST 110 UNIT #1 | 42-197-31307 | Hardeman | Texas |
| STEPP-HURST 110 UNIT #2 | 42-197-31319 | Hardeman | Texas |
| STEPP-HURST 110-1 SW | 42-197-31720 | Hardeman | Texas |
| SUMMERLEE #1 CONGLOMERATE | 42-197-31513 | Hardeman | Texas |
| SUMMERLEE 6H | 42-197-31576 | Hardeman | Texas |
| SUMMERLEE 8H | 42-197-31588 | Hardeman | Texas |
| SUMMERLEE A 7H | 42-197-31578 | Hardeman | Texas |
| SUMMERLEE NO. 1H | 42-197-20035 | Hardeman | Texas |
| SUMMERLEE STEPP UNIT 1H | 42-197-31527 | Hardeman | Texas |
| SUMMERLEE UNIT 3 | 42-197-31555 | Hardeman | Texas |

| Well Name | API | County | State |
|---|---|---|---|
| SUMMERLEE UNIT B-2H | 42-197-31553 | Hardeman | Texas |
| WELLS UNIT #1 | 42-197-31439 | Hardeman | Texas |
| WELLS UNIT #2 | 42-197-31721 | Hardeman | Texas |
| WELLS UNIT #3ST | 42-197-31728 | Hardeman | Texas |
| WELLS-NICHOLS #1 | 42-197-30294 | Hardeman | Texas |
| WELLS-NICHOLS #4 | 42-197-31711 | Hardeman | Texas |
| WELLS-NICHOLS #5 SWD | 42-197-31727 | Hardeman | Texas |
| WEST ESTATE #1 | 42-197-31423 | Hardeman | Texas |
| WEST ESTATE UNIT #2 | 42-197-31452 | Hardeman | Texas |
| YOUNG #1 | 42-197-31448 | Hardeman | Texas |
| Zip 74-1H | 42-197-31685 | Hardeman | Texas |
| CATO-HOLMES UNIT 1 | 42-197-30954 | Hardeman | Texas |
| MCNABB 1 | 42-197-30303 | Hardeman | Texas |
| MCNABB  2 | 42-197-30524 | Hardeman | Texas |
| MCNABB 3 | 42-197-30303 | Hardeman | Texas |
| WORD A 2 | 42-197-31451 | Hardeman | Texas |
| DEWITT 1-17H | 35-065-20268 | Jackson | Oklahoma |
| EDDIE 2-31H | 35-065-20265 | Jackson | Oklahoma |
| HATCH 2-29H | 35-065-20262 | Jackson | Oklahoma |
| EDDIE 1-31H | 35-065-20249 | Jackson | Oklahoma |
| HATCH 1-29 | 35-065-20245 | Jackson | Oklahoma |
| CAROL SUE 1-20 | 35-065-20243 | Jackson | Oklahoma |
| JUDD 'A' 3 | 42-197-31750 | Hardeman | Texas |
| JUDD 'A' 2 | 42-197-31743 | Hardeman | Texas |
| JUDD 'A' 1 | 42-197-31715 | Hardeman | Texas |
| Coleman 1 | 42-363-35293 | Palo Pinto | Texas |
| Coleman 2 | 42-363-35482 | Palo Pinto | Texas |
| Dabney 1 | 42-363-35361 | Palo Pinto | Texas |
| Dabney 2 | 42-363-35483 | Palo Pinto | Texas |
| Deno-Gragg 1 | 42-363-35219 | Palo Pinto | Texas |
| Deno-Gragg 2 | 42-363-35385 | Palo Pinto | Texas |
| Deno-Gragg 3 | 42-363-35526 | Palo Pinto | Texas |
| Francis 1 | 42-363-35295 | Palo Pinto | Texas |
| Gragg, P.K 1 | 42-363-35369 | Palo Pinto | Texas |

**EXHIBIT C**

**ASSIGNED CONTRACTS**

See attached.

## Contracts

| Party A | Party B | Document Description |
|---|---|---|
| Sunoco Partners Marketing & Terminals L.P. | Eagle Energy Acquisitions LP | Crude Oil Purchase Agreement (Sunoco Partners Reference No. 530697) dated March 1, 2014. See latest amendment to be effective June 1, 2020. |
| Sunoco Partners Marketing & Terminals L.P. | Eagle Energy Acquisitions LP | Crude Oil Purchase Agreement (Sunoco Partners Reference No. 530535) dated September 1, 2012. See latest amendment effective August 1, 2014. |
| PK Gathering, Inc. | Dry Fork Production Company, LLC | Compression and Transportation Agreement |
| Targa Midstream Services LLC | Eagle Hydrocarbons Inc. | Gas Purchase Agreement |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective March 1, 2012. Angelo Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective March 1, 2011. Johnson Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective October 1, 2011. Spanky Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective September 1, 2011. Zip Unit. |
| General American Oil Co. of Texas | Lone Star Producing Co., et al | Operating Agreement (AAPL Form 610-1956), effective May 1, 1975. Sections 97 & 96 Hyson Wells & Wells Nichols |
| Key Production Co., Inc. | EEX Operating L.P., et al | Operating Agreement (AAPL Form 610-1982), effective May 15, 1989. Section 96. Wells Unit |
| Mineral Development, Inc. | Brosier Oil & Gas, Inc. | Operating Agreement (AAPL Form 610-1982), effective October 16, 1992. Medicine Mounds |
| Key Energy of Colorado, Inc. | Ensearch Exploration, Inc., et al | Operating Agreement (AAPL Form 610-1982), effective November 1, 1997. Gerald Unit |
| Expando Oil Company | General American Oil Co. of Texas, et al | Operating Agreement (AAPL Form 610-1977), effective October 8, 1982. McNabb |
| Key Production Co., Inc. | Phillips Petroleum Co., et al | Operating Agreement (AAPL Form 610-1982), effective May 22, 2000. McNabb |
| Cimarex Energy Co. | Sundown Energy, Inc.., et al | Operating Agreement (AAPL Form 610-1982), effective July 1, 2004. Summerlee Unit #3 |
| Cimarex Energy Co. | Sundown Energy, Inc., et al | Operating Agreement (AAPL Form 610-1982), effective August 1, 2005. Summerlee Unit #8 |
| GLB Exploration, Inc. | Panther Energy Company, LLC, et al | Operating Agreement (AAPL Form 610-1989), effective October 19, 2012. Dewitt Unit. Jackson County, OK |
| Panther Energy Company, LLC | Atchley Resources, Inc. | Operating Agreement (AAPL Form 610-1989), effective July 20, 2011. Jackson County, OK |
| GLB Exploration, Inc. | Panther Energy Company, LLC, et al | Operating Agreement (AAPL Form 610-1989), effective August 25, 2009. Jackson County, OK |
| Seismic Exchange, Inc. | Eagle Energy Acquisitions LP | Master Geophysical Data Use License, effective September 24, 2012. |
| Merrick Systems, Inc. | Eagle Energy Acquisitions LP | Master Agreement (Production Software), effective February 29, 2012. |
| Eagle Hydrocarbons Inc. | Salt Flat Acquisition LLC | Seismic Data License Agreement |
| IHS Global | Eagle Hydrocarbons Inc. | License Agreement (Perpetual Kingdom SMT and Petra US Licenses) |
| TRC Consultants | Eagle Hydrocarbons Inc. | License Agreement (PHDWin Reserves Software) |
| MJ Systems | Eagle Hydrocarbons Inc. | License Agreement (Mud log data set) |
| MP2 Energy Texas LLC | Eagle Hydrocarbons Inc. | Retail Power Sales Agreement, dated May 21, 2019. |

## MSAs

| Counterparty | Type of Agreement | Date Executed |
|---|---|---|
| SPOC Automation Inc. | MSA | August 9, 2018 |
| Kiewschnick Welding | MSA | May 16, 2018 |
| Cudd Pressure Control, Inc., and Cudd Pumping Services, Inc. and Bronco Oilfield Services, Inc. | MSA | November 1, 2017 |
| Matador Petroleum Consultants, LLC | MSA | January 15, 2017 |
| Well Optix Inc. | SAAS License Agmt | October 18, 2018 |
| Axip Energy Services, LP | Master Compression Services Agreement | February 28, 2018 |
| STRC Oilfield Technology LLC | MSA | September 5, 2017 |
| Lario Transports, Inc. | MSA | August 16, 2017 |
| L&S Hot Oil Service, Inc. | MSA | August 16, 2017 |
| Quasar Energy Services, Inc. | MSA | August 19, 2015 |
| Cactus Pipe & Supply | MSA | December 3, 2015 |
| J & M Oil Field Service & Equipment | MSA | November 19, 2015 |
| Knight Oil Tools, LLC | MSA | March 10, 2014 |
| Energy Pipe & Equipment Rentals | MSA | March 1, 2013 |
| Archrock Partners Operating LLC | Master Compression Services Agreement | August 22, 2018 |
| HB Rentals | Equipment Master Rental Agreement | September 3, 2014 |

**EXHIBIT D**

**FORM OF ASSIGNMENT, CONVEYANCE AND BILL OF SALE**

**EXHIBIT E**

**FORM OF OFFICER'S CERTIFICATE**

---

**[VENDOR'S][PURCHASER'S] OFFICER'S CERTIFICATE**

TO:     **[Name of Vendor/Purchaser] [("Vendor")] [("Purchaser")]**

RE: Purchase and Sale Agreement dated May 28, 2020 between Vendor and Purchaser (the "**Agreement**")

Unless otherwise defined herein, the definitions provided for in the Agreement are adopted in this certificate (the "**Certificate**").

I, **[Name]**, **[Position]** of **[Name of Vendor/Purchaser] [("Vendor")] [("Purchaser")]** hereby certify that as of the date of this Certificate:

1.      The undersigned is personally familiar, in **[his][her]** capacity as an officer of **[Vendor][Purchaser]**, with the matters hereinafter mentioned.

2.      **[The representations and warranties of Vendor contained in section 4.1 of the Agreement were true and correct (without giving effect to any limitation or qualification as to materiality or Material Adverse Effect or other similar qualifiers) when made and are true and correct (without giving effect to any limitation or qualification as to materiality or Material Adverse Effect or other similar qualifiers) as of the Closing Date; provided that in the event of a breach or inaccuracy in the representations and warranties of Vendor contained in section 4.1 of the Agreement, the effect of all such breaches or inaccuracies in such representations and warranties taken together does not result in a Material Adverse Effect.][The representations and warranties of Purchaser contained in section 4.2 of the Agreement were true and correct in all material respects when made and are true and correct in all material respects as of the Closing Date.]**

3.      All covenants and obligations of **[Vendor][Purchaser]** contained in the Agreement to be performed prior to or at Closing have been timely performed in all material respects.

4.      This Certificate is made for and on behalf of the **[Vendor][Purchaser]** and is binding upon it, and I am not incurring, and will not incur, any personal liability whatsoever with respect to it.

5.      This Certificate is made with full knowledge that the **[Vendor][Purchaser]** is relying on the same for the Closing of the transactions contemplated by the Agreement.

IN WITNESS WHEREOF I have executed this Certificate this ____ day of _____, 2020.

**[Name of Vendor/Purchaser]**

Per:     _____

Name:  _____
Title:    _____

**EXHIBIT F**

**ALBERTA FORM OF APPROVAL AND VESTING ORDER**

**EXHIBIT G**

**EXCLUDED ASSETS**

See attached.

| Office Contracts | | |
|---|---|---|
| **Party A** | **Party B** | **Document Description** |
| New Concepts Leasing, Inc. | Eagle Hydrocarbons Inc. | Master Finance Lease Agreement (Vehicle Lease) |
| Energy Tower IV Investments LTD | Eagle Hydrocarbons Inc. | Office Lease |
| FP Mailing Solutions | Eagle Hydrocarbons LLC | Postage Meter |
| Quench | Eagle Hydrocarbons LLC | Water |
| De Lage Landen Financial Services | Eagle Hydrocarbons LLC | Ops copier MPC3002 |
| Century Link | Eagle Hydrocarbons Inc. | Phone Service |
| Comcast | Eagle Hydrocarbons Inc. | Internet Service |
| Cogent Communications | Eagle Hydrocarbons Inc. | Backup Internet Service |
| Unetek, Inc. | Eagle Hydrocarbons Inc. | Master Service Agreement (IT Consultant) |
| Wayne Wisniewski | Eagle Hydrocarbons Inc. | Employment Contract |
| Greg Roberts | Eagle Hydrocarbons Inc. | Employment Contract |
| Kirt Warrack | Eagle Hydrocarbons Inc. | Employment Contract |
| Andrea Alfred | Eagle Hydrocarbons Inc. | Employment Contract |
| Jim Moore | Eagle Hydrocarbons Inc. | Employment Contract |
| Vannell McCaslin | Eagle Hydrocarbons Inc. | Employment Contract |

| MSAs | | |
|---|---|---|
| **Counterparty** | **Type of Agreement** | **Date Executed** |
| Expro Americas, LLC | MSA | September 10, 2019 |
| Peak Completion Technologies, Inc. | MSA | August 12, 2019 |
| Robert Register dba R5 Trucking & Construction | MSA | July 15, 2019 |
| D D Farms | MSA | June 24, 2019 |
| Premier Pipe, LLC | MSA | December 18, 2019 |
| Tri-Point Oil & Gas Production Systems, LLC | MSA | September 18, 2019 |
| GR Wireline, LP | MSA | December 4, 2018 |
| Altus Intervention USA, Inc. | MSA | October 10, 2018 |
| CWS Wireline, LLC | MSA | October 10, 2018 |
| TanMar Rentals, LLC | MSA | September 25, 2018 |
| Epic Lift Systems, LLC | MSA | September 25, 2018 |
| Packers Plus Energy Services (USA) Inc. | MSA | August 31, 2018 |
| Core Laboratories LP, for its ProTechnics Division | MSA | May 4, 2018 |
| Hot Splash, LLC | MSA | April 9, 2018 |
| Innovex Downhole Solutions, Inc. | MSA | March 26, 2018 |
| Warrior Directional Drilling, L.L.C. | MSA | March 20, 2018 |
| Kingsley Directional | MSA | February 20, 2018 |
| Downhole Technology, LLC | MSA | November 6, 2017 |
| Divine Wireline Solutions, LLC | MSA | October 27, 2017 |
| Johnson Matthey Inc. dba Tracerco | MSA | October 3, 2017 |
| Z&A Consulting & Services, Inc. | MSA | October 4, 2017 |
| Oil States Energy Services, L.L.C. | MSA | August 26, 2014 |
| Centerline Trucking LLC (Quintana Energy Services LP) | MSA | August 21, 2017 |
| American Eagle Logistics, L.L.C. | MSA | September 21, 2017 |
| Joe's HotShot & Trucking, L.L.C. | MSA | December 8, 2014 |
| Hanzik Hydraultics Inc. | MSA | May 25, 2017 |
| New Energy Transport Inc. | MSA | March 16, 2017 |
| Safarico | MSA | July 14, 2017 |
| OSC Energy, LLC | MSA | February 22, 2017 |
| Crest Pumping Technologies, LLC | MSA | October 6, 2014 |
| Synergy Pump & Equipment | MSA | February 22, 2017 |
| Quick Connectors, Inc. | MSA | January 17, 2017 |
| Primed Up Nitrogen Services | MSA | November 16, 2016 |
| (Pumps Plus) Pumps and Pump & Valve Repair | MSA | October 20, 2015 |
| Tucker Energy Services, Inc. | MSA | September 23, 2014 |
| Jerry's Waterline Service, a division of Jerry's Oilfield Services Co., Inc. et al. | MSA | August 24, 2017 |
| Five Star Rousabouts, DBA Five Star Construction | MSA | August 4, 2017 |
| Quintana Energy Services LP | MSA | August 21, 2017 |
| Carbon Allied, LLc DBA Allied Testing | MSA | May 25, 2017 |
| Oil Patch Group, Inc. | MSA | February 8, 2017 |
| Bulldog Well Service | MSA | December 1, 2106 |
| Raydon, Inc. | MSA | September 23, 2013 |
| Sterlings Vacuum Service, LLc | MSA | October 26, 2016 |
| Hickey Electric | MSA | April 26, 2016 |
| Texas Submersible Pump Specialist, Inc. | MSA | September 16, 2016 |
| Sprint Energy Service LLC | MSA | March 24, 2016 |
| Kel-Tech, Inc. | MSA | June 17, 2016 |
| Driven 2 Deliver Logistic Services L.L.C. | MSA | June 13, 2016 |
| Bering Gas Process Inc. | MSA | November 7, 2016 |
| iReservoir.com, Inc. | MSA | August 17, 2016 |
| Essential Logistics LLC | MSA | July 8, 2015 |
| Lightning Oilfield Services, Inc. | MSA | May 6, 2015 |
| Precision Pressure Data, Inc. | MSA | August 28, 2015 |
| Orr Enterprises, Inc. | MSA | September 2, 2015 |
| Centex Supply & Rentals LLc | MSA | September 30, 2015 |

| Counterparty | Type of Agreement | Date Executed |
|---|---|---|
| OS&S Operating, Inc. | MSA | January 12, 2016 |
| A-Team Construction | MSA | July 9, 2015 |
| True-Tex Services, Inc. | MSA | July 30, 2015 |
| W&W Fiberglass Tank Co. | MSA | Undated, saved June 3, 2016 |
| Maverick Field Services, LLC | MSA | April 6, 2015 |
| Maverick Field Services Logistics, LLC | MSA | April 6, 2015 |
| Tejas Performance Energy. LLC | MSA | September 1, 2015 |
| Gemini Drilling Solutions L.L.C. | MSA | July 31, 2015 |
| Hot Shot USA | MSA | April 21, 2015 |
| M.W. Rentals & Services, Inc. | MSA | January 15, 2016 |
| Baldwin Oilfield Trucking Inc. | MSA | August 3, 2015 |
| Stringer Transports, Inc. | MSA | December 14, 2015 |
| Red River Brand LLC | MSA | February 11, 2016 |
| Aldonsa dba Oilfield Instrumentation | MSA | March 17, 2016 |
| Lyon Operating Co Inc. | MSA | November 1, 2015 |
| Rockwater Mid-Con, LLc | MSA | April 12, 2016 |
| OMI, LP Oilfield Materials Mgmt | MSA | September 3, 2014 |
| Key Welding Inc. | MSA | April 9, 2015 |
| WTW, Inc. (West Texas Well, Inc.) | MSA | April 6, 2015 |
| Graham Construction & Land Clearing | MSA | April 7, 2015 |
| Usa Rock Bit Inc. | MSA | March 17, 2015 |
| B.O.P. Ram-Block & Iron Rentals, Inc. | MSA | April 3, 2015 |
| The Cavins Corporation | MSA | March 13, 2015 |
| QO Inc. | MSA | March 13, 2015 |
| Langford Testers & Anchors, LLC | MSA | January 26, 2015 |
| The SydCo System, Inc. | MSA | December 9, 2014 |
| JA Oilfield Manufacturing, Inc. | MSA | December 1, 2014 |
| Custom Trucks & Equipment | MSA | Nov 17, 2014 |
| Completion Resources, L.L.C. | MSA | May 27, 2014 |
| Oilfield Equipment Rentals LLC | MSA | May 27, 2014 |
| Triton Hardbanding Service LLC | MSA | May 27, 2014 |
| Rig Testers Inc. | MSA | August 19, 2013 |
| Ellison Fluid Calipers LLC | MSA | May 27, 2014 |
| MR Hauling LLC | MSA | August 28, 2013 |
| Nitro-Lift Technologies, L.L.C. | MSA | August 1, 2014 |
| CSI Inspection, LLC | MSA | August 20, 2013 |
| Hot Rods Hot Shot Service LLC | MSA | July 30, 2013 |
| Legend Energy Services, LLc | MSA | October 31, 2013 |
| Nova Training, Inc. | MSA | October 7, 2013 |
| Arc Angel, LLC | MSA | August 7, 2013 |
| S&A Oilfield Services LLc | MSA | August 2, 2013 |
| Quantum Machining LLc | MSA | August 30, 2013 |
| Capital Petroleum Consultants, Inc. | MSA | March 3, 2015 |
| Texas Digger Service, Inc. | MSA | December 22, 2014 |
| EOS (Environmental Oil Solutions LLC) | MSA | November 1, 2014 |
| Wenzel Downhole Tools US, Inc. | MSA | November 4, 2014 |
| Midwestern Mud Service | MSA | September 4, 2014 |
| SBI of Texas, LLC | MSA | June 13, 2014 |
| McMillan Welding | MSA | May 28, 2014 |
| Key Energy Services, LLC | MSA | August 28, 2014 |
| Dubose Drilling Inc, | MSA | November 1, 2013 |
| Drill Collar Inspection Services, Inc. | MSA | June 6, 2014 |
| J&W Services and Equipment Co, Inc, | MSA | June 1, 2013 |
| Mid-Tex Propane, Inc. | MSA | July 31, 2014 |
| R.B. Electric, LLC | MSA | August 8, 2014 |
| Brady's Welding & Machine Shop, Inc. | MSA | August 6, 2014 |

| Counterparty | Type of Agreement | Date Executed |
|---|---|---|
| Paisano Lease Company, Inc. | MSA | July 14, 2014 |
| Phoenix 911 Enterprises LP | MSA | July 11, 2014 |
| Sandy Creek Energy Services, LLC | MSA | May 28, 2014 |
| Nitro Fluids, LLC | MSA | June 9, 2014 |
| Nitro Downhole, LLC | MSA | June 9, 2014 |
| Nitro Construction, LLC | MSA | June 9, 2014 |
| Acid Specialists, LLC | MSA | May 7, 2014 |
| Esparza Trucking | MSA | May 2, 2014 |
| AC Construction Inc. | MSA | April 4, 2014 |
| Elite Production Services, LLC | MSA | January 30, 2014 |
| Xtreme Hotshots & Trucking LLC | MSA | June 25, 2014 |
| Halliburton Energy Services, Inc. | MSA | March 8, 2018 |

**EXHIBIT H**

**PERMITTED ENCUMBRANCES**

None.

**EXHIBIT I**

**BANKRUPTCY COURT ORDER**

**EXHIBIT J**

**CURE COSTS**

None.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(d)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

## CONSENTS

See attached.

Case 19-33868-hdh15 Doc 69-2 Filed 06/03/20    Entered 06/03/20 13:42:37    Page 95 of 109

Schedule 4.1(d)

**Contracts**

| Party A | Party B | Document Description |
|---|---|---|
| Sunoco Partners Marketing & Terminals L.P. | | Crude Oil Purchase Agreement (Sunoco Partners Reference No. 530697) dated March 1, 2014. See latest amendment to be effective June 1, 2020. |
| Sunoco Partners Marketing & Terminals L.P. | Eagle Energy Acquisitions LP | Crude Oil Purchase Agreement (Sunoco Partners Reference No. 530535) dated September 1, 2012. See latest amendment effective August 1, 2014. |
| Panther Energy Company, LLC | Eagle Energy Acquisitions LP | Operating Agreement (AAPL Form 610-1989), effective March 1, 2012. Angelo Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective March 1, 2011. Johnson Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective October 1, 2011. Spanky Unit. |
| Panther Energy Company, LLC | Red Willow Mid-Continent LLC, et al | Operating Agreement (AAPL Form 610-1989), effective September 1, 2011. Zip Unit. |
| General American Oil Co. of Texas | Lone Star Producing Co., et al | Operating Agreement (AAPL Form 610-1956), effective May 1, 1975. Sections 97 & 96 Hyson Wells & Wells Nichols |
| Key Production Co., Inc. | EEX Operating L.P., et al | Operating Agreement (AAPL Form 610-1982), effective May 15, 1989. Section 96. Wells Unit |
| Mineral Development, Inc. | Brosier Oil & Gas, Inc. | Operating Agreement (AAPL Form 610-1982), effective October 16, 1992. Medicine Mounds |
| Key Energy of Colorado, Inc. | Ensearch Exploration, Inc., et al | Operating Agreement (AAPL Form 610-1982), effective November 1, 1997. Gerald Unit |
| Expando Oil Company | General American Oil Co. of Texas, et al | Operating Agreement (AAPL Form 610-1977), effective October 8, 1982. McNabb |
| Key Production Co., Inc. | Philips Petroleum Co., et al | Operating Agreement (AAPL Form 610-1982), effective May 22, 2000. McNabb |
| Cimarex Energy Co. | Sundown Energy, Inc., et al | Operating Agreement (AAPL Form 610-1982), effective July 1, 2004. Summerlee Unit #3 |
| Cimarex Energy Co. | Sundown Energy, Inc., et al | Operating Agreement (AAPL Form 610-1982), effective August 1, 2005. Summerlee Unit #8 |
| GLB Exploration, Inc. | Panther Energy Company, LLC, et al | Operating Agreement (AAPL Form 610-1989), effective October 19, 2012. Dewitt Unit. Jackson County, OK |
| Panther Energy Company, LLC | Atchley Resources, Inc. | Operating Agreement (AAPL Form 610-1989), effective July 20, 2011. Jackson County, OK |
| GLB Exploration, Inc. | Panther Energy Company, LLC, et al | Operating Agreement (AAPL Form 610-1989), effective August 25, 2009. Jackson County, OK |
| Seismic Exchange, Inc. | Eagle Energy Acquisitions LP | Master Geophysical Data Use License, effective September 24, 2012. |
| Merrick Systems, Inc. | Eagle Energy Acquisitions LP | Master Agreement (Production Software), effective February 29, 2012. |
| Unetek, Inc. | Eagle Hydrocarbons Inc. | Master Service Agreement (IT Consultant), effective September 14, 2016. |
| New Concepts Leasing, Inc. | Eagle Hydrocarbons Inc. | Master Finance Lease Agreement (Vehicle Lease), effective June 24,2014 |
| Eagle Hydrocarbons Inc. | Salt Flat Acquisition LLC | Seismic Data License Agreement |
| IHS Global | Eagle Hydrocarbons Inc. | License Agreement (Perpetual Kingdom SMT and Petra US Licenses) |
| TRC Consultants | Eagle Hydrocarbons Inc. | License Agreement (PHDWin Reserves Software) |
| MJ Systems | Eagle Hydrocarbons Inc. | License Agreement (Mud log data set) |

Schedule 4.1(d)

## MSAs

| Party A | Party B | Type of Agreement | Date Executed |
|---|---|---|---|
| Eagle Hydrocarbons Inc. | Well Optix Inc. | SAAS License Agmt | October 18, 2018 |
| Eagle Hydrocarbons Inc. | Archrock Partners Operating LLC | Master Compression Services Agreement | August 22, 2018 |
| Eagle Hydrocarbons Inc. | Axip Energy Services, LP | Master Compression Services Agreement | February 28, 2018 |
| Eagle Energy Acquisitions, LP | IHS Global, Inc. | Master Agreement for the Provision of Information and Insight | July 18, 2013 |

Case 19-33868-hdh15 Doc 69-2 Filed 06/03/20    Entered 06/03/20 13:42:37    Page 97 of 109

Schedule 4.1(d)

**Surface Interests**

| Grantor | Grantee | Date | Book/Inst. No. | Page | Document Type/Comments |
|---|---|---|---|---|---|
| Charles G. Conley Trust, et al | Cimarex Energy Co. | 3/1/2005 | 415 | 903 | Pipeline Right of Way |
| Zacaweista Land & Cattle Company | Cimarex Energy Co. | 1/19/2005 | 414 | 581 | Pipeline Right of Way |
| Milligan Family Trust | Cimarex Energy Co. | 2/2/2005 | 416 | 110 | Pipeline Right of Way |
| Quail Trails, L.L.C. | Cimarex Energy Co. | 5/11/2005 | 416 | 314 | Pipeline Right of Way |
| Joseph A. Baller, Jr., et ux | Eagle Hydrocarbons Inc. | 6/15/2015 | DI15-60020 | | Pipeline Right of Way |
| BNSF Railway Company | Cimarex Energy Services, Inc. | 4/11/2005 | 04-27865 | | Pipeline Right of Way |
| Zacaweista Land & Cattle Company | Eagle Hydrocarbons Inc. | 10/23/2015 | DI15-60239 | | Pipeline Right of Way |
| Quail Trails, L.L.C., et al | Eagle Hydrocarbons Inc. | 5/10/2019 | DI19-64362 | | Road Way Access Agreement - Quail Lane |
| Holmes Properties, LTD | Eagle Hydrocarbons Inc. | 1/1/2017 | Not Recorded | | Saltwater Disposal Agreement |
| Quail Trails, L.L.C., et al | Eagle Hydrocarbons Inc. | 5/10/2019 | DI19-64594 | | Road Way Access Agreement - Summerlee 8 |
| Helen F. Parker | Eagle Hydrocarbons Inc. | 12/13/2016 | Not Recorded | | Saltwater Disposal Agreement |
| Stepp Ranch, LP | Eagle Hydrocarbons Inc. | 1/20/2015 | Not Recorded | | Saltwater Disposal Agreement |

Case 19-33868-hdh15 Doc 69-2 Filed 06/03/20   Entered 06/03/20 13:42:37    Page 98 of 109
Schedule 4.1(d)

**O&G Leases**

| Lessor | Lessee | Lease Date | Book/Inst # | Page | County | State |
|---|---|---|---|---|---|---|
| Mollie Evans Heirs Trust | Charleston Energy Inc. | 09/17/17 | DI17-62223 | | Hardeman | Texas |
| Glover Steiner Johns IV Trust | Dry Fork Production Co., LLC | 7/6/2004 | 1255 | 43 | Palo Pinto | Texas |
| Inez Caudill, et al | Dry Fork Production Co., LLC | 6/5/2003 | 1261 | 344 | Palo Pinto | Texas |

Page 4 of 4

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(e)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

### ACTIONS AND PROCEEDINGS

- Billy J. Perryman, Inc., Plaintiffs, v. Eagle Hydrocarbons, Inc., Salt Flat Acquisition LLC, and North South Oil LLC, Defendants, Case No. 18-O-547, 421st Judicial District Court, Caldwell County, Texas

99862756.14

US 7024321

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(f)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

**RIGHTS OF FIRST REFUSAL**

None.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(g)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

**<u>BROKERS' FEES</u>**

None.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(h)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

## SUSPENSE FUNDS

None.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(i)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

### COMPLIANCE WITH LAWS

None.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(j)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

## <u>MATERIAL CONTRACTS</u>

- Master Compression Services Agreement made by and among Axip Energy Services, LP and Eagle Hydrocarbons Inc. and its affiliates and subsidiaries, dated effective as of February 28, 2018.

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(l)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

## <u>CREDIT SUPPORT</u>

- $50,000 Operator Bond with the Railroad Commission of Texas

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(m)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

**WELL MATTERS**

See attached.

**Plugging and Abandonment Disclosures:**
None.

**Wells Operated by Vendor and Activity Status:**

| Well Name | API | Status |
|---|---|---|
| Angelo 4-2H | 42-197-31676 | active |
| DURHAM FARMS UNIT 1 | 42-197-31547 | active |
| GERALD UNIT #1 | 42-197-31185 | inactive |
| GILLIAM C J #1 SWD | 42-197-30048 | inactive |
| GILLIAM C J #3 | 42-197-30278 | inactive |
| GILLIAM CJ #5ST | 42-197-31710 | active |
| HOLMES #7 | 42-197-31276 | active |
| HOLMES 284 #3 SWD | 42-197-31277 | active |
| HOLMES 284 #4ST | 42-197-31280 | inactive |
| HOLMES 284 #5 | 42-197-31281 | inactive |
| HOLMES 284-6 | 42-197-31286 | inactive |
| HOLMES-NEAL 284 UNIT 1 | 42-197-31265 | inactive |
| HURST #2H | 42-197-31313 | active |
| JMOJ #3 (F.K.A. HURST #3) | 42-197-31479 | active |
| HURST #4 | 42-197-30453 | active |
| HURST 10 #1 | 42-197-31328 | active |
| JMOJ #12H (F.K.A. HURST 12H) | 42-197-31565 | active |
| HURST 6H | 42-197-00133 | active |
| HURST B 9H | 42-197-31541 | inactive |
| HURST C 5H | 42-197-31489 | active |
| HURST D 7H | 42-197-31521 | active |
| JAMES LONG 1 | 42-197-30646 | inactive |
| Johnson 1-1H | 42-197-31662 | active |
| JUDD 1A | 42-197-30765 | active |
| JUDD 399 #1 | 42-197-31366 | inactive |
| LONG 398 3X | 42-197-31316 | active |
| LONG 398 A4 | 42-197-31364 | inactive |
| LONG 6 | 42-197-31581 | inactive |
| LONG 7 | 42-197-31580 | inactive |
| LONG 8 | 42-197-31585 | active |
| LOVE 20 ST1 3 | 42-197-30567 | inactive |
| LOVE 20 4 SWD | 42-197-30589 | active |
| LOVE UNIT #1 | 42-197-31433 | active |
| MCMICHAEL 59 #1 | 42-197-31393 | inactive |
| MCNABB #4H | 42-197-31470 | inactive |
| MEHARG UNIT NO. 1 | 42-197-31444 | active |
| MILLIGAN 1 | 42-197-31744 | inactive |
| NEAL 2-1 | 42-197-31318 | active |
| ROBINSON 1H | 42-197-31739 | active |
| ROBINSON 2H | 42-197-31755 | active |
| SORENSON 70 #1 | 42-197-31322 | active |
| Spanky 2-2H | 42-197-31678 | active |
| STEPP 110 #1 | 42-197-31325 | active |
| STEPP JUDD 1H | 42-197-31745 | inactive |
| STEPP-HURST 110 UNIT #1 | 42-197-31307 | active |
| STEPP-HURST 110 UNIT #2 | 42-197-31319 | active |
| STEPP-HURST 110-1 SW | 42-197-31720 | active |

| Well Name | API | Status |
|---|---|---|
| SUMMERLEE #1 CONGLOMERATE | 42-197-31513 | active |
| SUMMERLEE 6H | 42-197-31576 | inactive |
| SUMMERLEE 8H | 42-197-31588 | active |
| SUMMERLEE A 7H | 42-197-31578 | active |
| SUMMERLEE NO. 1H | 42-197-20035 | inactive |
| SUMMERLEE STEPP UNIT 1H | 42-197-31527 | active |
| SUMMERLEE UNIT 3 | 42-197-31555 | active |
| SUMMERLEE UNIT B-2H | 42-197-31553 | inactive |
| WELLS UNIT #1 | 42-197-31439 | active |
| WELLS UNIT #2 | 42-197-31721 | active |
| WELLS UNIT #3ST | 42-197-31728 | active |
| WELLS-NICHOLS #1 | 42-197-30294 | active |
| WELLS-NICHOLS #4 | 42-197-31711 | active |
| WELLS-NICHOLS #5 | 42-197-31727 | active |
| WEST ESTATE #1 | 42-197-31423 | inactive |
| WEST ESTATE UNIT #2 | 42-197-31452 | active |
| YOUNG #1 | 42-197-31448 | inactive |
| Zip 74-1H | 42-197-31685 | active |
| CATO-HOLMES UNIT 1 | 42-197-30954 | active |
| MCNABB 1 | 42-197-30303 | inactive |
| MCNABB  2 | 42-197-30524 | inactive |
| MCNABB 3 | 42-197-30303 | inactive |
| WORD A 2 | 42-197-31451 | active |
| DEWITT 1-17H | 35-065-20268 | active |
| EDDIE 2-31H | 35-065-20265 | inactive |
| HATCH 2-29H | 35-065-20262 | active |
| EDDIE 1-31H | 35-065-20249 | inactive |
| HATCH 1-29 | 35-065-20245 | inactive |
| CAROL SUE 1-20 | 35-065-20243 | active |
| JUDD 'A' 3 | 42-197-31750 | active |
| JUDD 'A' 2 | 42-197-31743 | active |
| JUDD 'A' 1 | 42-197-31715 | active |
| Coleman 1 | 42-363-35293 | active |
| Coleman 2 | 42-363-35482 | Inactive |
| Dabney 1 | 42-363-35361 | active |
| Dabney 2 | 42-363-35483 | active |
| Deno-Gragg 1 | 42-363-35219 | active |
| Deno-Gragg 2 | 42-363-35385 | active |
| Deno-Gragg 3 | 42-363-35526 | active |
| Francis 1 | 42-363-35295 | active |
| Gragg, P.K 1 | 42-363-35369 | active |

THE FOLLOWING COMPRISES <u>SCHEDULE 4.1(n)</u> ATTACHED TO AND FORMING PART OF A PURCHASE AND SALE AGREEMENT DATED THE 28th DAY OF MAY, 2020 BETWEEN FTI CONSULTING CANADA INC., solely in its capacity as the court-appointed receiver and manager of EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC., and not in its personal or corporate capacity (as so represented, Eagle Hydrocarbons Inc., "Vendor"), and AGUILA ENERGY, LLC, a Delaware limited liability company ("Purchaser").

---

**TAXES**

None.

## **Exhibit B**

**Canadian Sale Order**

US 7041926v.12

| | |
|---|---|
| COURT FILE NUMBER | 1901-16293 |
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| PROCEEDINGS | IN THE MATTER OF THE RECEIVERSHIP OF EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC. |
| APPLICANT | FTI CONSULTING CANADA INC., in its capacity as Court-appointed Receiver of the current and future assets, undertakings and properties of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc. and Eagle Hydrocarbons Inc. |
| DOCUMENT | **SALE APPROVAL AND VESTING ORDER**<br><br>**(Sale by Receiver)** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | Norton Rose Fulbright Canada LLP<br>400 3rd Avenue SW, Suite 3700<br>Calgary, Alberta  T2P 4H2  CANADA<br><br>Howard A. Gorman, Q.C. / Meghan L. Parker<br>howard.gorman@nortonrosefulbright.com<br>meghan.parker@nortonrosefulbright.com<br>Tel: +1 403.267.8222<br>Fax: +1 403.264.5973<br><br>Lawyers for FTI Consulting Canada Inc., in its capacity as Court-appointed Receiver of the current and future assets, undertakings and properties of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc., and Eagle Hydrocarbons Inc.<br>File no.: 1001023920 |

Clerk's stamp

DATE ON WHICH ORDER WAS PRONOUNCED: June 2, 2020
NAME OF JUDGE WHO MADE THIS ORDER: the Honourable Justice Grosse
LOCATION OF HEARING:  Calgary, Alberta

**UPON THE APPLICATION** of FTI Consulting Canada Inc., in its capacity as Court-appointed Receiver (the **Receiver**) of the current and future assets, undertakings and properties of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc., and Eagle Hydrocarbons Inc. (**EHI** and together with Eagle Energy Inc., Eagle Energy Trust, and Eagle Energy Holdings Inc., the **Debtors**) for an order approving the sale transaction (the **Transaction**) contemplated by an agreement of purchase and sale (the **Sale Agreement**) between the Receiver and Aguila Energy, LLC (the **Purchaser**), a copy of which is appended

ame.

to the Supplement to the Receiver's Second Report, filed May 29, 2020 (the **Supplemental Report**), and vesting in the Purchaser (or its nominee) EHI's right, title and interest in and to the assets described in the Sale Agreement (the **Assets**);

**AND UPON HAVING READ** the Receivership Order granted by the Honourable Justice R.A. Neufeld and dated November 19, 2019 (the **Receivership Order**), the Receiver's Second Report, filed May 12, 2020, the Supplemental Report, and the Affidavit of Service, filed;

**AND UPON HEARING** the submissions of counsel for the Receiver and the Purchaser and UPON no other parties seeking to be heard

**AND UPON IT APPEARING** that service has been effected;

**IT IS HEREBY ORDERED AND DECLARED THAT:**

## SERVICE

1.   Service of notice of this application and supporting materials is hereby declared to be good and sufficient, no other person is required to have been served with notice of this application and time for service of this application is abridged to that actually given.

2.   Unless otherwise defined in this Order, all capitalized terms used in this Order shall have the meanings given to them in the Sale Agreement.

## APPROVAL OF TRANSACTION

3.   The Transaction is hereby approved and execution of the Sale Agreement by the Receiver is hereby authorized and approved, with such minor amendments as the Receiver may deem necessary.  The Receiver is hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for completion of the Transaction and conveyance of the Assets to the Purchaser (or its nominee).

4.   The Debtors and the Receiver are each authorized and directed to take all such steps, perform, consummate, implement, execute and deliver all such conveyance documents, bills of sale, assignments, conveyances, transfers, deeds, representations, indicia of title, tax elections, documents and instruments of whatsoever nature or kind as may be reasonably necessary or desirable to consummate the Transaction in accordance with the terms of the Sale Agreement.

5.   The Transaction and Sale Agreement are commercially reasonable and in the best interest of the Debtors and their Stakeholders.

EX B-000002

**VESTING OF PROPERTY**

6. Upon delivery of a Receiver's certificate to the Purchaser (or its nominee) substantially in the form set out in **Schedule "A"** hereto (the **Receiver's Certificate**), all of the EHI's right, title and interest in and to the Assets shall vest absolutely in the name of the Purchaser (or its nominee), free and clear of and from any and all caveats, security interests, hypothecs, pledges, mortgages, liens, trusts or deemed trusts, reservations of ownership, royalties, options, rights of pre-emption, privileges, interests, assignments, actions, judgments, executions, levies, taxes, writs of enforcement, charges, or other claims, whether contractual, statutory, financial, monetary or otherwise, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, **Claims**) including, without limiting the generality of the foregoing:

   (a) any encumbrances or charges created by the Receivership Order;

   (b) any charges, liens, security interests or claims, whether evidenced by registrations pursuant to the Uniform Commercial Code (United States) or any other personal, mineral or real property registry system, or otherwise;

   (c) any liens or claims of lien under the *Builders' Lien Act* (Alberta); and

   (d) those Claims listed in **Schedule "B"** hereto

(all of which are collectively referred to as the **Encumbrances**), all Claims, including Encumbrances other than the encumbrances, caveats, interests, easements, and restrictive covenants listed in **Schedule "C"** (the **Permitted Encumbrances**), affecting or relating to the Assets are hereby expunged, discharged and terminated as against the Assets.

7. Upon delivery of the Receiver's Certificate, and upon filing a certified copy of this Order, together with any applicable registration fees, all governmental authorities including those referred to below in this paragraph (collectively, **Governmental Authorities**) are hereby authorized, requested and directed to accept delivery of such Receiver's Certificate and certified copy of this Order as though they were originals and to register such transfers, interest authorizations, discharges and discharge statements of conveyance as may be required to convey to the Purchaser or its nominee clear title to the Assets subject only to Permitted Encumbrances.

8. The aid and assistance of the officials of the public registries of any Province or Territory in Canada or in the United States is requested to give effect to this Order by transferring each of the registrations identified in the Sale Agreement to the name of the Purchaser (or its nominee), irrespective of whether the registration stands in the name of the EHI or some other third party.

ame.

EX B-000003

9.      The Receiver is hereby authorized and directed to take all necessary steps and execute any and all documents to effect any and all discharges, and the registrars and all other persons in control or otherwise supervising such offices of registration or recording shall forthwith remove and discharge all such registrations.

10.     For the purposes of determining the nature and priority of Claims, net proceeds from sale of the Assets (to be held in an interest bearing trust account by the Receiver) shall stand in the place and stead of the Assets from and after delivery of the Receiver's Certificate and all Claims including Encumbrances (but excluding Permitted Encumbrances) shall not attach to, encumber or otherwise form a charge, security interest, lien, or other Claim against the Assets and may be asserted against the net proceeds from sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale. Unless otherwise ordered (whether before or after the date of this Order), the Receiver shall not make any distributions to creditors of net proceeds from sale of the Assets without further order of this Court, provided however the Receiver may apply any part of such net proceeds to repay any amounts the Receiver has borrowed for which it has issued a Receiver's Certificate pursuant to the Receivership Order.

11.     Except as expressly provided for in the Sale Agreement, the Purchaser (or its nominee) shall, by virtue of the completion of the Transaction, have no liability of any kind whatsoever in respect of any Claims against the Debtors.

12.     Upon completion of the Transaction, the Debtors and all persons who claim by, through or under the Debtors in respect of the Assets, and all persons or entities having any Claims of any kind whatsoever in respect of the Assets, save and except for persons entitled to the benefit of the Permitted Encumbrances, shall stand absolutely and forever barred, estopped and foreclosed from and permanently enjoined from pursuing, asserting or claiming any and all right, title, estate, interest, royalty, rental, equity of redemption or other Claim whatsoever in respect of or to the Assets, and to the extent that any such persons or entities remain in the possession or control of any of the Assets, or any artifacts, certificates, instruments or other indicia of title representing or evidencing any right, title, estate, or interest in and to the Assets, they shall forthwith deliver possession thereof to the Purchaser (or its nominee).

13.     The Purchaser (or its nominee) shall be entitled to enter into and upon, hold and enjoy the Assets for its own use and benefit without any interference of or by the Debtors, or any person claiming by, through or against the Debtors.

ame.

EX B-000004

14.   Immediately upon closing of the Transaction, holders of Permitted Encumbrances shall have no claim whatsoever against the Receiver.

15.   The Receiver is directed to file with the Court a copy of the Receiver's Certificate forthwith after delivery thereof to the Purchaser (or its nominee).

16.   The Purchaser (or its nominee) shall be authorized (but not obligated), as of the closing of the Transaction and in accordance with the Sale Agreement, to be substituted for EHI, or to become the successor operator to EHI, in relation to operations under any Governmental Authority, licence, permit, registration and authorization or approval of or given to EHI with respect to the Assets, and the Purchaser (or its nominee) shall be authorized (but not obligated) to take whatever steps necessary to effect the same.

17.   Notwithstanding paragraph 16 above, to the extent that the said paragraph 16 and any other paragraph of this Order vests or purports to vest any unexpired leases, licenses, permits or mineral interests granted to EHI by the United States Government, including any leases, licenses, permits or mineral interests granted to EHI by any American Indian interests for which the United States Government acts as a trustee, this Honourable Court's approval of the vesting of such rights in the Purchaser is subject to the recognition and further determination of the "Bankruptcy Court" as that term is defined in the Sale Agreement, pursuant to the United States Bankruptcy Code, of this Order. This Order does not release any party from any environmental or plugging and abandonment obligations to the United States.

18.   Pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act* (Canada) and section 20(e) of the Alberta *Personal Information Protection Act*, the Receiver is authorized and permitted to disclose and transfer to the Purchaser (or its nominee) (i) any personal information of customers of EHI and users of EHI's Property, including all persons or entities who had or continue to have any interface with the Assets in the course of EHI's businesses; and (ii) all human resources and payroll information in EHI's records pertaining to EHI's past and current employees. The Purchaser (or its nominee) shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use (of such information) to which EHI was entitled.

**MISCELLANEOUS MATTERS**

19.   Notwithstanding:

(a)    the pendency of these proceedings and any declaration of insolvency made herein;

(b)    the pendency of any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c.B-3, as amended (the **BIA**) or United

ame.

EX B-000005

States Bankruptcy Code, in respect of the Debtors, and any bankruptcy order issued pursuant to any such applications;

(c)     any assignment in bankruptcy made in respect of the Debtors; and

(d)     the provisions of any federal or provincial statute:

the vesting of the Assets in the Purchaser (or its nominee) pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Debtors and shall not be void or voidable by creditors of the Debtors, nor shall it constitute nor be deemed to be a transfer at undervalue, settlement, fraudulent preference, assignment, fraudulent conveyance, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

20.     The Receiver, the Purchaser (or its nominee) and any other interested party, shall be at liberty to apply for further advice, assistance and direction as may be necessary in order to give full force and effect to the terms of this Order and to assist and aid the parties in closing the Transaction.

21.     This Honourable Court hereby requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, in the United States or in any foreign jurisdiction, to act in aid of and to be complimentary to this Court in carrying out the terms of this Order, to give effect to this Order and to assist the Receiver and its agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such order and to provide such assistance to the Receiver, as an officer of the Court, as may be necessary or desirable to give effect to this Order or to assist the Receiver and its agents in carrying out the terms of this Order.

22.     Service of this Order shall be deemed good and sufficient by:

(a)     Serving the same on:

(i)      the persons listed on the service list created in these proceedings;

(ii)     any other person served with notice of the application for this Order;

(iii)    any other parties attending or represented at the application for this Order;

(iv)     the Purchaser or the Purchaser's solicitors; and

(b)     Posting a copy of this Order on the Receiver's website at:
        http://cfcanada.fticonsulting.com/EagleEnergy/

and service on any other person is hereby dispensed with.

ame.

EX B-000006

7

23.     Service of this Order may be effected by facsimile, electronic mail, personal delivery or courier. Service is deemed to be effected the next business day following transmission or delivery of this Order.


_____
Justice of the Court of Queen's Bench of Alberta

EX B-000007

**Schedule "A": Form of Receiver's Certificate**

| COURT FILE NUMBER | 1901-16293 | Clerk's stamp |
|---|---|---|
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA | |
| JUDICIAL CENTRE | CALGARY | |
| | IN THE MATTER OF THE RECEIVERSHIP OF EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., and EAGLE HYDROCARBONS INC. | |
| APPLICANT | FTI CONSULTING CANADA INC., in its capacity as Court-appointed Receiver of the current and future assets, undertakings and properties of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc. and Eagle Hydrocarbons Inc. | |
| DOCUMENT | **RECEIVER'S CERTIFICATE** | |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | Norton Rose Fulbright Canada LLP 400 3rd Avenue SW, Suite 3700 Calgary, Alberta  T2P 4H2  CANADA  Howard A. Gorman, Q.C. / Meghan L. Parker howard.gorman@nortonrosefulbright.com meghan.parker@nortonrosefulbright.com Tel: +1 403.267.8222 Fax: +1 403.264.5973  Lawyers for FTI Consulting Canada Inc., in its capacity as Court-appointed Receiver of the current and future assets, undertakings and properties of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc., and Eagle Hydrocarbons Inc. File no.: 1001023920 | |

**RECITALS**

A.     Pursuant to an Order of the Honourable Justice Neufeld of the Court of Queen's Bench of Alberta, Judicial District of Calgary (the **Court**) dated November 19, 2019, FTI Consulting Canada Inc. was appointed as the receiver and manager (the **Receiver**) of certain undertakings, property, and assets of Eagle Energy Inc., Eagle Energy Trust, Eagle Energy Holdings Inc., and Eagle Hydrocarbons Inc. (the **Debtors**).

B.     Pursuant to an Order of the Court dated **[Date]**, the Court approved the agreement of purchase and sale and certain assets made as of **[Date of Agreement]** (the **Sale Agreement**) between the Receiver and Aguila Energy, LLC (the **Purchaser**) and provided for the vesting in the Purchaser of the Debtors' right, title and interest in and to the Purchased Assets, which vesting is to be effective

**ame.**

with respect to the Purchased Assets upon the delivery by the Receiver to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Purchased Assets; (ii) that the conditions to Closing as set out in the Sale Agreement have been satisfied or waived by the Receiver and the Purchaser; and (iii) the Transaction has been completed to the satisfaction of the Receiver.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

**THE RECEIVER CERTIFIES** the following:

1       The Purchaser (or its nominee) has paid and the Receiver has received the Purchase Price for the Purchased Assets payable on the Closing Date pursuant to the Sale Agreement;

2       The conditions to Closing as set out in the Sale Agreement have been satisfied or waived by the Receiver and the Purchaser (or its nominee); and

3       The Transaction has been completed to the satisfaction of the Receiver.

4       This Certificate was delivered by the Receiver at **[Time]** on **[Date]**.

**FTI CONSULTING CANADA INC.,** in its capacity as receiver of certain of the undertakings, property and assets of **EAGLE ENERGY INC., EAGLE ENERGY TRUST, EAGLE ENERGY HOLDINGS INC., AND EAGLE HYDROCARBONS INC.,** and not in its personal capacity

Per:    _____

       Name:

       Title:

ame.

EX B-000009

## Schedule "B": Encumbrances

**General**

Any and all obligations, liabilities and Claims of any kind or character, known or unknown, to the extent that they are attributable to, arise out of, are based upon or are otherwise related to the ownership or operation of (a) the Purchased Assets prior to the closing of the Transaction or (b) the Excluded Assets and the Excluded Contracts (each as defined in the Sale Agreement)[1] prior to, on or after the closing of the Transaction and any and all other obligations and liabilities of Debtors, including those obligations and liabilities as are set forth in the Sale Agreement in the definition of "Retained Liabilities,"[2] other than the Assumed Liabilities (as defined in the Sale Agreement).

**Specific Alberta Encumbrances**

| | |
|---|---|
| **Registration Number:** | **17030922602** |
| Registration Type: | SECURITY AGREEMENT |
| Registration Date: | 2017-Mar-09 |
| Expiry Date: | 2027-Mar-09 23:59:59 |
| Debtor(s): | EAGLE HYDROCARBONS INC. |
| Secured Party / Parties: | WHITE OAK GLOBAL ADVISORS, LLC, AS ADMINISTRATIVE AGENT |

Collateral: General:
1. Each account of the Debtor maintained with The Bank of Nova Scotia in Canada (such accounts, including in each case, any replacement account thereof, collectively, the "Accounts"), all monies, investment property or other property now or at any time or from time to time hereafter deposited therein, credited thereto, or payable thereon, all proceeds thereof, and all investments made from time to time therewith from any of the Accounts, including all renewals thereof, accretions thereto, substitutions thereof, and all interest, income, receivables and revenue arising therefrom or by virtue thereof.
2. Proceeds: goods, investment property, documents of title, chattel paper, instruments, money and intangibles.

| | |
|---|---|
| **Registration Number:** | **17080410109** |
| Registration Type: | SECURITY AGREEMENT |
| Registration Date: | 2017-Aug-04 |
| Expiry Date: | 2022-Aug-04 23:59:59 |
| Debtor(s): | EAGLE HYDROCARBONS INC. |
| Secured Party / Parties: | THE BANK OF NOVA SCOTIA |

Collateral: General:
All of the right, title and interest of the Debtor in, to and under the following property, whether now owned or existing or hereafter from time to time acquired or coming into existence (collectively, the "Collateral"): (a) an account of the Debtor held with the Secured Party (the "Account"), all funds held therein or credited thereto, all rights to renew or withdraw the same, and all certificates and instruments, if any, from time to time representing or evidencing the Account; (b) any notes, certificates of deposit, guaranteed investment certificates, instruments, financial assets or investment property evidencing or arising out of investment of any funds held in or credited to the Account; (c) any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Collateral; and (d) all proceeds of any and all of the Collateral.

---

[1] The Excluded Assets and Excluded Contracts include without limitation (a) all employment contracts with any of the Debtors and (b) that certain Lease dated as of September 22, 2017 by and between Energy Tower IV Investments LTD and EHI.

[2] Retained Liabilities include, without limitation, all Claims and causes of action against any of the Debtors in that certain lawsuit styled: *Billy J. Perryman, Inc., Plaintiffs, v. Eagle Hydrocarbons, Inc., Salt Flat Acquisition LLC, and North South Oil LLC, Defendants*, Case No. 18-O-547, 421st Judicial District Court, Caldwell County, Texas.

ame.

**Schedule "C": Permitted Encumbrances**

At the closing of the Transaction, Purchaser or its nominee will be conveyed clear title to the Purchased Assets subject to Permitted Encumbrances as are set forth in the Sale Agreement in the definition of "Permitted Encumbrances."

Purchaser will also assume certain liabilities relating to the Purchased Assets, including (a) all liabilities and obligations (including all liabilities and obligations of EHI under the Assigned Contracts (as defined in the Sale Agreement)) arising from the possession, ownership, use and/or operation of the Purchased Assets, to the extent such liabilities and obligations arise from and after the closing of the Transaction, (b) all Abandonment and Reclamation Obligations (as defined in the Sale Agreement) and all Environmental Liabilities (as defined in the Sale Agreement) and (c) such other liabilities set forth in the Sale Agreement in the definition of "Assumed Liabilities."

ame.